Timothy Bell C34254
P.O. Box 20/L-329
Tracy, CA 95378

STATE PRISON
GENERATED MAIL



RECEIVED
MAR - 5 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA. 94102

**E-filing**

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ___Bell_____    ___Timothy_____    **FILED**.
　　(Last)　　　　　　　　　　　　　　　　(First)　　　　　　　　　(Initial)

Prisoner Number ____C-34257_____    MAR 1 0 2008

Institutional Address _____    **RICHARD W. WIEKING**
　　　　　　　　　　　　　　　　　　　　　**CLERK, U.S. DISTRICT COURT**
　　　　　　　　　　　　　　　　　　　　　**NORTHERN DISTRICT OF CALIFORNIA**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Timothy James Bell　　　　　　CV 08 1363

Full Name of Petitioner

　　　　　　　　　　　　　　　Case No.(To be provided by the
　　　　　　　　　　　　　　　clerk of court)

　　　vs.　　　　　　　　　　　　　TEH (PR)

Steve Moore, Warden (A)_____    PETITION FOR A WRIT OF HABEAS CORPUS
　　Name of Respondent
　　(Warden or jailor)

Read Comments Carefully Before Filling In

When and Where to File

　　You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

　　If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

1

petition will likely be transferred to the district court for the district that includes the institution where you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

<u>San Francisco County Superior Court</u>    <u>San Francisco, CA</u>
       Court                                              Location

(b)   Case number, if known  <u>#104748</u>
(c)   Date and terms of sentence  <u>8/11/1981   26 years to Life</u>
(d)   Are you now in custody serving this term?  (Custody means being in jail, on parole or probation, etc.) (Yes)   No

Where? <u>Deuel Vocational Institution, P.O. Box 400, Tracy, CA  95378</u>
          (Name of Institution)                          (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>First Degree Murder w/use of a knife  PC187/12022(b)</u>

_____

_____

3.    Did you have any of the following?

Arraignment: Yes <u>X</u> No __  Preliminary Hearing: Yes <u>X</u> No __ Motion to Suppress: Yes <u>X</u> No __

3

4.    How did you plead?

Guilty _____    Not Guilty __X____    Nolo Contendere _____

Any other plea (specify) ___N/A___

5.    If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes _X_ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment  Yes _X_        No __
(b)    Preliminary hearing          Yes _X_    No __
(c)    Time of plea  Yes _X_        No __
(d)    Trial  Yes _X_    No __
(e)    Sentencing    Yes _X_       No __
(f)    Appeal        Yes _X_    No
(g)    Other post-conviction proceeding    Yes _X_        No __

8.    Did you appeal your conviction?   Yes _X_ No __

(a)    If you did, to what court(s) did you appeal?

| | | | | |
|---|---|---|---|---|
| Court of Appeal | Yes _X_ | No __ | Unknown | Denied |
| | | | (Year) | (Result) |
| Supreme Court of California | Yes _X_ | No __ | Unknown | Denied |
| | | | (Year) | (Result) |

USDC N.D. CAL Case #C-90-0272-TEH Unknown
Any other court    Yes _X_    No __

| | | |
|---|---|---|
| | (Year) | (Result) |
| 9th Circuit Court of Appeals | 1989 (Approx) | Denied |

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                    Yes __ No _X_

(c)    Was there an opinion?        Yes _X_ No __

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                Yes __    No _X_

4

If you did, give the name of the court and the result:

N/A

_____

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes          No  X

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court __San Francisco County Superior Court__

Type of Proceeding __Habeas Corpus__

Grounds raised (Be brief but specific):

a.    __Same as this Petition__

b.    _____

c.    _____

d.    _____

Result __Denied__          Date of Result __11/16/2007__

II.    Name of Court __First District Court of Appeal__

Type of Proceeding __Habeas Corpus__

Grounds raised (Be brief but specific):

a.    __Same as this Petition__

b.    _____

c.    _____

d.    _____

Result _____          Date of Result __12/6/2007__

III.    Name of Court __California Supreme Court__

6

Type of Proceeding __Petition for Review__

Grounds raised (Be brief but specific):

a.    __Same as this Petition__

b.    _____

c.    _____

d.    _____

Result __Denied__                              Date of Result __2/13/03__

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?       Yes __ No ✔

__N/A__

(Name and location of court)


B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: __See Attached Ground One, Pages 1-8__

7

Supporting Facts: See Attached Supporting Facts Ground One

Pages 1-8

Claim Two: See Attached Ground Two

Pages 9-17

Supporting Facts: See Attached Supporting Facts Ground Two

See Attached Prayer for Relief Apge 18

Claim Three: N/A

Supporting Facts: N/A

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

N/A

8

Ground 1

**THE BOARD OF PAROLE HEARINGS (BPH) VIOLATED PETITIONERS STATE AND FEDERAL RIGHT TO DUE PROCESS. THE PAROLE REGULATIONS THE BPH USED TO FIND PETITIONER UNSUITABLE FOR PAROLE, AS INTERPRETED BY THE CALIFORNIA SUPREME COURT, IS UNCONSTITUTIONALLY VAGUE IN ITS OVERLY BROAD SCOPE.**

### INTRODUCTION

On February 23, 2007 the BPH held Petitioners 5th parole consideration hearing pursuant to California penal code 3041, 3042 and the rules and regulations governing for parole hearings (see exhibit A).

Petitioner offered evidence that he would not poses an unreasonable risk to public safety if paroled.

This evidence was current and included psychological reports, prisoner evaluation reports, Postconviction Progress Report (See exhibit B, C, D).

In spite of twenty six years of incarceration, psychological evaluations stating that Petitioner is a low risk to society, and an abundance of evidence that demonstrated Petitioner was suitable for parole, the BPH found petitioner remained an unreasonable risk to public safety.

Supporting cases, rules or other authority are cited in petitioners attached Point, Authorities and Argument, and are incorporated by this reference.

1

**Point, Authorities and Argument**

The California Code of Regulations 2402, subd. (c)(1)(D)
is specifically what the BPH used to find petitioner
unsuitable for parole.

Subdivision (c) specifies six nonexclusive circumstances,
which is set forth tending to show unsuitability.
Specifically, a commitment offense tends to show
unsuitability when "the prisoner committed the offense in
"an especially heinous, atrocious or cruel manner". (Id
at 2402, subd. (c)(1).) For example, two of the factors
to be considered in the determination whether the offense
was committed in an "especially heinous, atrocious, or
cruel" manner include, "multiple victims were attacked,
injured or killed in the same or separate incidents,"
also that, "The offense was carried out in a manner which
demonstrates an exceptionally callous disregard for human
suffering." (Id at (c)(1)(A) & (D).)

In other words, these specific factors are not listed in
a vacuum. They are to be considered in relation to the
question whether the crime was committed in "an
especially heinous, atrocious or cruel manner," a
standard that begs the question: "Compared to what?"
The term "especially heinous, atrocious, and cruel", on
it's face, is found to be unconstitutionally vague by the
U.S. Supreme Court in Maynard v. Cartwright, 486 U.S.
356, 100 L. Ed. 2d 372, 56USLW 4501.

2

> "First, the language of the Oklahoma
> aggravating circumstance at issue--
> "especially heinous, atrocious, or
> cruel" -gave no more guidance than the
> "outrageously or wantonly vile, horrible
> or inhuman" language that the jury
> returned in Godfrey. Maynard v.
> Cartwright, 486 U.S.356,363-364

Sub-factor (D) of 2402 (c)(1) is meant to define
Subdivision (c). However, this sub-factor the BPH used to
deny petitioner's parole is vague and devoid of any
objective factors itself.

To illustrate, Sub-factor (A) states: "Multiple victims
were attacked, injured or killed in the same or separate
incidents". No reasonable person could misinterpret this
clear and concise factor. The clarity of Sub-factor (A)
compared to Sub-factor (D) Illuminates the vagueness in
the regulation. Sub-factor (D) states: "The offense was
carried out in a manner which demonstrates an
exceptionally callous disregard for human suffering."
Petitioner contends that this sub-factor does not
adequately protect him against arbitrary and capricious
denials of parole. The U.S. Supreme Court has observed:

> "Vague terms do not suddenly become
> clear when they are defined by reference
> to other vague terms." Walton v.
> Arizona, 497 U.S. at 693-694 n.16

3

The California Supreme Court has interpreted Cal. Code
Reg's 2402 (c) (1) (D), by reasoning that "especially
heinous, atrocious, and cruel" and "The offense was
carried out in a manner which demonstrates an
exceptionally callous disregard for human suffering"
means:

> "that the violence or viciousness of the
> inmate's crime must be more than
> minimally necessary to convict him of
> the offense for which he is confined."
> In re Dannenberg, 34 Cal. 4th 1061
> (2005).

Petitioner alleges that the California Supreme Courts
interpretation is also unconstitutionally vague in its
overly broad scope.

The dissenting opinion in Dannenberg stated:

> "Second degree murder is an abstraction
> that consists of certain legal elements.
> These facts are never necessary or
> minimally necessary to convict" In re
> Dannenberg 34 Cal. 4th 1061 (2005).

The reasoning of the dissent seems to be the very nature
of the void-for-vagueness doctrine.

> "As generally stated, the void-for-
> vagueness doctrine requires that a penal
> statute define the criminal offense with
> sufficient definiteness that ordinary

4

> people can understand what conduct is
> prohibited and in a manner **that does not**
> **encourage arbitrary and discriminatory**
> **enforcement**." Kolender v. Lawson, 461
> U.S. 352,357, 103 S. Ct. 1855,1858, 75
> L. Ed. 2d 903 (1983) (emphasis added).

In Maynard v. Cartwright the term "especially heinous,
atrocious, and cruel" was found to be unconstitutionally
vague. However, the Eighth Circuit found that the
Nebraska Supreme Court's construction of the term was
constitutional.

The Nebraska Supreme Court reasoned the term "especially
heinous, atrocious, and cruel" means:

> "Directed to the conscienceless or
> pitiless crime which is unnecessarily
> torturous to the victim." Harper v.
> Grammer, 895 F.2d. 473,478 (8th
> Cir.1990)

Further evidence that the regulation, and the California
Supreme Court's interpretation, endorses arbitrary and
discriminatory enforcement can be found in the historical
records of the few prisoners that have been found
suitable for parole. Petitioner maintains that virtually
all of the very few prisoners that have been found
suitable for parole have multiple denials in the past
where the BPH had used this very regulation to find them

5

unsuitable. However, the BPH's use of this factor in the
regulations mysteriously was no longer an issue when the
prisoner was found suitable. The reason for this
phenomenon is that the only hope petitioner has to be
found suitable, is for a panel in the future to
arbitrarily find that the circumstances of his offense is
not that serious. A presentation of this evidence can
only be obtained through an order from the court in an
evidentiary hearing.

California Penal Code 3041(A) orders the BPH to craft
criteria for paroling similar offenders after similar
periods of incarceration. The BPH, however, crafted
administrative regulations that contain such vague
criteria that the BPH can, in practice, ignore
proportionality in sentencing by declaring virtually all
prisoners' offenses especially heinous and exceptionally
callous. The evidence of this can be found in the
percentage of life prisoners that are paroled compared to
the number of hearings the BPH holds.

In 1999, for example, no life prisoners were paroled out
of about 2,000 parole hearings (Legis. Analyst's analysis
of 2000-2001 Budget Bill, p. D-59)
(http://www.bpt.ca.gov/caseload_stats.asp[as of Jan. 24,
2005]).

6

The key words of the California Code of Regulations 2402
(c) & (D) are "especially" and "exceptionally". The
American Heritage Dictionary defines especially in this
manner:

> "Standing above or apart from others;
> exceptional".

The BPH uses this statute to encompass and deny parole to
virtually all prisoners convicted of murder. The
California Supreme Court allows them to do this by way of
their overly broad interpretation of the regulations.
The dissenting opinion in Dannenberg stated:

> "It is perhaps that the majority
> endorses the Board's way of conducting
> parole release because it seeks to avoid
> the undesirable result of the mass
> release of convicted murderers. I do not
> believe such mass release or anything
> like it will occur" In re Dannenberg,
> 34 Cal. 4th (2005).

State courts may not interpret their law in such a manner
that the interpretation is nothing but an evasion of the
federal due process requirements.

> "We are bound by the state's
> construction of state laws except when
> it appears that its interpretation is an

7

> obvious subterfuge to evade the
> consideration of a federal issue"
> Peltier v. Wright, 15 F.3d 860,862 (9th
> Cir. 1994)

The California Supreme Court's construction of the
regulations also eviscerates any meaningful review by a
state or federal habeas court. If the BPH finds that the
circumstances of the offense fits this regulation then
they simply recite the facts of the offence, how can a
state or federal court overturn their finding considering
that no one, even the minority of justices on the
California Supreme Court, seems to understand what "more
than minimally necessary to convict" means?

8

GROUND 2

**THE BOARD OF PRISON HEARINGS (BPH) HAS VIOLATED
PETITIONERS STATE AND FEDERAL RIGHT TO DUE PROCESS IN THAT
THE BPH FINDINGS THAT HE POSSES AN UNREASONABLE RISK TO
PUBLIC SAFETY IS NOT SUPPORTED BY ANY EVIDENCE.**

## Point, Authorities, and Argument

Even giving deference to the California Supreme
Court's decision in In re Dannenberg, Penal Code 3041
creates a federally-protected liberty interest in parole.

The 9th Circuit has repeatedly considered whether
California inmates have a federally-protected liberty
interest under Penal Code 3041 and has repeatedly found
that they do. Sass v. California Board of Prison Terms (9th
Cir. 2006) 461 F.3d 1123, 1127-28; Biggs v. Terhune, 334
F.3d 910,914 (9th Cir. 2003).

U.S. Supreme Court precedent clearly indicates that
post-conviction factors merit primary consideration when
determining parole suitability: "The behavior record of an
inmate during confinement is critical in the sense that it
reflects the degree to which the inmate is prepared to
adjust to parole release." Greenholtz v. Inmates of
Nebraska Penal Inmates and Correctional Complex, 442 US 1,
at 12. (emphasis added) Additionally:

> The Board communicates the reason for its denial
> **as a guide to the inmates for his future
> behavior**. See Franklin v. Shields, 569 F.2d at

9

800 (en banc). To require the parole authority to
provide a summary of the evidence would tend to
convert the process into an adversary proceeding
and to equate the Board's parole-release
determination with a **guilt determination**.

Greenholtz at 16.

If denial of parole indefinitely based on the offense
factors or other unchanging factors, such as social or
criminal history, satisfies the "some evidence" test under
California law and thereby implicates no federal or state
due process violation, the recognized liberty interest
under Penal Code 3041 is meaningless. Nothing more than a
"guilt determination" based on the offense would be
required to satisfy federal due process standards. This
was essentially the conclusion of the BPH. Prior
California Supreme Court cases, however suggest greater
due process protections than merely a guilt determination
by the BPH.

The California Supreme Court held more than thirty years
ago that parole applicants are entitled to due process of
law (In re Minnis, 7 Cal.3d 639, 645; 102 Cal Rptr. 749
(1972) and are entitled to the following due process
rights: (1) individualized consideration, (2) a written
statement of reasons for denial, (3) *freedom from an
arbitrary parole decision*, (4) the right to secure
information necessary to prepare for interviews with the

10

board, and (5) something *more than mere "pro forma"
consideration.* In re Strum, (1974) 11 Cal.3d 258, 267; 113
Cal. Rptr. 361 at 268-73; In re Minnis, 7 Cal. 3d 639,
645; 102 Cal. Rptr. 749 (1972) at 646.

Additionally, in 1979 the U.S. Supreme Court
discussed the goal of the parole process in relation to
due process requirements:

> It is important that we not over look the
> ultimate purpose of parole which is a component
> of the long-range *objective of rehabilitation…*
> The objective of rehabilitating convicted persons
> to be useful, law abiding members of society can
> remain a goal no matter how disappointing the
> progress.
>
> *But it will not contribute to these desirable
> objectives to invite or encourage a continuing
> state of adversary relations between society and
> the inmate.*

Greenholtz at 13-14 (emphasis added).

The BPH denial of parole failed to consider whether the
objective of rehabilitation had been reached in
Petitioner's case and bases their decision on a "guilt
determination". A due process threshold this low permits
the BPH to deny parole based on unchanging factors,
insulating the BPH's repeated denials from review under a
cloak of unreviewable subjectivity. Thus, if citing the

11

facts of the offense is sufficient to immunize the BPH's
decision from state or federal review, Petitioner has no
protection against the BPH's arbitrary refusal to grant
parole and, consequently, a liberty interest in parole
with no substance.

Petitioner believes the ultimate question for this
court is: Does the "some evidence standard articulated by
the Dannenburg court satisfy federal due process
standards? Dannenberg, 34 Cal. 4th 1061
Greenholtz, supra, articulated a fundamental aspect to the
meaning of due process:

> The function of legal process, as that concept is
> embodied in the constitution, and in the realm of
> fact finding, is to **minimize the risk of
> erroneous decisions.** Because of the broad
> spectrum of concerns to which the term must
> apply, flexibility is necessary to gear the
> process to the particular need; the quantum and
> quality of the process due in a particular
> situation depends upon the need to serve the
> purpose of minimizing the risk of error.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976)
Greenholtz at 13 (emphasis added).

Thus, the objective of due process is to *minimize the
risk of error*.

12

Giving deference to the California Supreme Court's interpretation of its own statute and Constitution leads to the inescapable conclusion that the "some evidence" test requires more than a "guilt determination" a citation of crime facts or other unchanging factors, to meet due process standards. Whatever basis the BPH or court cites to support parole denial must have a direct connection with the parole applicant's *present* risk to society. Dannenburg, supra at 1088, 1090 (upholding Board's denial of parole based on gravity of crime upon finding of a "continuing" risk to society). Accordingly, due process requires more than a recitation of the crime or criminal history. The inmate's "present risk" must be assessed not merely on the nature of the crime and criminal history, but also in light of the inmate's postconviction record. Stated simply, if the goal of rehabilitation has been reached, parole must be granted, as the inmate no longer poses an unreasonable public safety risk. An evaluation, therefore, of the inmate's present risk to society is paramount. California courts of appeal have come to he same conclusion:

> • In re Elkins, (2006) 144 Cal.App.4th 475
> (Governor's findings unsupported);

13

- <u>In re Lee</u>, (2006) 143 Cal.App.4th 1400
  (Governor's findings unsupported);

- <u>In re Andrade</u>, (2006) 143 Cal.App.4th 807
  (Board unreasonably applied its own rule
  concerning parole plans);

- <u>In re Scott</u>, (2005) 133 Cal.App.4th 573 (Scott
  II)
  (Governor's findings arbitrary);

- <u>In re DeLuna</u>, (2005)126 Cal.App.4th 585
  (some board findings arbitrary);

- <u>In re Scott</u>, (2004) 119 Cal.App.4th 871 (Scott
  I)
  (Board failed to consider all relevant
  circumstances; findings unsupported);

- <u>In re Smith</u>, (2003) 114 Cal.App.4th 343
  (some Governor's findings arbitrary);

- <u>In re Smith</u>, (2003) 109 Cal.App.4th 489
  (Governor's findings arbitrary);

14

• In re Capistran, (2003) 107 Cal.App.4th 1299
(some Governor's findings arbitrary);

(See also, Irons, v. Warden of California State
Prison-Solano, 358 F.Supp.2d 936 (all Board findings
arbitrary), app. Pending, sub nom; Irons v. Carey, (9th
Cir.2005) 408 F.3d 1165, Rosenkrantz v. Marshall, (C.D.
Cal 2006) 444 F. Supp. 2d 1063 [2006 WL 2327085] (all
Board findings arbitrary); Sanchez v. Kane, (C.D. Cal.
2006) 444 F.Supp.2d 1049; Martin v. Marshall, (N.D. Cal.
2006) 431 F.Supp.2d 1038, *order amended* at 448 F.Supp.2d
1143 (all Governor findings arbitrary, bias also found)

In In re Lee, supra, 143 Cal.App.4th at 1408, the
court observed, "Some evidence of the existence of a
particular factor does not necessarily equate to some
evidence the parolee's release unreasonably endangers
public safety." This is because as the court explained,
[t]he test is not whether some evidence supports the
reasons the [Board] cites for denying parole, but whether
some evidence indicates a parolee's release unreasonably
endangers public safety." *Id.* The Lee court concluded:
"Applying that test, we find no evidence that Lee is
likely to commit another crime or that his release would
unreasonably endanger the public". *Id.* The court further
explained, "Simply from the passing of time, Lee's **crimes
almost 20 years ago, have lost much of their usefulness** in
foreseeing the likelihood of future offenses than if he

15

had committed them five or ten years ago." (*Id* at p. 1412 citing, In re Scott, (2005) 133 Cal.App.4yh 573 at p.597].)

If the parole system's goal of rehabilitation is ever to be realized, the "some evidence" test must require more than a "guilt determination" and denial of parole indefinitely based on the offense or other unchanging factors that are two decades old. Federal due process standards prohibit an arbitrary and unreviewable state policy. Accordingly, this court should find that the BPH's decision was contrary to or an unreasonable application of federal law.

The arbitrariness of the "some evidence" test and the BPH decision is further illustrated by the proceedings in this case. Along with the offence, The BPH also simply recited Petitioners criminal history to justify their denial of parole. However, the only expert on record states that Polysubstance Abuse is in sustained remission and gives Petitioner an AXIS V GAF (Global Assessment of Functioning) score of 90 out of a possible 100 (See exhibit B). The Deputy Commissioner also suggests that the Psychologist ignored evidence when he reached a different opinion than herself (See exhibit A p.73). Ultimately, the Psychologist declares: "There is no evidence of psychopathology or mental problems that would preclude routine release planning. Inmate Bell, throughout his

16

period of incarceration, has shown the ability to transform his behavior at a young age from being impulsive and an antisocial youth, to now becoming a productive and integral part of his community and work force". Dr. Mann also observes, "…with his last incident of violent behavior occurring in 1982" (See exhibit B p.5).

**CONCLUSION**

For these reasons set forth above, Petitioner respectfully requests this court reverse the judgment of the BPH, and issue a writ of habeas corpus.

17

## Prayer for Relief

It is for the above reasons that Petitioner claims that the State Court Decision was:

1) contrary to and unreasonable in light of the facts of this case and evidence (the record presented). * Superior Court Decision

2) contrary to and unreasonable in light of clearly established Federal Law; Federal and State Constitutions; State Penal Code; and Administrative Law (California Code of Regulations). All of the above are protected under the Due Process Clause, Liberty Interest: Procedural Due Process; and Due Course of Law.

Petitioner requests complete Habeas Corpus Relief in Release from Custody and all State Supervision (Parole). If this Court determines further review is needed, Petitioner requests Appointment of Counsel, an Order to Show Cause, Evidentiary Hearing, and finally, complete Habeas Corpus Relief.

* Superior Court Decision:

Please note that the Petitioner objects to the Superior Court decision in that a complete review of the record would have revealed that the Court did not Review the Record and the Exhibits. Had the Court Reviewed the Record, it would have been noted in the Transcript (Exhibit-A) the Judge points to a substance Abuse disciplinary (page 108) dated 9/2004, yet failed to find the Contradiction in both the Exhibit-B Stating the disciplinary in 9/2000 (Report dated 9/9/05) and in Exhibit-C Stating the (Exhibit Date 1/2007) the date of disciplinary was 9/2000. Further any prison disciplinary that fails to yield a new criminal charge is suspect and has no predictive value to current dangerousness if the Petitioner was paroled. I am therefore requesting a remand back to the Superior Court for a Formal Show Cause, an Appointment of Counsel, Evidentiary Hearing & Habeas Relief.

(18)

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

Included within Grounds and Supporting Facts

Do you have an attorney for this petition?    Yes ___ No X

If you do, give the name and address of your attorney:

N/A

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on  2- 25 - 08
          Date

Signature of Petitioner

( rev. 5/96)

9

USDC N.D.CA1

# TABLE OF CONTENTS

**Exhibit A**        **Hearing Transcripts**

**Exhibit B**        **Psychological Reports**

**Exhibit C**        **Evaluation Report**

**Exhibit D**        **Post Conviction Report**

**Exhibit E**        **Superior Court Documents**

**Exhibit F**        **Appeals Court Documents**

**Exhibit G**        **CA Supreme Court Documents**

(

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of: ) CDC Number C-34257
)
TIMOTHY BELL )
)
_____)

DEUEL VOCATIONAL INSTITUTION

TRACY, CALIFORNIA

FEBRUARY 23, 2007

12:20 P.M.

PANEL PRESENT:

Edward Martinez, Presiding Commissioner
Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Timothy Bell, Inmate
Mark Norton, Attorney for Inmate
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

**ROBERT DEVON BELL
NORTHERN CALIFORNIA COURT REPORTERS**

ii

## INDEX

PAGE

Proceedings ........................................... 1

Case Factors ....................................... 12

Pre-Commitment Factors ............................ 36

Post-Commitment Factors ........................... 49

Parole Plans ...................................... 76

Closing Statements ................................ 94

Recess ........................................... 103

Decision ......................................... 104

Adjournment ...................................... 114

Transcriber Certification ........................ 115

--oOo--

1

1                    P R O C E E D I N G S

2          **PRESIDING COMMISSIONER MARTINEZ:**  CDC

3     number is C as in Charlie, 34257.  Today's date

4     is February the 23rd, 2007.  The time is 12:20

5     p.m..  We are located at Deuel Vocational

6     Institution, DVI, in Tracy.  The inmate was

7     received on August the 11th of 1981.  The minimum

8     eligible parole date is listed as July the 17th

9     of 1997.  And he was, again, received from San

10    Francisco County.  The controlling offense for

11    which the inmate has been committed is murder

12    first degree with the use of a deadly weapon, and

13    showing an enhancement of 12022 -- Penal Code

14    Section 12022(b), in parentheses, under case

15    number 104748, count one.  And again, Penal Code

16    Section 187.  The inmate did receive a term 26

17    years to life for this offense.  The hearing is

18    being tape recorded.  And for the purposes of

19    voice identification, each of us will state our

20    first and last name, spelling our last name.

21    When it comes to you, Mr. Bell, please provide us

22    with your full name, spell your last name, and

23    provide us with your CDC number as well, all

24    right?  And if you'd like, you can set that on

25    the table so you don't have to keep that on your

26    lap.

27          **INMATE BELL:**  I can probably reach it.

2

1   Reach my stuff here.

2       **PRESIDING COMMISSIONER MARTINEZ:**  So with

3   that, I'm going to start with myself, Mr. Bell,

4   and then I'm going to go to the left.  My name is

5   Ed Martinez, M-A-R-T-I-N-E-Z.  I'm a

6   commissioner.

7       **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen

8   Blonien, B-L-O-N-I-E-N.  I'm a deputy

9   commissioner.

10      **INMATE BELL:**  My name is Timothy Bell,

11  B-E-L-L, C-34257.

12      **ATTORNEY NORTON:**  Mark Norton,

13  N-O-R-T-O-N, attorney for Mr. Timothy Bell.

14      **PRESIDING COMMISSIONER MARTINEZ:**  All

15  right.  Thank you very much.  Again, I'd also

16  like to note that there is a correctional officer

17  present here today for security purposes who will

18  not be participating in this hearing today.  Mr.

19  Bell, in front of you is the ADA statement.

20  Could you please read that out loud, sir.

21      **INMATE BELL:**  The ADA statement reads:

22          "The Americans with Disabilities

23          Act, ADA, is the law to help people

24          with disabilities.  Disabilities

25          are problems that make it harder

26          for some people to see, hear,

27          breathe, talk, walk, learn, think,

| | |
|---|---|
| 1 | work, or take care of themselves |
| 2 | than it is for others. Nobody can |
| 3 | kept out of public places or |
| 4 | activities because of a disability. |
| 5 | If you have a disability, you have |
| 6 | the right to ask for help to get |
| 7 | ready for your board of prison |
| 8 | hearings, get to the hearing, talk, |
| 9 | read forms and papers, and |
| 10 | understand the hearing process. |
| 11 | BPT will look at what you asked for |
| 12 | to make sure that you have a |
| 13 | disability that is covered by the |
| 14 | ADA and that you have asked for the |
| 15 | right to that kind of help. If you |
| 16 | do not get help, or if you do not |
| 17 | think you need that kind of help, |
| 18 | you need to ask for a board of |
| 19 | prison terms 1074 grievance form. |
| 20 | You can also get help to fill it |
| 21 | out." |
| 22 | **PRESIDING COMMISSIONER MARTINEZ:**  Good, |
| 23 | sir.  You understand those rights? |
| 24 | **INMATE BELL:**  Yes. |
| 25 | **PRESIDING COMMISSIONER MARTINEZ:**  The |
| 26 | record does show that on October the 11th of 2006 |
| 27 | you did sign the BPT 1073.  And at that time, you |

4

1   did indicate that you did not have any

2   disabilities.  Is that information still correct,

3   sir?

4          **INMATE BELL:**  Yes.

5          **PRESIDING COMMISSIONER MARTINEZ:**  All

6   right.  Very well.  I see you have glasses.

7   Prescription glasses?

8          **INMATE BELL:**  Yeah.

9          **PRESIDING COMMISSIONER MARTINEZ:**  Do they

10  fit your --

11         **INMATE BELL:**  Except for the glasses.

12         **PRESIDING COMMISSIONER MARTINEZ:**  I'm

13  sorry.  Except glasses.  Do they meet your needs

14  here today?

15         **INMATE BELL:**  Yes.

16         **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

17  Very well.  In regards to hearing, any problems

18  with your hearing?  Any impairments in that area?

19         **INMATE BELL:**  No.

20         **PRESIDING COMMISSIONER MARTINEZ:**  As far

21  as physical, mobility, getting around -- any

22  problems walking a distance of over a hundred

23  yards?

24         **INMATE BELL:**  No.

25         **PRESIDING COMMISSIONER MARTINEZ:**  Going

26  up and down stairs?

27         **INMATE BELL:**  No.

1          **PRESIDING COMMISSIONER MARTINEZ:** Okay.
2    You came here today by your own steam?
3          **INMATE BELL:** Yes.
4          **PRESIDING COMMISSIONER MARTINEZ:** Very
5    well. In regards to the triple CMS, EOP
6    programs, have you ever been involved in the
7    mental health programs?
8          **INMATE BELL:** No.
9          **PRESIDING COMMISSIONER MARTINEZ:** All
10   right. Have you ever taken any psychiatric
11   medication?
12         **INMATE BELL:** No.
13         **PRESIDING COMMISSIONER MARTINEZ:** Okay.
14   Are you on any medication here today?
15         **INMATE BELL:** No.
16         **PRESIDING COMMISSIONER MARTINEZ:** None.
17   Okay. For medical reasons, or --
18         **INMATE BELL:** No.
19         **PRESIDING COMMISSIONER MARTINEZ:** All
20   right.
21         **INMATE BELL:** Well, yeah. Excuse me.
22   I'm on Lipitor and aspirin. Excuse me, yes.
23         **PRESIDING COMMISSIONER MARTINEZ:** Okay.
24   All right. And you have taken those
25   (inaudible)--
26         **INMATE BELL:** That's ongoing, yes. It's
27   every morning.

1          **PRESIDING COMMISSIONER MARTINEZ:** Okay.
2   Very well. So you --
3          **INMATE BELL:** My cholesterol, and that's
4   it.
5          **PRESIDING COMMISSIONER MARTINEZ:** Okay.
6   So you are good to go, then.
7          **INMATE BELL:** Yes.
8          **PRESIDING COMMISSIONER MARTINEZ:** All
9   right. In regards to education, how far did you
10   get in school?
11          **INMATE BELL:** I'm a high school graduate.
12   And at the present time, I'm enrolled in
13   Coastline Community College, studying business.
14   This past year I just completed a business 222
15   class.
16          **PRESIDING COMMISSIONER MARTINEZ:** All
17   right. Well, we will get further into that
18   regarding your post conviction. But you did
19   graduate from high school in the street?
20          **INMATE BELL:** Yes, I am. Yeah.
21          **PRESIDING COMMISSIONER MARTINEZ:** All
22   right. During that time, did you take any
23   special education classes for any issues
24   regarding learning, any learning disabilities or
25   anything like that?
26          **INMATE BELL:** No.
27          **PRESIDING COMMISSIONER MARTINEZ:** No?

1   Very well. All right. With that, is there
2   anything that would prevent you today from
3   participating in this hearing?

4          **INMATE BELL:** No.

5          **PRESIDING COMMISSIONER MARTINEZ:** Good.
6   Counselor, have we met all of Mr. Bell's ADA
7   rights?

8          **ATTORNEY NORTON:** Yes.

9          **PRESIDING COMMISSIONER MARTINEZ:** Mr.
10  Bell, this hearing is being conducted pursuant to
11  Penal Code sections 3041, 3042, and the rules and
12  the regulations of the board of prison terms
13  governing parole consideration hearings for life
14  inmates. The purpose of today's hearing is to
15  once again consider the number and the nature of
16  the crimes that you were committed for, your
17  prior criminal and your social history, and your
18  behavior and programming since your commitment.
19  We've had the opportunity to review your central
20  file and your prior transcripts, and we will be
21  given -- you will be given an opportunity to
22  correct or clarify the record. We will reach a
23  decision today and inform you whether or not we
24  find you suitable for parole and the reasons for
25  our decision. If you are found suitable for
26  parole, the length of your confinement will be
27  explained to you. Now, nothing that happens here

1   today is going to change the findings of the
2   court.   This panel is not here to retry your
3   case.   This panel is here for the sole purpose of
4   determining your suitability for parole.  Do you
5   understand that, sir?

6          **INMATE BELL:**  Yes.

7          **PRESIDING COMMISSIONER MARTINEZ:**  All
8   right.   The hearing is going to be conducted in
9   two phases.   I will discuss with you the crime
10  for which you were committed, your prior criminal
11  and your social history, your parole plans, any
12  letters of support that you may have as well as
13  letters of opposition that may exist in the file.
14  Commissioner Blonien will discuss with you your
15  progress since your commitment, your counselors'
16  reports, and your psychological evaluations.

17         **INMATE BELL:**  Okay.

18         **PRESIDING COMMISSIONER MARTINEZ:**  Once
19  that is concluded, then the commissioners and
20  your attorney will then have an opportunity to
21  ask you questions.   Questions in regards to --
22  again, just noting that there is no district
23  attorney here present here today for this
24  hearing.   So once that is concluded, again, then
25  your attorney and then yourself will have an
26  opportunity to make a final closing statement
27  regarding your suitability for parole.  And your

1   statement should address as to why you feel you
2   are suitable for parole today.  Once that is
3   concluded, we will then -- the panel will then
4   recess, clear the room for deliberations.  Once
5   deliberations are completed, we will then resume
6   the hearing and announce our decision.

7           **INMATE BELL:**  Okay.

8           **PRESIDING COMMISSIONER MARTINEZ:**

9   California Code of Regulations states that
10  regardless of time served, a life inmate shall be
11  found unsuitable for and denied parole if in the
12  judgment of the panel the inmate would pose an
13  unreasonable risk of danger to society if
14  released from prison.  You have certain rights.
15  Those rights do include the right to a timely
16  notice of this hearing, the right to review your
17  central file, and the right to present relevant
18  documents.  So with that, counsel, have those
19  rights been met, to your knowledge?

20          **ATTORNEY NORTON:**  Yes.

21          **PRESIDING COMMISSIONER MARTINEZ:**  All
22  right.  Mr. Bell, you have an additional right to
23  be heard by an impartial panel.  Do you have any
24  objections to the panel that is sitting in front
25  of you here today?

26          **INMATE BELL:**  No, I don't.

27          **PRESIDING COMMISSIONER MARTINEZ:**  Very

1   well.  You'll receive a written copy of our

2   tentative decision today, and that decision does

3   become effective within 120 days.  So a copy of

4   the decision and a copy of the transcript will be

5   sent to you.  The board has eliminated its appeal

6   process.  So therefore, if you disagree with

7   anything in this hearing today, you have the

8   right to go to the court with your complaint.

9   I'd also like to add that you are not required to

10  admit or discuss your offense today.  However,

11  this panel does accept the findings of the court

12  to be true.  Do you understand that, sir?

13          **INMATE BELL:**  Yes, sir.

14          **PRESIDING COMMISSIONER MARTINEZ:**  All

15  right.  Commissioner Blonien, is there any

16  confidential material, and it will be used here

17  today?

18          **DEPUTY COMMISSIONER BLONIEN:**  There is

19  confidential information that we may use today.

20          **PRESIDING COMMISSIONER MARTINEZ:**  All

21  right.  With that, I believe I have the checklist

22  here.  I'll turn this over to Mr. Norton, make

23  sure that we are -- we all have the same

24  documents here today.

25          **ATTORNEY NORTON:**  Yes, I do.

26          **PRESIDING COMMISSIONER MARTINEZ:**  All

27  right.  Thank you, sir.  We will mark that

11

1    Exhibit 1.  And will there be any additional
2    documents (inaudible).

3         **ATTORNEY NORTON:** Yes, there is.  Mr.
4    Bell has put together a copy -- I have an
5    identical copy -- it's basically some of his post
6    conviction factors such as education and things
7    like that.

8         **PRESIDING COMMISSIONER MARTINEZ:** And
9    will there be any preliminary objections, sir?

10        **ATTORNEY NORTON:** No.

11        **PRESIDING COMMISSIONER MARTINEZ:** Will
12   Mr. Bell be speaking with the panel here today?

13        **ATTORNEY NORTON:** He will.

14        **PRESIDING COMMISSIONER MARTINEZ:** In all
15   matters?

16        **INMATE BELL:** Yes.

17        **PRESIDING COMMISSIONER MARTINEZ:** All
18   right.  Mr. Bell, please raise your right hand,
19   sir.  Do you solemnly swear or affirm that the
20   testimony you give at this hearing will be the
21   truth and nothing but the truth?

22        **INMATE BELL:** Yes.

23        **PRESIDING COMMISSIONER MARTINEZ:** Thank
24   you very much.  Counsel, no objections, I'm going
25   to reference the statement of facts from the
26   probation officer's report.

27        **ATTORNEY NORTON:** No objection.

1              **PRESIDING COMMISSIONER MARTINEZ:**   And
2     this will commence on page three of the probation
3     officer's report.
4              "On January the 18th of 1981 at
5              approximately six p.m., officers
6              were called to 114 Geneburn,
7              G-E-N-E-B-U-R-N, Way on the report
8              of a body lying on the steps to the
9              residence.  The deceased, Walter
10             Gill, G-I-L-L, was found to have
11             been strangled and stabbed.
12             Autopsy indicated that the victim
13             had been murdered early that
14             morning.  Further investigation
15             indicated that certain rooms in the
16             house had been ransacked.  The
17             defendant's fingerprints were found
18             on a pizza box in the kitchen.  The
19             fingerprints of Sandra Lakins,
20             L-A-K-I-N-S, the defendant's
21             sister, were found on a piece of
22             glass in the home of the deceased.
23             One of the victim's cars, a green
24             Cadillac, was missing from the
25             garage.  This car, license plate
26             number 645, C as in Charlie, W as
27             in William, X as in x-ray, was

```
1          subsequently found burned in a
2          parking lot of a market at 51
3          Wilder Street.  Witness told police
4          that he had seen someone set fire
5          to the car at approximately two
6          a.m.."
```

7  And that concludes the statement of facts.  Let
8  me refer to if there's any prisoner's version.
9  Which if there is, I will enter that.  Yes, there
10 is, and this is in reference to the October 2005
11 calendar board report, indications under the
12 prisoner's version.  It states:

```
13         "Bell remembers that he went to a
14         bar in San Francisco with his
15         sister, Sandra Larkins.  His sister
16         began talking to the victim, and
17         the three of them went to a
18         restaurant for dinner.  They
19         returned to the victim's house with
20         a box of pizza.  Bell left the
21         victim and his sister in the
22         kitchen briefly while he went to
23         the bathroom.  When he returned the
24         victim was assaulting his sister.
25         According to Bell, a fight erupted.
26         Bell stabbed the victim with a
27         knife that had been lying next to
```

14

1              the box of pizza.  Bell stated that
2              he ransacked the house to make it
3              look like a burglary because he was
4              afraid of how it would look, since
5              he had been released from CYA a day
6              or two before.  Bell admits taking
7              the victim's vehicle, but he denies
8              burning it.  Bell indicated that he
9              regrets his actions; and instead of
10             attempting to cover up the crime,
11             he wished he would have contacted
12             authorities."
13    And so with that, Mr. Bell -- how old were you
14    when you committed this offense?
15             **INMATE BELL:**  I was 20 years old.
16             **PRESIDING COMMISSIONER MARTINEZ:**  You
17    were 20?
18             **INMATE BELL:**  Yes.
19             **PRESIDING COMMISSIONER MARTINEZ:**  And how
20    old are you now?
21             **INMATE BELL:**  Forty-eight.
22             **PRESIDING COMMISSIONER MARTINEZ:**  Forty-
23    eight?  And I know -- in reviewing back the prior
24    transcripts -- and obviously there's discussion
25    regarding the commitment offense -- one question
26    I have, and this is that when you were out
27    drinking at the bar -- and I think you went to

15

1  another bar after, where you met Mr. Gill; is

2  that correct?

3          **INMATE BELL:**  Yes.

4          **PRESIDING COMMISSIONER MARTINEZ:**  And was

5  it just alcohol that you and your sister were

6  involved with?  Drinking?

7          **INMATE BELL:**  Yes.

8          **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

9  How old -- your sister was older than you.

10         **INMATE BELL:**  Yeah.  She is three years

11 older than I am.

12         **PRESIDING COMMISSIONER MARTINEZ:**  All

13 right.  So she was roughly 23, 24 years old in

14 that time?

15         **INMATE BELL:**  Yes.

16         **PRESIDING COMMISSIONER MARTINEZ:**  Was

17 this something that your sister Sandra would do,

18 is pick up someone, especially of Mr. Gill's age,

19 who was 61 years old?

20         **INMATE BELL:**  I really can't answer that,

21 speaking for my sister.  I haven't --

22         **PRESIDING COMMISSIONER MARTINEZ:**  Well,

23 I'm just asking you in your -- knowing your

24 sister, and obviously this wasn't the first time,

25 right, that you had gone out drinking with your

26 sister?  You had done that in the past?

27         **INMATE BELL:**  Yes.  Basically -- I was at

1  the bar across the street.  There was two bars,
2  one on each side of the corner from each other.
3  They were neighborhood bars.  And the one I was
4  at was for more of the younger, you know,
5  patrons, because there was a pool hall in the
6  back, so to speak.  So I was back there
7  basically, you know, shooting pool and drinking
8  beer.

9       **PRESIDING COMMISSIONER MARTINEZ:** Did you
10 have a fake ID?

11      **INMATE BELL:** Which I shouldn't have.
12 Yes, I did.  And -- so from there I went across
13 the street, because my sister had left to go over
14 there with some other friends that she was with.
15 They had left that -- you know, The Station was
16 the name of the bar I was at.

17      **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
18      **INMATE BELL:** And went across the street
19 to The Lodge, which was the name of that
20 establishment.

21      **PRESIDING COMMISSIONER MARTINEZ:** Right.
22 I recall reading that.  My question to you is,
23 was this a common thing for your sister to pick
24 up older men like that?

25      **INMATE BELL:** No.  I would have to say
26 no.

27      **PRESIDING COMMISSIONER MARTINEZ:** No?

1          **INMATE BELL:** She was, you know, more of
2   a free spirit and this and that growing up, you
3   know, in the tail end of the 60's and all of
4   that. She always hung out with elder gentlemen
5   and this and that; so I really didn't really even
6   think there was anything amiss or, you know --
7   when I met this gentleman, I was introduced to
8   him -- they were sitting at the bar, you know,
9   drinking with some other individuals that I knew
10  from the neighborhood and from --

11          **PRESIDING COMMISSIONER MARTINEZ:** Had you
12  ever met Mr. Gill prior to this?

13          **INMATE BELL:** No I hadn't, no.

14          **PRESIDING COMMISSIONER MARTINEZ:** And had
15  your sister met him prior? Did she know him from
16  previous in the bar?

17          **INMATE BELL:** It appeared that way, from
18  my standpoint. Like I said, I had just recently
19  been released, so I wasn't familiar with anybody
20  that she --

21          **PRESIDING COMMISSIONER MARTINEZ:** But
22  now, looking at it now -- and obviously,
23  everything now laid out, you know. Have you
24  talked to your sister since then, and did she
25  ever indicate that she knew him before?

26          **INMATE BELL:** Just from the social
27  gatherings at the bar. I guess he was a local

18

1   patron at that particular bar.

2          **PRESIDING COMMISSIONER MARTINEZ:**   All
3   right.  Okay.

4          **INMATE BELL:**  Because from my
5   understanding later on, that Ron Slater, the
6   witness in the case, he had known Mr. Gill from
7   previous working engagements, I guess.  But other
8   than that, I'm not really sure their long-
9   standing relationship or whatnot.  At the time
10  Ronald Slater was my sister's boyfriend.

11         **PRESIDING COMMISSIONER MARTINEZ:**  And he
12  was there at the bar as well?

13         **INMATE BELL:**  He was there at the bar
14  that evening -- no.  Actually, he was up at the
15  house.  And then he came down later and then left
16  the bar again.  And then that's when my sister
17  and Mr. Gill and myself had went out and went up
18  the street to go get a pizza.

19         **PRESIDING COMMISSIONER MARTINEZ:**  What
20  time was this?

21         **INMATE BELL:**  I guess it had to have been
22  around maybe 10:30, 11, maybe later.  I'm not
23  quite sure.  We went up to No-No's Pizza on
24  Monterey Boulevard.

25         **PRESIDING COMMISSIONER MARTINEZ:**  What
26  was the distance from the bar to the pizza joint?
27         **INMATE BELL:**  About a mile, maybe less.

1          **PRESIDING COMMISSIONER MARTINEZ:** A mile.

2  And you and your sister didn't have any wheels?

3  No car?

4          **INMATE BELL:** No, no. At the time, no.

5          **PRESIDING COMMISSIONER MARTINEZ:** How did

6  you get to the bar?

7          **INMATE BELL:** In Mr. Gill's vehicle.

8          **PRESIDING COMMISSIONER MARTINEZ:** No no

9  no. Prior --

10         **INMATE BELL:** Oh. To the bar?

11         **PRESIDING COMMISSIONER MARTINEZ:** To the

12  bar.

13         **INMATE BELL:** It was in walking distance

14  from where -- not only where my sister lived, but

15  also from my house.

16         **PRESIDING COMMISSIONER MARTINEZ:** Okay.

17         **INMATE BELL:** You know --

18         **PRESIDING COMMISSIONER MARTINEZ:** So you

19  walked to the bar.

20         **INMATE BELL:** Yes. It's only, I'd say

21  half a mile away from, you know, either direction

22  from where my sister lived and where I lived.

23         **PRESIDING COMMISSIONER MARTINEZ:** And you

24  and your sister frequented both bars?

25         **INMATE BELL:** Growing up, off and on.

26  You know, family and friends of family. They

27  were -- both bars were owners of neighborhood

1  associates.

2          **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.

3  So then you leave with Mr. Gill in his car, which

4  is the Cadillac in question.

5          **INMATE BELL:** Yes. Yes.

6          **PRESIDING COMMISSIONER MARTINEZ:** And

7  then you go to the pizza joint.

8          **INMATE BELL:** Yes.

9          **PRESIDING COMMISSIONER MARTINEZ:** You

10 eat?

11         **INMATE BELL:** Yes.

12         **PRESIDING COMMISSIONER MARTINEZ:** Who

13 pays for it?

14         **INMATE BELL:** Mr. Gill had.

15         **PRESIDING COMMISSIONER MARTINEZ:** Mr.

16 Gill paid for all of it.  Were you drinking beer

17 there, as well?

18         **INMATE BELL:** Yeah.  Wine, at the

19 restaurant.

20         **PRESIDING COMMISSIONER MARTINEZ:** And

21 what about your sister?

22         **INMATE BELL:** Yes.

23         **PRESIDING COMMISSIONER MARTINEZ:** Did she

24 continue to drink, as well?

25         **INMATE BELL:** Yes.

26         **PRESIDING COMMISSIONER MARTINEZ:** And

27 then from there, who makes the decision to -- as

1   to how you end up at Mr. Gill's house?

2        **INMATE BELL:** I think after we left the

3   restaurant, if I recall, it was just a matter of

4   just driving back to his house. Because we had

5   taken the pizza to go. And we were just

6   continuing, you know, the evening --

7        **PRESIDING COMMISSIONER MARTINEZ:** But you

8   were drinking there while you were waiting for

9   the pizza to get done.

10       **INMATE BELL:** No. We were sitting around

11  at the pizza parlor eating. And then when it was

12  time to go, you know, I don't know if it was

13  myself or my sister or Mr. Gill asked for a, you

14  know, a take-out box.

15       **PRESIDING COMMISSIONER MARTINEZ:** Okay.

16       **INMATE BELL:** And so while they --

17       **PRESIDING COMMISSIONER MARTINEZ:** Oh. So

18  that was the pizza that you were eating, you

19  asked for a --

20       **INMATE BELL:** Yeah. Yeah.

21       **PRESIDING COMMISSIONER MARTINEZ:** -- a

22  doggy bag.

23       **INMATE BELL:** Yeah, right. Exactly. So

24  they put it in the box along with some other food

25  that was being consumed at the time. I can't

26  remember all the details, you know. But yeah, it

27  was basically take out after we had sat and ate.

22

1          **PRESIDING COMMISSIONER MARTINEZ:**  Who
2   made the decision to go back to his place?
3          **INMATE BELL:**  To be honest with you, I'm
4   not quite sure.  I think it was just a joint --
5   it was just a joint venture.
6          **PRESIDING COMMISSIONER MARTINEZ:**  Let me
7   ask you this: During this time, when you leave
8   the bar and go to the pizza place and are
9   drinking there, you and your sister and Mr. Gill,
10  what was the situation there between Mr. Gill and
11  your sister?  Did you see that there was
12  something there going on?  What was going -- what
13  did you observe?
14         **INMATE BELL:**  When I first walked into
15  The Lodge, where they were at, okay -- like I
16  said, at first we were all over shooting pool and
17  all that.  And then my sister left and went
18  across the street.  And then maybe a half hour,
19  20 minutes or so had passed.  I had walked across
20  the street by myself or with some other friends
21  to go, you know, across the street into The
22  Lodge.  So in reality I came through this door on
23  the right-hand side, okay?  And they were sitting
24  down at the left-hand side of the bar by the
25  other door.  So when I came down, I was meeting
26  some people I hadn't seen in quite a while and
27  some family friends, you know, in the bar.  So as

1  I kind of made my way through the bar, that's

2  when I noticed my sister and Ron was there, you

3  know. And they were engaged in a conversation

4  with Mr. Gill and a few other people -- I'm not

5  really sure who, you know. And so as they got to

6  -- as I was introduced, I was given a, you know

7  -- I was bought a drink and this and that and got

8  to talking. And then from there, I was just

9  still talking to other people. As I engaged more

10  of a conversation with Mr. Gill, I believe he

11  worked for the railroad department. And I was

12  just in search of a job or any type of job, you

13  know.

14         **PRESIDING COMMISSIONER MARTINEZ:** You

15  weren't working at the time?

16         **INMATE BELL:** No, no. Like I said, I had

17  just been released from YA. So at the same time

18  -- I was already down at the parole department

19  trying to get, you know, workloads, vouchers and

20  all that stuff. And I had some semi-jobs lined

21  up, but nothing concrete at the time. I was

22  going to go back into construction and

23  remodeling.

24         **PRESIDING COMMISSIONER MARTINEZ:** Was

25  your sister working at the time?

26         **INMATE BELL:** I believe she was a waiter

27  -- a waitress at -- there was like a sub sandwich

1   place, maybe one, two -- about four

2   establishments up the street from the bar.

3        **PRESIDING COMMISSIONER MARTINEZ:** She was

4   working?

5        **INMATE BELL:** Yes. Yeah. Yeah.

6        **PRESIDING COMMISSIONER MARTINEZ:** All

7   right.

8        **INMATE BELL:** I can't remember the name

9   of the dining establishment.

10       **PRESIDING COMMISSIONER MARTINEZ:** That's

11  all right.

12       **INMATE BELL:** But anyway, so then after

13  that conversation kind of just blew over, I was,

14  like I said, still, you know, interacting with

15  other people, okay? And then I happened to see

16  my sister and Mr. Gill heading out the door. And

17  that's when I shot out the door, not even --

18  just, you know, took off, asked them where they

19  were going. And they were going to get something

20  to eat. So I just jumped in the car, you know.

21  And then we proceeded up to No-No's Pizza up on

22  Monterey Boulevard. This was about a mile away

23  from that establishment.

24       **PRESIDING COMMISSIONER MARTINEZ:** And you

25  end up over at his house.

26       **INMATE BELL:** Yeah. And then from there,

27  from sitting around eating and this and that, and

1  then we -- you know, we had proceeded over to Mr.
2  Gill's.

3        **PRESIDING COMMISSIONER MARTINEZ:** And
4  what transpired, what happens at his house?

5        **INMATE BELL:** Well, throughout the
6  evening, he -- you know, he was making advances
7  through my sister.  And at the same time, you
8  know, she was -- looking back at it --

9        **PRESIDING COMMISSIONER MARTINEZ:** At the
10  pizza -- pizza joint as well?

11        **INMATE BELL:** It was all through the
12  evening, you know.

13        **PRESIDING COMMISSIONER MARTINEZ:** And
14  then the bar as well?

15        **INMATE BELL:** Yes, yes.  But at the time,
16  I didn't really take too much notice of it.  It
17  was just --

18        **PRESIDING COMMISSIONER MARTINEZ:** Well,
19  was your sister being offended by this?

20        **INMATE BELL:** Looking back at it, no.  At
21  the time --

22        **PRESIDING COMMISSIONER MARTINEZ:** She
23  didn't have a problem?

24        **INMATE BELL:** She was pushing some
25  advances away, some she wasn't.  You know, she
26  was being just as much of a flirt, I guess, as
27  Mr. Gill.

1      **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.

2      **INMATE BELL:** I'm not trying to blame Mr.

3  Gill for this at all, so -- you know, I really

4  can't recollect exactly what took place as far as

5  who was, you know, coming on to who throughout

6  the evening. But it was going back and forth.

7      **PRESIDING COMMISSIONER MARTINEZ:** Well,

8  it appears -- what you are telling me is, it was

9  mutual.

10     **INMATE BELL:** To a certain degree, yes.

11  Yes. From what I seen. And then it just got to

12  the point where, you know, I was uncomfortable

13  with it because of the age of Mr. Gill and being

14  my sister's little brother, you know.

15     **PRESIDING COMMISSIONER MARTINEZ:** Your

16  sister was an adult.

17     **INMATE BELL:** Yeah. Yeah. That's true.

18  But looking -- always looking at her for her

19  short stature and this and that, I always

20  perceived myself as the bigger brother, so to

21  speak.

22     **PRESIDING COMMISSIONER MARTINEZ:** Sure.

23     **INMATE BELL:** You know. So from there,

24  going back to Mr. Gill's house, you know, the

25  evening was still going well. There was no

26  problem whatsoever. There was a couple times I

27  asked him to back off, you know. And there was

27

1   really no response either way, you know.

2          **PRESIDING COMMISSIONER MARTINEZ:**   Were

3   you much bigger than Mr. Gill?

4          **INMATE BELL:**   Yes, I was.   No, I wouldn't

5   say so as far as, maybe athletic-wise, but he was

6   much taller -- I think he was six foot one,

7   maybe, six foot two.   You know, he was a lot

8   taller, you know.

9          **PRESIDING COMMISSIONER MARTINEZ:**   How

10  tall were you back then?   About the same height?

11         **INMATE BELL:**   Yeah, maybe a half inch.

12         **PRESIDING COMMISSIONER MARTINEZ:**   How

13  tall are you?

14         **INMATE BELL:**   I'm five-eight.

15         **PRESIDING COMMISSIONER MARTINEZ:**   Okay.

16         **INMATE BELL:**   And I think at that time I

17  was weighing maybe 180 pounds, 185.

18         **PRESIDING COMMISSIONER MARTINEZ:**   And Mr.

19  Gill was 61 years old at the time?

20         **INMATE BELL:**   Yeah, yeah.

21         **PRESIDING COMMISSIONER MARTINEZ:**   Was he

22  heavy, or just --

23         **INMATE BELL:**   I'd say about maybe 230,

24  250, maybe.   Somewhere between, you know, that

25  weight.

26         **PRESIDING COMMISSIONER MARTINEZ:**   So for

27  his height.   (inaudible).

1          **INMATE BELL:**  Yeah.  When I got up to
2    excuse myself -- like we were sitting around the
3    table.  It was something similar to about the
4    size of that table over there on the left of this
5    room.  And we were just sitting around the table
6    drinking and talking and basically having a good
7    time.  And we were eating the pizza, and we were
8    drinking wine at the table.  And I had gotten up
9    to go to the bathroom.  I was there for a while,
10   and then excused my -- you know, I had came back.
11   And, you know, that's when Mr. Gill was kind of
12   like advancing his -- there was more of an
13   aggressional (sic) advancement towards my sister
14   as far as, you know, what I perceived.

15         **PRESIDING COMMISSIONER MARTINEZ:**  How
16   much more?

17         **INMATE BELL:**  He kind of had her on his
18   lap, you know, and this and that.  And from what
19   I appeared to see at the time was she was kind of
20   like, you know, pushing the advancements away.
21   And that's when I says, 'come on, we're out of
22   here,' you know.  And when I --

23         **PRESIDING COMMISSIONER MARTINEZ:**  Was
24   there a time -- was she yelling at him or hitting
25   him?

26         **INMATE BELL:**  No, no.

27         **PRESIDING COMMISSIONER MARTINEZ:**  Or

1    saying 'let me go,' anything of that?

2         **INMATE BELL:**  No.  It wasn't -- looking

3    back at this now, it wasn't anything other than

4    maybe her squirming and pushing back.  Not really

5    saying no, but not really saying, you know -- me,

6    like I said, I took it completely wrong.  I

7    totally overreacted.  Because I grabbed her by

8    the wrist or by the arm or something like that

9    and says 'come on, we are out are here,' you

10   know.  And when I grabbed her and we started to

11   head to the door -- or, you know, leave the table

12   -- that's when he kind of jumped up.  And then

13   that's when a fight ensued, you know.  I believe

14   I either pushed him first when he stood up, to,

15   you know, tell him the back off, that we were out

16   of here.  Or he just stood up and then I just --

17   you know, startled, and, you know, before you

18   know it a fight ensued.

19        **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.

20        **INMATE BELL:**  And through, you know, the

21   melee, you know, all the contents of the table

22   and the chairs all got knocked over, and we ended

23   up on the ground, more of a, you know, wrestling

24   match than anything.  And the phone happened to

25   be there.  The phone cord was like wrapped up all

26   between us.  And that's when I grabbed the phone

27   -- the cord, and I wrapped it around his -- you

1    know, his neck and strangled him out.  And when
2    he went limp on me, what I assumed, you know,
3    that he had just fell out.  I had went to get up,
4    and that's when he had lunged at me.  You know,
5    he was basically playing possum.  And the knife
6    just happened to be there, you know, right in --
7    I mean, this all happened within, I would say 30
8    to 60 seconds.  And that's when I grabbed the
9    knife and I stabbed him.  And it was a one-time
10   stab.  And you know, believe it or not, I didn't
11   think -- I just kind of seen what happened.  And
12   when I jumped up, it was like -- you know, it was
13   more of a panic situation at that time.  And I
14   just kind of assessed the situation.  So I just
15   looked at her.  She wanted to head out the door.
16   And I says no, we got to, you know, make it look
17   like something went wrong here, you know.  Like
18   this guy surprised burglars or something.  So we
19   started ransacking the house.

20          **PRESIDING COMMISSIONER MARTINEZ:**  Didn't
21   it occur to you that you were seen leaving with
22   him from the bar?  You were seen --

23          **INMATE BELL:**  At that point in time, I
24   wasn't thinking, you know.  This wasn't the
25   thoughts of a rational individual.

26          **PRESIDING COMMISSIONER MARTINEZ:**  Once
27   you stabbed him and he was laying there, you made

31

1  no attempts to correct the situation by trying to

2  get him some help?

3         **INMATE BELL:**  No, no.  It was more panic

4  than anything.

5         **PRESIDING COMMISSIONER MARTINEZ:**  For

6  yourself.

7         **INMATE BELL:**  Yes, yes.  At the time,

8  yes.

9         **PRESIDING COMMISSIONER MARTINEZ:**  You

10  know, for yourself and your sister.

11         **INMATE BELL:**  Yeah.  And my sister.

12  Which in looking back, I didn't really need to --

13         **PRESIDING COMMISSIONER MARTINEZ:**  Your

14  sister part of that happening?  Had she been

15  involved with problems with law enforcement?

16         **INMATE BELL:**  Yes.

17         **PRESIDING COMMISSIONER MARTINEZ:**  Been

18  arrested?

19         **INMATE BELL:**  Yes.

20         **PRESIDING COMMISSIONER MARTINEZ:**  What

21  kind of things did she have in her background?

22         **INMATE BELL:**  I don't really know her

23  entire rap sheet or even portions of it.

24         **PRESIDING COMMISSIONER MARTINEZ:**  Well,

25  I'm sure you know a few things.

26         **INMATE BELL:**  Basically robbery and

27  burglaries and, you know --

32

 1          **PRESIDING COMMISSIONER MARTINEZ:**  She was
 2    involved in all of that kind of stuff?
 3          **INMATE BELL:**  And runaways and stuff like
 4    that.
 5          **PRESIDING COMMISSIONER MARTINEZ:**  Robbery
 6    and burglaries?
 7          **INMATE BELL:**  Yes.  Yes.
 8          **PRESIDING COMMISSIONER MARTINEZ:**  And
 9    this wasn't a situation where you were going to
10    be setting him up?
11          **INMATE BELL:**  To my recollection, no.
12    No.  I had no idea --
13          **PRESIDING COMMISSIONER MARTINEZ:**  She
14    never discussed that with you, that possibly, the
15    possibility that, hey, you know, set this guy up
16    and see where he is at and steal from him?
17          **INMATE BELL:**  No, no.  There was nothing
18    like that.  The chain of events that night, they
19    were just  -- they led from, you know, a party
20    atmosphere and everything going fine, to a dinner
21    atmosphere, to back at his house, you know, in a
22    pleasant setting.  And it was almost bizarre.  It
23    was almost, you know, surreal, so to speak,
24    looking, you know, back.  Even that evening, you
25    know, and from the time it happened until now,
26    I've tried to analyze this.  I've tried to see
27    what I could have done different.  And there are

1  many things I could have done different.  I
2  shouldn't have even been in the bar that evening.
3  You know, I wasn't of age, you know.  There's
4  nothing I can do to change the events that took
5  place that night.  I don't remember all the fine
6  details.  I just remember, you know, some of the
7  details that led to this incident, you know.  And
8  Mr. Gill just happened to be an innocent victim
9  in this whole, you know, selfish act, to be
10  honest with you.  If I can turn back the hands of
11  time, I surely would.  And Mr. Gill, you know --
12  we wouldn't be here today, and Mr. Gill would
13  still be alive.

14       **PRESIDING COMMISSIONER MARTINEZ:**  What
15  did your sister (inaudible).

16       **INMATE BELL:**  I believe she did eight
17  years on an eleven-year manslaughter.

18       **PRESIDING COMMISSIONER MARTINEZ:**  Okay.
19  She is out now?

20       **INMATE BELL:**  Yeah.  Yeah, she has been
21  out and clean and sober and living a good life.
22  She was recently reunited with one of her
23  children, who lives up here in Sonora.  Her two
24  twin boys, they are living in Florida right now,
25  in the construction field, buying and selling
26  homes, and helping the hurricane relief systems
27  and all that.  So things are good with her.

1          **PRESIDING COMMISSIONER MARTINEZ:** In
2    regards to, you took the car also, and indicated
3    that your -- you got your uncle involved in this
4    as well. And that he was the one that was the
5    one that burned the car?

6          **INMATE BELL:** I think the car, that
7    happened a couple nights later. I was -- had no
8    idea that even taken place. That was something
9    between my sister and my uncle. I happened to
10   hear about it the morning, the following morning.

11         **PRESIDING COMMISSIONER MARTINEZ:** But the
12   uncle is the one that did it, along with your
13   sister.

14         **INMATE BELL:** I believe it was my uncle
15   and my sister, yes.

16         **PRESIDING COMMISSIONER MARTINEZ:** And
17   what about the property that you guys took, I
18   think was mentioned on television, and --

19         **INMATE BELL:** That was thrown in a
20   dumpster over on (inaudible).

21         **PRESIDING COMMISSIONER MARTINEZ:** You
22   guys never kept any of that?

23         **INMATE BELL:** No, no.

24         **PRESIDING COMMISSIONER MARTINEZ:** Any
25   money that you took?

26         **INMATE BELL:** No.

27         **PRESIDING COMMISSIONER MARTINEZ:**

1   Anything else about the crime that you would like
2   to tell us about?

3        **INMATE BELL:**  That's basically it.  Like
4   I said, I wish this never taken place.  My heart
5   goes out to not only Mr. Gill's family, but to
6   him as well.  Like I said, I had overreacted, you
7   know, totally in this incident.  And I do take
8   full responsibility for my actions.  I not only
9   put my sister in this situation, you know,
10  where -- all because of my bravado or my actions
11  of that evening -- this was clearly not something
12  planned.  This was just something that just  -- I
13  look back, it's just something that kept
14  evolving.  Excuse me.  Over the years when I have
15  gotten into trouble, it's always been me just
16  doing it, you know.  I knew what I was always
17  doing.  This incident here just kept -- it was
18  like something out of a movie, looking back at
19  it.  And there's nothing I can do to change it.
20  You know, it was 26 years ago.  It's difficult to
21  talk about.  It's surely not my character.  I was
22  just a petty hood.  I was a petty thief.  And one
23  thing just kept leading to another that evening.
24  And like I said, if things, you know, can change,
25  I surely would change them.

26       **PRESIDING COMMISSIONER MARTINEZ:**  All
27  right.  We will move forward.  We might go back

1  to this, but let's cover your pre-conviction
2  factors, noting that as a juvenile you did have a
3  record. History starting at the age of nine.
4  Placements due to offenses of battery and being
5  beyond control, auto theft and purse snatching --
6  this is all in the juvenile, starting 1989.

7        **INMATE BELL:** Yes.

8        **PRESIDING COMMISSIONER MARTINEZ:** And
9  battery. Obviously getting in fights in school,
10 or what?

11       **INMATE BELL:** No, that was -- if I
12 recall, that incident there had to do with some
13 kids at a park when we were living in Sunnyvale
14 shortly after my father died. It was something I
15 got caught up in with my older brothers.

16       **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
17       **INMATE BELL:** And if I recall, it had
18 something to do with a bicycle, and --

19       **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
20       **INMATE BELL:** And the battery on that --
21 you know, we were charged with battery because it
22 was a fight.

23       **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
24       **INMATE BELL:** And as far as any of the
25 details, I really can't remember. I knew it had
26 to do with something with a bicycle.

27       **PRESIDING COMMISSIONER MARTINEZ:** That

1  was back in '68, for -- charge of battery and
2  violation of curfew.  Wardship was declared.  And
3  then in March of '70, petition sustained on the
4  battery.  Wardship again declared.  April '72,
5  beyond control, wardship declared.  Minor was
6  placed on probation.  May of '72, beyond control,
7  minor was committed to Hidden Valley Ranch.

8          **INMATE BELL:**  Yes.

9          **PRESIDING COMMISSIONER MARTINEZ:**  And
10  then January of '73, beyond control issue, minor
11  was committed to Hidden Valley Ranch for the
12  third time.  And then in May of '73, the auto
13  theft.  Wardship was continued, and the case was
14  transferred to San Mateo County probation
15  department.  December of '75, purse snatching.
16  Minor was placed on probation, returned home.
17  February of '76, auto theft, committed to
18  California Youth Authority on April of 1976.  And
19  commitment was vacated and (inaudible) was
20  admitted to the Camp Glenwood.

21          **INMATE BELL:**  Yes.

22          **PRESIDING COMMISSIONER MARTINEZ:**  So
23  there's been CYA commitment, and then also camp.
24  And then you escaped from the county facility.

25          **INMATE BELL:**  From Camp Glenwood.

26          **PRESIDING COMMISSIONER MARTINEZ:**  You
27  escaped from Camp Glenwood?

38

1     **INMATE BELL:** Yes. It was more of a walk
2   away. It was an open camp.

3     **PRESIDING COMMISSIONER MARTINEZ:** But
4   it's still considered an escape.

5     **INMATE BELL:** Yeah. That's what -- on
6   the Hidden Valley Ranch, three commitments, it
7   was actually one commitment. And I kept going --

8     **PRESIDING COMMISSIONER MARTINEZ:**
9   Returning back on the same offense?

10     **INMATE BELL:** (inaudible) yeah.

11     **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
12   And then, again, the November '76 auto theft,
13   escaped from county facility while you were
14   committed to the California Youth Authority for a
15   90-day diagnostic evaluation. And then March of
16   '77, you were committed to CYA. And then you
17   were paroled in November of '77. So you did less
18   than a year.

19     **INMATE BELL:** Yeah.

20     **PRESIDING COMMISSIONER MARTINEZ:** And
21   that's all on the juvenile. In regards to your
22   adult convictions, April of '78, San Francisco
23   459, second-degree burglary. You received three
24   years probation and county jail time. And in
25   June of 1978, you were also arrested for a drunk
26   driving on the highway. And that's under Vehicle
27   Code section 22102(a), in parentheses. You

39

1   received 18 months court probation on that.  And
2   a fine, October of '78, Redwood City arrest for a
3   vehicle theft and receiving stolen property.
4   Grand theft, joyriding, and -- so what was that
5   stolen property in -- what was all that about?
6            **INMATE BELL:**  It was just a car stereo
7   from the car I stole.
8            **PRESIDING COMMISSIONER MARTINEZ:**  Okay.
9   Well, normally that's from something else; but
10  that's what they associated it with, receiving
11  the stolen property?
12           **INMATE BELL:**  The property that was in
13  the car, yes.
14           **PRESIDING COMMISSIONER MARTINEZ:**  Okay.
15  January of 1979, Redwood City arrest.  Again, a
16  23102(a), small case parentheses, drunk driving
17  on a highway, Vehicle Code Section.  You had a
18  one year in county jail.  You were suspended and
19  you were placed on probation for two years.  You
20  did three days county jail on that, traffic
21  school required.  So, two DUI's noted.  And then
22  September of '79, you had a hit and run with a
23  death or injury, and then a grand theft auto.
24  What was that about?
25           **INMATE BELL:**  My uncle and I were down at
26  the beach in San Francisco, and we were basically
27  partying and carrying on.  And when we came back,

1    we stole a car.  And as I was driving up the

2    street, I guess I was intoxicated enough to hit

3    another vehicle, a parked car.  And it kind of

4    sent him through the windshield.  And I fled on

5    foot.  I tried to drag him out of the car, but he

6    was kind of inebriated.  And so when he kind of

7    groaned and said he was all right, I took off

8    running.  And later on, they put two and two

9    together and they arrested both of us.  I came

10   back to the scene of the crime to see if he was

11   okay, and apparently I had some injuries that

12   somebody had noticed in the crowd.

13           **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.

14           **INMATE BELL:**  And I was arrested.

15           **PRESIDING COMMISSIONER MARTINEZ:**  And

16   just injuries, or did he die?

17           **INMATE BELL:**  No, just injuries.

18           **PRESIDING COMMISSIONER MARTINEZ:**  Just

19   injuries?

20           **INMATE BELL:**  Yeah.  Minor scrapes and

21   bruises, and broken (inaudible).

22           **PRESIDING COMMISSIONER MARTINEZ:**  So then

23   that was a commitment to the CYA.  And then you

24   were paroled in January of 1981.  And I'm noting

25   that this occurred January 18th of 1981, the

26   commitment offense.  And you had been out two

27   days, three days?

41

1            **INMATE BELL:**  Yeah.

2            **PRESIDING COMMISSIONER MARTINEZ:**  Three

3    days?  I notice you have tattoos.  Where did you

4    get those?

5            **INMATE BELL:**  Just over the years, here

6    and there.

7            **PRESIDING COMMISSIONER MARTINEZ:**  Here?

8            **INMATE BELL:**  Not here, but from when I

9    was at Soledad.

10           **PRESIDING COMMISSIONER MARTINEZ:**  So all

11   of that stuff is new since you have been in here

12   incarcerated -- all those tattoos are since you

13   have been incarcerated?

14           **INMATE BELL:**  Most of them were through

15   YA.  You know, and some early on.

16           **PRESIDING COMMISSIONER MARTINEZ:**  You

17   have on both arms, up your arms?

18           **INMATE BELL:**  Yes.  Yes.

19           **PRESIDING COMMISSIONER MARTINEZ:**  What

20   about your back?

21           **INMATE BELL:**  Yes.

22           **PRESIDING COMMISSIONER MARTINEZ:**  Front?

23           **INMATE BELL:**  Yes.

24           **PRESIDING COMMISSIONER MARTINEZ:**

25   Stomach?

26           **INMATE BELL:**  Yes.

27           **PRESIDING COMMISSIONER MARTINEZ:**  All

1   through, huh?  Anything around your neck?
2          **INMATE BELL:**  No.
3          **PRESIDING COMMISSIONER MARTINEZ:**  No?
4   What do they mainly consist of?
5          **INMATE BELL:**  Just females and roses and
6   stuff of that nature.
7          **PRESIDING COMMISSIONER MARTINEZ:**  Any
8   white supremacy, anything like that?
9          **INMATE BELL:**  Yes, I do.
10          **PRESIDING COMMISSIONER MARTINEZ:**  Do you
11   have swastikas?
12          **INMATE BELL:**  Yes.
13          **PRESIDING COMMISSIONER MARTINEZ:**  Where
14   at?
15          **INMATE BELL:**  On my stomach.
16          **PRESIDING COMMISSIONER MARTINEZ:**  Where
17   are you at with that?
18          **INMATE BELL:**  Where am I at with that
19   today?
20          **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.
21          **INMATE BELL:**  Completely different
22   person, you know.  That was more of a YA thing,
23   coming up.  Those were my beliefs then.  I don't
24   hold those beliefs today.  As a matter of fact,
25   I'm somewhat ashamed of it.
26          **PRESIDING COMMISSIONER MARTINEZ:**  What
27   was Mr. Gill?

1          **INMATE BELL:** He was white.

2          **PRESIDING COMMISSIONER MARTINEZ:** All

3 right. Any other convictions, arrests, that we

4 haven't talked about?

5          **INMATE BELL:** No, not that I can recall.

6          **PRESIDING COMMISSIONER MARTINEZ:** All

7 right. With that, then, we go to your personal

8 history. And noting that you were born in San

9 Francisco, and you are the third of six children

10 born to Margarite and Oroville Bell. At the age

11 of six, your father died. And in 1965 -- in

12 1965, from heart attack.

13          **INMATE BELL:** Yes.

14          **PRESIDING COMMISSIONER MARTINEZ:** He had

15 a heart attack. And then your mother remarried

16 your father's best friend, Ronald Sutton, and --

17 approximately one year later. You attended

18 various schools, completed your high school

19 education while incarcerated in (inaudible); is

20 that correct?

21          **INMATE BELL:** Yeah.

22          **PRESIDING COMMISSIONER MARTINEZ:** Okay.

23 You held a variety of jobs and had your own

24 business remodeling Victorian houses in San

25 Francisco, from '77 to '79?

26          **INMATE BELL:** Yes.

27          **PRESIDING COMMISSIONER MARTINEZ:** And you

1    are not having any problem with alcohol or drug

2    abuse.  However, (inaudible) does indicate that

3    you were -- you do have some arrests, convictions

4    for DUI, driving under the influence, as well as

5    being under the influence at the time of the

6    commitment offense.

7            **INMATE BELL:**  Yes.

8            **PRESIDING COMMISSIONER MARTINEZ:**  So

9    there is some issues there regarding your

10   alcohol.  Any drug abuse?

11           **INMATE BELL:**  Just experimental use of

12   marijuana and LSD.

13           **PRESIDING COMMISSIONER MARTINEZ:**

14   Marijuana and LSD?

15           **INMATE BELL:**  Yes.

16           **PRESIDING COMMISSIONER MARTINEZ:**

17   Anything else?

18           **INMATE BELL:**  Periodic heroin and

19   methamphetamine.

20           **PRESIDING COMMISSIONER MARTINEZ:**  And

21   when did you -- when were you doing these drugs?

22   How old were you?

23           **INMATE BELL:**  Basically from about junior

24   high school, about 16, on up to my arrest.

25           **PRESIDING COMMISSIONER MARTINEZ:**

26   Alrighty.  And your parents still alive?

27           **INMATE BELL:**  My mother just passed away

1   in 2001.  My stepfather is still alive.

2           **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

3   Did you have a good relationship with your

4   stepfather growing up?

5           **INMATE BELL:**  Yes.  Yes.

6           **PRESIDING COMMISSIONER MARTINEZ:**  You

7   spent pretty much of your teenage years, though,

8   incarcerated.

9           **INMATE BELL:**  Yes.

10          **PRESIDING COMMISSIONER MARTINEZ:**  You

11  have brothers and sisters?

12          **INMATE BELL:**  Yes.  I have two, one older

13  brother and my younger brother Ed.

14          **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.

15          **INMATE BELL:**  My older brother Raymond,

16  he is  -- I'm not sure where he is at these days.

17  He has drug use, and his behavior -- he is kind

18  of not right in the head.  And the last I heard,

19  he was in a treatment center somewhere, but doing

20  well.  Come to find out, he had a brain tumor or

21  something on his head over the years.  So it

22  contributed to some of his aggressions and

23  behavior towards that.

24          **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.

25          **INMATE BELL:**  My younger brother Eddie,

26  he is out there working in the medical field at

27  San Francisco General psychiatric department.  He

1   has been doing that for the past 20 years or so.
2   He was working in the hospice care in the Haight
3   district for all of the 80's. And then because
4   he was dealing with AIDS patients and stuff like
5   that, he just couldn't deal with the death.
6        **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
7        **INMATE BELL:** So he moved into the
8   psychiatric department.
9        **PRESIDING COMMISSIONER MARTINEZ:** What
10  about your sister?
11       **INMATE BELL:** My sister is doing well out
12  there. I'm not really sure where she is staying
13  right now. I haven't heard from her in, you
14  know, a few months. But last I heard, she was
15  doing well.
16       **PRESIDING COMMISSIONER MARTINEZ:** Uh-huh.
17  You stay in contact with your brother?
18       **INMATE BELL:** Yeah. I'm in contact with
19  my brother all the time. I just got a letter of
20  support from him not only offering me employment,
21  but housing if need be.
22       **PRESIDING COMMISSIONER MARTINEZ:** What
23  about -- okay. Now, indicates that you were
24  married on one occasion, but no children. You
25  met Jacqueline Wright through mutual friends.
26  And this is while you were incarcerated. And you
27  two ended up marrying in 1996.

47

1          **INMATE BELL:**  Yes.

2          **PRESIDING COMMISSIONER MARTINEZ:**  And

3    that is no longer intact?

4          **INMATE BELL:**  No.  No.

5          **PRESIDING COMMISSIONER MARTINEZ:**  So you

6    are divorced?

7          **INMATE BELL:**  Yes.

8          **PRESIDING COMMISSIONER MARTINEZ:**  She

9    does have two daughters and one son, but they are

10   from a previous marriage.

11         **INMATE BELL:**  Yes.

12         **PRESIDING COMMISSIONER MARTINEZ:**  Have

13   you stayed in contact with them in here?

14         **INMATE BELL:**  I was in contact with them

15   up until 2001.  And then I think they had either

16   moved to Colorado, or -- I haven't heard from

17   them in a while.

18         **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

19   All right.  Anything else about your social, your

20   personal history that you would like to include?

21         **INMATE BELL:**  Not that I can think of

22   specifically.  Growing up, I lost my older

23   brother between me and my eldest brother,

24   Michael, in an auto  -- an accident he had gotten

25   into riding double on a bike.  The brakes went

26   out.  And when we got to the bottom of the hill,

27   a bus had ran us over and crushed and killed him

48

1    and crushed and paralyzed my leg.  And I was laid

2    up in the hospital for a while.

3         **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.

4         **INMATE BELL:**  It took me about a year to

5    learn how to walk again.

6         **PRESIDING COMMISSIONER MARTINEZ:**  How old

7    were you?

8         **INMATE BELL:**  I was eight at the time.

9    This was in 1968.  '67, '68.  And then I lost my

10   youngest brother.  The marriage between my father

11   and my mother -- my stepfather and mother --

12   Kenneth, he was the youngest of all the boys.

13   And he died at 25.  He died of AIDS.

14        **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

15   Who visits you here?

16        **INMATE BELL:**  Right now, nobody.

17        **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

18   And -- all right.  You mentioned, again, that --

19   the white supremacist thing.  Were you involved

20   in that out on the streets as well?

21        **INMATE BELL:**  No.

22        **PRESIDING COMMISSIONER MARTINEZ:**  When

23   you were in the CYA, was that a CYA thing?

24        **INMATE BELL:**  It really wasn't.  It's --

25   I was never part of any group or any -- you know,

26   I'm not a white supremacist so to speak.  Those

27   are just my beliefs growing up.  I never ran

1 around any gang or group of people. So I think
2 that's a misconception right there.

3     **PRESIDING COMMISSIONER MARTINEZ:** And
4 that hasn't carried over here in prison?

5     **INMATE BELL:** No, no.

6     **PRESIDING COMMISSIONER MARTINEZ:** Okay.
7 All right. All right. I don't have anything
8 further. I'm going to turn it over to
9 Commissioner Blonien for post conviction.

10     **DEPUTY COMMISSIONER BLONIEN:** Mr. Bell,
11 this is your fourth hearing. And your last
12 actual appearance before the board was October
13 14th of '04, and the decision was for a one-year
14 denial. And the panel recommended no more 115's,
15 get self help, and stay disciplinary free. In
16 January of '06, you stipulated to a one-year
17 denial. And in order to give my report about
18 what you have been doing in the institution, I've
19 read through the C file. I've read the board
20 report by counselor Nebis, N-E-B-I-S, updated to
21 January '07. I read the psych reports of Dr.
22 Heather Mann, M-A-N-N, dated 10/27/06; and I went
23 back and read the psych reports from Dr. Patricia
24 Miller dated September of '05 and March of '02,
25 and Dr. Gurtin's report dated June 2004. So in
26 looking through your C file, I just noted on your
27 probation officer's report that in their

50

1    conclusion they said, 'this young man seems to

2    have two very distinct sets of values and

3    behavioral modes.  He is at once bright,

4    hardworking and personable, as well as a chronic

5    substance abuser who is easily led by those close

6    to him.'  So that's who you were when you came

7    in.

8          **INMATE BELL:**  Yes.  Yes.

9          **DEPUTY COMMISSIONER BLONIEN:**  So sort of

10   go through your history, and I've looked through

11   your -- the board's copy of -- what would you

12   call this?  Your life in prison.

13         **INMATE BELL:**  Yes, yes.  My

14   accomplishments and my life-changing feats.

15         **DEPUTY COMMISSIONER BLONIEN:**  And I'll

16   refer to that during -- as I go over all of this.

17   Since you have been incarcerated, you've had six

18   115's, the latest one in 9/25/2000.  And I want

19   to talk about that one.

20         **INMATE BELL:**  Yes.

21         **DEPUTY COMMISSIONER BLONIEN:**  That was a

22   115 where -- you were at your workplace?

23         **INMATE BELL:**  Which one?

24         **DEPUTY COMMISSIONER BLONIEN:**  The

25   September 25th, 2000.  Substance abuse.

26         **INMATE BELL:**  Yes.  The possession?

27         **DEPUTY COMMISSIONER BLONIEN:**  Uh-huh.

51

1        **INMATE BELL:**  Yeah.  I was out at PIA.  I
2   was working as a machinist down in the PIA
3   industries.

4        **DEPUTY COMMISSIONER BLONIEN:**  And you had
5   your own particular area.

6        **INMATE BELL:**  Yes.  Yes.

7        **DEPUTY COMMISSIONER BLONIEN:**  And you
8   found a lid containing --

9        **INMATE BELL:**  Yes.  It was a Copenhagen
10  lid.  When I returned from the lunch break -- we
11  had went out to lunch.  It's an open shop.  They
12  are just -- they are basically broken off into
13  cubbyholes for the machines to be in place for
14  certain areas.  And when I returned from lunch,
15  there happened to be something on the counter
16  that I happened to notice.  And I picked it up.
17  And as I was inspecting what it was, at the same
18  time Officer Chavez came around the corner.  And
19  I was sitting there holding, you know, what
20  appeared to be heroin inside this tin.  And at
21  that time it was not mine.  I had not been using
22  -- I haven't used heroin the entire time I have
23  been down.  I have smoked marijuana and I have
24  drinken (sic) wine up until about '85.  Other
25  than that, yes, I have no response to that except
26  for what is written in the 115.

27       **DEPUTY COMMISSIONER BLONIEN:**  And as we

1  put on the record, what Officer Chavez said is

2  that he came around the corner and you hid it.

3           **INMATE BELL:** Yes.

4           **DEPUTY COMMISSIONER BLONIEN:** And then he

5  found it, and that it was still warm. And that a

6  means of ingesting heroin in the institution, you

7  don't necessarily need a syringe. You can also

8  inhale it.

9           **INMATE BELL:** That's true. During the

10  hearing, I also asked him to check my -- you

11  know, the contents of what was on my possession

12  during the time. I was not in possession of a

13  lighter, I had no lighter. I asked all those

14  questions during the hearing. He just attributed

15  it to -- you know, I can't recall what his

16  statement was. But I tried to fight that as best

17  as possible. I even asked for the, you know --

18  there was a camera that monitored the areas out

19  there, and I assumed that it was on a video. And

20  apparently it's not. It's just a monitor.

21  Sergeant Silva at the time had testified that I

22  had asked for that to be submitted into the

23  record. You know, I wanted to get to the bottom

24  of it as much as, you know, them. I was the one

25  holding the bag, so to speak.

26           **DEPUTY COMMISSIONER BLONIEN:** And based

27  on -- and you were found guilty.

1          **INMATE BELL:**  And I realized what it was.
2   And, you know, I'm no dummy to the, you know, the
3   illegal drugs.

4          **DEPUTY COMMISSIONER BLONIEN:**  Yeah, well
5   -- and you are not new in the institution.

6          **INMATE BELL:**  Right. And when I seen him,
7   yeah, I tossed it underneath the cabinet.

8          **DEPUTY COMMISSIONER BLONIEN:**  You've also
9   had four 128's, the last one January 17th of '06.

10         **INMATE BELL:**  Yes.

11         **DEPUTY COMMISSIONER BLONIEN:**  And that
12  was for possession of tobacco.

13         **INMATE BELL:**  Yes.

14         **DEPUTY COMMISSIONER BLONIEN:**  So you are
15  a smoker.

16         **INMATE BELL:**  Yes.

17         **DEPUTY COMMISSIONER BLONIEN:**  And there's
18  a no-smoking policy in all of our institutions.

19         **INMATE BELL:**  That had just came about
20  during that time.  And I had still had some
21  tobacco left over from the days of legal tobacco.

22         **DEPUTY COMMISSIONER BLONIEN:**  You have 14
23  FEMA certificates that you have completed.

24         **INMATE BELL:**  Yes.  I got two last night
25  in the mail.  So actually now it's 16.

26         **DEPUTY COMMISSIONER BLONIEN:**  16?

27         **INMATE BELL:**  Yeah.

1        **DEPUTY COMMISSIONER BLONIEN:** The last
2    one -- you had one in '06. So this will be
3    your -- two in '07.

4        **INMATE BELL:** Yeah. I have two more.
5    One is for -- this one here is IS-100, and it's
6    for Incident Command Center. And the other one
7    is IS-15, which is Special Events Contingency
8    Planning.

9        **DEPUTY COMMISSIONER BLONIEN:** And what
10   you do is, they send you materials and you read
11   them and you complete a report or a test.

12       **INMATE BELL:** Yes.

13       **DEPUTY COMMISSIONER BLONIEN:** And submit
14   that to them, and then they send you the
15   certificate.

16       **INMATE BELL:** Yeah. There's a booklet
17   that is -- you know, depending on what the
18   courses are. Like in the natural disaster and
19   chemical skills. Some of them, they are double
20   books. And they are basically from a mail-order
21   thing to the government. And you do the -- you
22   do the course curriculum. You fill in, you know,
23   the answers. You do some writings on it, and
24   then you submit them. And then they send you a
25   certificate of completion whether or not you
26   passed or not.

27       **DEPUTY COMMISSIONER BLONIEN:** And

1   according to their records, you have completed
2   19.

3        **INMATE BELL:**   Yes.   Up to date, yeah.
4   Yeah.   I started to do these mainly because with
5   the type of business that I am into, in the
6   construction cabinetry shop -- because I deal
7   with hazardous materials.   And plus by being from
8   San Francisco, an earthquake-prone area.   When I
9   was introduced to these at first, it was about
10   emergency preparedness and hazardous spills and
11   natural and unnatural disasters.   And I thought
12   what better way to be prepared, not only for what
13   I do, you know -- I'll be needing that
14   information anyway.   But I thought it also
15   something to give back to the community, you
16   know.

17        **DEPUTY COMMISSIONER BLONIEN:**   You've also
18   completed courses in Marine Science,
19   Oceanography, Health Education, Success in the
20   Workplace, Victim Awareness, Own Your Own
21   Business -- and I was really impressed when I was
22   looking through your submitted material about
23   your business plan in the woodworking arena.   And
24   you started your education in woodworking at the
25   Youth Authority.

26        **INMATE BELL:**   Actually, I started it when
27   I was in junior high school, when I was about 12

1   years old, at James Lick Junior High.

2          DEPUTY COMMISSIONER BLONIEN:   And at the

3   Youth Authority, you had over a thousand hours of

4   instruction at Preston.

5          INMATE BELL:   Yeah.

6          DEPUTY COMMISSIONER BLONIEN:   Where they

7   had a really excellent cabinet vocational shop.

8          INMATE BELL:   Yeah, they did.   The

9   instructor, his name was Mr. Linwood, he was

10   since passed away.   Linkwood.   He has since

11   passed away.   But I was in contact with him up

12   until he passed away in 19 -- I think '83, I

13   believe.   I was in correspondence with him.   One

14   of his other instructors in the print shop, Mr.

15   -- he worked here for a while.   I have forgotten

16   his name.   It has slipped my mind right now.   But

17   yeah, through those two individuals, they led me

18   into a real good learning experience as far as

19   woodworking and other skills.

20          DEPUTY COMMISSIONER BLONIEN:   It's

21   something that you are talented in, but you also

22   like.

23          INMATE BELL:   Yes.   Yes.   It's more of a

24   love.   The business plan, I did it mainly for

25   myself, but it was a curriculum for the business

26   222 college course.

27          DEPUTY COMMISSIONER BLONIEN:   Business --

57

1   right.

2           **INMATE BELL:**  This here is literally 15

3   years in the making for three products I plan to

4   manufacture when I get out.  I literally have

5   some photographs of some of my work that I have

6   done over the years.  I either sell through the

7   handicraft program -- and this here is one of the

8   projects in the business plan.  It's a desk set

9   for executives.  And then also inside --

10          **PRESIDING COMMISSIONER MARTINEZ:**  You

11  want to give those, so we can view those during

12  deliberations?

13          **INMATE BELL:**  Yes.  Okay.

14          **PRESIDING COMMISSIONER MARTINEZ:**  Go

15  ahead and talk about it.

16          **INMATE BELL:**  In the business plan, I did

17  -- I literally broke the cardinal rule of trying

18  to bring three products to market.  It's hard

19  enough to bring one to market, but I'm confident

20  in not only --

21          **DEPUTY COMMISSIONER BLONIEN:**  Wine

22  cabinet?

23          **INMATE BELL:**  That's a wine cabinet I

24  made for officer O'Reardon down in Z dorm here.

25  I have made him quite a bit of furniture over the

26  years.  The first one I made for my father.  I

27  guess his girlfriend at the time, daughter owns a

1   Napa -- a vineyard up in Napa Valley.  So he
2   wanted a wine cabinet, because I guess she
3   collects wines, vintage wines.

4         **DEPUTY COMMISSIONER BLONIEN:**  As
5   evidenced by your photographs, you do beautiful
6   work.

7         **INMATE BELL:**  That there, the plaque in
8   the preceding photo, is the other project inside
9   the business plan.  For -- that one there took me
10  about ten years to really perfect, you know, as
11  far as size, shape, you know, and the most
12  economical way to bring something to market.  And
13  then the other one is a trinket box that I -- I
14  don't have no photographs of.  But those are some
15  other projects there through the Arts in
16  Corrections program here at DVI.

17        **DEPUTY COMMISSIONER BLONIEN:**  And you
18  sell your work through the hobby shop?

19        **INMATE BELL:**  Through the hobby shop, out
20  in front.  And then with the proceeds, I
21  re-invested back into what I am doing in
22  materials or tools or whatever.  I have -- I'd
23  say I have got about maybe 10 thousand dollars
24  worth of tools and equipment I have accumulated
25  over the past 20 years, actually.  I started
26  hobbying -- a friend of mine got me involved in
27  the hobby program in Soledad.  That's when I was

1   still getting in trouble, and I was literally

2   becoming a prison thug, so to speak.  I had no

3   direction in life, no nothing.  He was involved

4   in jewelry making, and I had mentioned about my

5   past experience with making jewelry boxes.  So he

6   -- you know, he brought me into the hobby shop

7   and set me up.  And, you know, basically I was on

8   my own from then on, since 1987.  And since then

9   I've taken all my time, effort, and energy, and

10   literally, you know, been honing my trade.

11        **DEPUTY COMMISSIONER BLONIEN:**  So the

12   three products that you plan to manufacture, you

13   now sell in the hobby shop?

14        **INMATE BELL:**  I sell in the store, and

15   plus --

16        **DEPUTY COMMISSIONER BLONIEN:**  And how do

17   they sell?

18        **INMATE BELL:**  They do pretty well.

19        **DEPUTY COMMISSIONER BLONIEN:**  What's your

20   best seller?

21        **INMATE BELL:**  Well, it's a toss up

22   between the desk set and the plaque.  Because

23   when people retire, well then they get the clock,

24   the pocket watch.  And then just recently one of

25   the officers -- I guess somebody from this

26   department in here is retiring, or just finished

27   a course.  And a plaque was just purchased in

1  commemoration of that. So they are more of a
2  commemorating plaque. And the desk sets for
3  retirement. I did a lot of research on the stuff
4  out here on the west coast. And a lot of this
5  stuff isn't being produced out here. It's mainly
6  produced out on the east coast.

7      **DEPUTY COMMISSIONER BLONIEN:** Mostly
8  produced in China.

9      **INMATE BELL:** Well, yeah, there's that,
10  too.

11      **DEPUTY COMMISSIONER BLONIEN:** To tell you
12  the truth.

13      **INMATE BELL:** Yeah. Yeah. Quite a bit.
14  But at the same time, the stuff that is being
15  produced here in America, I found that by buying
16  in bulk and by keeping the cost down and the
17  production method that I have employed, over the
18  past 15 years I've taken all three items and I
19  have made them to where each and every component
20  fits on the next component. So I also make this
21  mantle clock that -- so the box, if you took the
22  box and turned it up on its side and cut it in
23  half, well, that is the base. And then the other
24  part of the same size box would be the carcass
25  for the dial. And then the railing on the pen
26  set is also the railing, same size railing on the
27  desk set and the same size frame material on the

61

1   plaque.

2          **DEPUTY COMMISSIONER BLONIEN:**   So

3   incorporating into your business plan are the

4   efficiencies of production.

5          **INMATE BELL:**   Yeah.   Yes.   And it costs

6   me approximately -- up to date, or as of last

7   year, it costs me just a little over eight

8   dollars to produce a plaque.   And I sell them for

9   69.95.   And then the desk set is the same thing.

10  Here I sell them for 49.95, but I know they can

11  sell more out in the market out there.

12         **DEPUTY COMMISSIONER BLONIEN:**   Okay.

13         **INMATE BELL:**   And that only costs me six

14  dollars and something-odd cents to make.   So the

15  overhead and the material-wise is very low.

16         **DEPUTY COMMISSIONER BLONIEN:**   And you

17  enjoy it, and you are also working in the hobby

18  shop.   You are the supervisor of the hobby shop?

19         **INMATE BELL:**   I'm the tool room

20  clerk-slash-maintenance all around.   I was given

21  the responsibility -- I literally run --

22         **DEPUTY COMMISSIONER BLONIEN:**   And you've

23  worked there since --

24         **INMATE BELL:**   2001.

25         **DEPUTY COMMISSIONER BLONIEN:**   And you

26  were removed from PIA when you got that 115?

27         **INMATE BELL:**   Yes, yes.   And then an

1    opening just happened to come up in the hobby
2    shop.  I was already in the program; and then the
3    opening in the tool room came up, and I was able
4    to --

5         **DEPUTY COMMISSIONER BLONIEN:**  And your
6    supervisor gives you all above average and
7    exceptional performance evaluations.

8         **INMATE BELL:**  Yes.  Mr. Spivey.

9         **DEPUTY COMMISSIONER BLONIEN:**  And you've
10   been a participant in hobby shop since 1993.

11        **INMATE BELL:**  When I arrived here.  I was
12   already doing it at Soledad since '87, so -- and
13   then I eventually got a job as a tool room clerk
14   there at Soledad as well, which is where I was
15   working before being transferred here in '93.

16        **DEPUTY COMMISSIONER BLONIEN:**  So you've
17   also -- you talked about, in your packet that you
18   gave me, this motivation group.  When was that?

19        **INMATE BELL:**  That is every Saturday,
20   believe it or not.

21        **DEPUTY COMMISSIONER BLONIEN:**  Every
22   Saturday, but what year?

23        **INMATE BELL:**  Oh.  It's been going on for
24   about 18 months now, I believe.

25        **DEPUTY COMMISSIONER BLONIEN:**  And you
26   wrote two essays, one on responsibility and one a
27   reality check.

1          **INMATE BELL:** Yes, and which I read to

2    the group. It meets every Saturday. Just this

3    -- when I'm available, on the weekends, when my

4    -- my boss, Ray Spivey, is Army Reserve. And I

5    work Saturday and Sunday. Once a month he goes

6    off and does Army training and such and that. So

7    when I'm available, that is my -- you know,

8    attend the motivational group. And what it is

9    basically is a bunch of lifers that gets together

10   in the culinary. We are being sponsored by this

11   female (inaudible) that works up in records.

12         **DEPUTY COMMISSIONER BLONIEN:** And how

13   come all these lifers come in here and say

14   there's nothing available and never talk about

15   that group?

16         **INMATE BELL:** This is something new.

17         **DEPUTY COMMISSIONER BLONIEN:** 18 months.

18         **INMATE BELL:** Yeah, I guess (inaudible).

19         **DEPUTY COMMISSIONER BLONIEN:** You know?

20         **INMATE BELL:** Yeah. I don't know. I can

21   only speak for myself.

22         **DEPUTY COMMISSIONER BLONIEN:**

23   (inaudible).

24         **INMATE BELL:** Yeah.

25         **DEPUTY COMMISSIONER BLONIEN:** It's very

26   good.

27         **INMATE BELL:** Yeah, it's really a good

64

1    group.  The Walden House out of San Francisco had
2    just came this past weekend.

3           **DEPUTY COMMISSIONER BLONIEN:**  That's such
4    a good group.

5           **INMATE BELL:**  Yes, it is.  I'm familiar
6    with that through my uncle's drug use in the
7    past, back in the 70's and stuff like that.  He
8    was a member of Walden House.

9           **DEPUTY COMMISSIONER BLONIEN:**  And you
10   also took courses in Correctional Learning
11   Network, and there's many certificates in there.

12          **INMATE BELL:**  Yeah, that's an educational
13   college course that is ran over the institutional
14   TV.  And you literally -- you follow the
15   curriculum on the television.  You take notes and
16   you submit your written synopsis of the video
17   that is shown.  The last ones I had done were
18   Victim's Awareness and the job -- On the Job
19   Success.  The one on the Victim's Awareness --

20          **DEPUTY COMMISSIONER BLONIEN:**  Success in
21   the Workplace.

22          **INMATE BELL:**  Yeah.  Well, there was one
23   -- there was a combination of --

24          **DEPUTY COMMISSIONER BLONIEN:**  Own Your
25   Own Business.

26          **INMATE BELL:**  Yeah.  There was Success
27   and Victim's Awareness, and that had to do with

1   sexual harassment on the job site, and plus out
2   in public.
3        **DEPUTY COMMISSIONER BLONIEN:**  And you
4   have taken courses in family relationships.
5        **INMATE BELL:**  Yes.
6        **DEPUTY COMMISSIONER BLONIEN:**  Now let's
7   talk about your involvement in NA/AA.
8        **INMATE BELL:**  I have been a member since
9   1987, around the same time I got involved in the
10  hobby program at Soledad.
11       **DEPUTY COMMISSIONER BLONIEN:**  There were
12  some lapses.
13       **INMATE BELL:**  Yes there was, yeah.
14       **DEPUTY COMMISSIONER BLONIEN:**  And then in
15  2001 you sort of re-involved yourself with the
16  Fresh Start NA.
17       **INMATE BELL:**  I was in AA at the time,
18  from '87 up until '98, the same night that this
19  Road to Freedom class.
20       **DEPUTY COMMISSIONER BLONIEN:**  Uh-huh.
21       **INMATE BELL:**  Through Jim McClary,
22  through the PRPP course, through the church.  It
23  was on the same night that AA was.  So because
24  that had to do with anger management, and, you
25  know, peace versus power and will training -- it
26  was the study of Dr. Lowe.
27       **DEPUTY COMMISSIONER BLONIEN:**  So we are

1    talking about AA and NA now.

2         **INMATE BELL:** Yeah. Well, I had to drop

3    out of AA. And so from there I went into NA.

4    And then, so I have been --

5         **DEPUTY COMMISSIONER BLONIEN:** So your

6    version of the 115 is your version.

7         **INMATE BELL:** Yes.

8         **DEPUTY COMMISSIONER BLONIEN:** But the

9    reality is, you were found guilty.

10        **INMATE BELL:** Yes.

11        **DEPUTY COMMISSIONER BLONIEN:** And with

12   your history, the question becomes, what are you

13   going to do so that if paroled, narcotics or

14   alcohol isn't going to be part of your parolee

15   life? And your past history speaks to this as a

16   major problem with you.

17        **INMATE BELL:** Yes, it is. Yes.

18        **DEPUTY COMMISSIONER BLONIEN:** And now you

19   have been in AA/NA significant amount of time.

20   Have you worked through the steps?

21        **INMATE BELL:** Yes, I have. And the first

22   step, step one, believe it or not, my life was

23   unmanageable at that time. And, you know, it's

24   been -- you know, it was unmanageable for quite a

25   few years. Growing up -- as you see, I'm not

26   proud of my past criminal history or my drug use

27   or substance abuse or any of that. And step

1   four, you know, I literally did a searching moral

2   inventory of myself.  I continue to do that

3   today.  I refer back to step ten all the time,

4   which continues to take that inventory.  And when

5   I'm wrong, you know, I like to be -- you know,

6   that to be pointed out.  I'm not above learning.

7   I'm not above changing my lifestyle or changing

8   what I do.  It's an ongoing process.  I know

9   this.  I try to --

10          **DEPUTY COMMISSIONER BLONIEN:**  I know you

11  are nervous right now.

12          **INMATE BELL:**  Yes, I am.

13          **DEPUTY COMMISSIONER BLONIEN:**  And I want

14  you to take a deep breath.  Because you have got

15  all of this in your head, and it's coming out no

16  matter what I am asking.

17          **INMATE BELL:**  Yes.

18          **DEPUTY COMMISSIONER BLONIEN:**  So --

19          **INMATE BELL:**  Okay.

20          **DEPUTY COMMISSIONER BLONIEN:**  Let's just

21  calm down a little bit.  And as we are talking

22  about this -- this major problem and in your

23  life, and you can name the steps.  You have named

24  one, four, and ten.

25          **INMATE BELL:**  Yes.

26          **DEPUTY COMMISSIONER BLONIEN:**  And you go

27  to the NA meetings.  How often are they?

1          **INMATE BELL:** Every two -- every other
2     Tuesday night.

3          **DEPUTY COMMISSIONER BLONIEN:** Every other
4     Tuesday.

5          **INMATE BELL:** Yes. Which I attend
6     regularly. I have a bunch of resources of places
7     that I have contacted.

8          **DEPUTY COMMISSIONER BLONIEN:** And
9     Commissioner Martinez is going to talk to you
10    about parole plans. And I know there's
11    components of that in there, too.

12         **INMATE BELL:** All right. Yeah. As far
13    as my drug abuse and my substance abuse --

14         **DEPUTY COMMISSIONER BLONIEN:** But you get
15    out, and you're -- and you find your sister
16    again, and she is going to throw a big party for
17    you, coming home. You are going to meet her on
18    the street --

19         **INMATE BELL:** That's not what I want. I
20    have no desire --

21         **DEPUTY COMMISSIONER BLONIEN:** What
22    strategies do you have now that keep you away --
23    I know there's lots of pruno out there, there's
24    drugs out there -- what keeps you away from them
25    right now?

26         **INMATE BELL:** Believe it or not, my
27    hobby, and where I am today. My woodworking, and

1    what I do today, is completely different from the
2    individual that sat before the courts all through
3    my life.  I did a lot of soul searching over the
4    years.  My mind was always clouded with drugs and
5    alcohol.  And one night -- I never made right
6    decisions through that.  You know, I had my own
7    business in 1977, you know, remodeling Victorian
8    homes.  And I threw all that away looking for the
9    fast lane, which really wasn't there.  It just
10   ended me back up into another institution.  And
11   then, you know, that's the way it's been all
12   through my life.  I have allowed peer pressure
13   and my own stupid decisions to lead me in the
14   wrong direction.  And a lot of it had to do with
15   alcohol and substance abuse.  That's been my
16   problem.  And I do agree with that.  As you see,
17   I've had drunk drivings -- although they were
18   minor at the time, okay, still yet they were
19   drunk driving.  They were under the influences.
20   I've had 115's for, you know, possession of
21   marijuana; and I've had 115's for pruno.  I don't
22   deny that.  Since then I've changed that
23   lifestyle.  I'm no longer tempted by other
24   people's actions, because I am the only one
25   accountable for what I do.  And what I do
26   sometimes affects the people around me, if not
27   all the time.  I have become a very responsible

1   individual. I have no desire whatsoever for any
2   drug use or alcohol any more. I don't -- I find
3   getting high on my woodworking and my craft, my
4   creativity. When I am under the influence, all
5   that goes out the window. I have no longer have
6   that. And I look back, and reflecting over the
7   years, we wouldn't be here today had it not been
8   for that type of behavior and those choices I
9   made over the years. And looking back at it in
10  my own soul searching, I've always asked myself,
11  what did it ever net me, you know? Just the next
12  morning with a hangover or feeling like crap?
13  Hurting somebody, maybe, if not -- or not knowing
14  that I hurt somebody, you know, things like that.
15  I never really took any of those things into
16  consideration. It's like when I stole the cars.
17        **DEPUTY COMMISSIONER BLONIEN:** Do you
18  think maybe it was to escape some of your reality
19  back then?
20        **INMATE BELL:** There was a possibly -- if
21  I blamed it on that, then I would be blaming it
22  on somebody other than myself. Because, you
23  know, I can blame my brother, my older brother,
24  for being a bad peer influence. You know, he
25  always led me, you know, astray. I wasn't strong
26  enough to walk away like my older brother between
27  us had done. You know, even on an early age,

1  that 1968 incident, my older brother Michael
2  literally walked home that day. He said he
3  didn't want no part of it. Me being the youngest
4  and my older brother being the eldest, I followed
5  his footsteps. All through my life I tried to
6  emulate my brother, you know. Same with my
7  uncle. I tried to emulate him. And I didn't
8  realize that there was somebody within Mr.
9  Timothy Bell -- you know, it's like the old
10  saying, you know. I have a C number, not a we
11  number. You know, you know, we are judged on our
12  own, you know, merits and our own actions.

13        **DEPUTY COMMISSIONER BLONIEN:** Yeah. When
14  I look at your psych reports and they talk about
15  your substance abuse history, the -- all of them
16  sort of ignored your 115 that you got for the --
17  in 2000, and just sort of believed your side of
18  the story.

19        **INMATE BELL:** Yeah.

20        **DEPUTY COMMISSIONER BLONIEN:** And in
21  talking about your substance abuse history, Dr.
22  -- I've got them all marked, here --

23        **INMATE BELL:** Dr. Mann? The first one?
24        **DEPUTY COMMISSIONER BLONIEN:** Dr. Mann
25  noted that you had alcohol dependence in
26  institutional remission on your diagnostic
27  impressions. It doesn't really talk about any

1   substance abuse indicators. He notes that you
2   have cannabis dependence in institutional
3   remission, no diagnosis of -- no current
4   diagnosis of your axis two. Whereas in previous
5   psych reports, you have been diagnosed with
6   antisocial personality disorder in remission.
7   Notes your elevated cholesterol. What is your
8   cholesterol?

9           **INMATE BELL:** Now I think it's down. It
10  was really up there a while back, 280-something
11  -- and I think it's down to about -- I haven't
12  taken a blood test in six months, but it was down
13  to only a hundred, actually. And I think it
14  fluctuates back and forth.

15          **DEPUTY COMMISSIONER BLONIEN:** It gives
16  you a global assessment functioning score of 90,
17  which indicates you have good general
18  functioning, and that you are interested in the
19  variety of activities. You are socially
20  connected, behaviorally and emotionally stable,
21  and functioning well. And in looking back on the
22  '05 report by Dr. Miller, she notes under
23  substance abuse that you acknowledge using drugs
24  and alcohol since your late teens, and described
25  yourself as a recreational user of marijuana and
26  alcohol in junior and senior high school, and
27  that you experimented with meth, heroin and LSD.

1   She notes your involvement in the AA 12-step
2   program, and NA '95 to '98, and your involvement
3   in the Road to Freedom program, and that "inmate
4   Bell's personal growth and positive attitude have
5   proven to be beneficial to himself and the group
6   as a whole. An asset to the group, he has a
7   favorable outlook toward the future," and gives
8   you a diagnosis under axis one of polysubstance
9   abuse with alcohol and marijuana as drugs of
10  choice, in sustained institutional remission.
11  And in '04 Dr. Gitman gives you a polysubstance
12  dependence in full institutional remission, even
13  after noting that he has not received any 115's,
14  with the last one being in 2000 for the drugs.
15  So that's very unusual, that the doctor would
16  just ignore that and take your --

17          **INMATE BELL:** Well, I was very adamant
18  about that 115.

19          **DEPUTY COMMISSIONER BLONIEN:** Well,
20  you've been here a long time. How many people
21  are adamant, and still --

22          **INMATE BELL:** Well, yes. That's true.
23  But I stood on the grounds of not being in
24  possession of a lighter, not turning in a dirty
25  toxicology -- if I had just done heroin, then I
26  would have turned in a dirty urine test, which I
27  volunteered to submit right then and there. And

1   then took another one the following week and came
2   out also negative.

3          **DEPUTY COMMISSIONER BLONIEN:**  Well,
4   didn't you take for -- didn't you test for a year
5   after that, pretty much?

6          **INMATE BELL:**  Yes, I did.  Yeah.  Yeah.

7          **DEPUTY COMMISSIONER BLONIEN:**  Because
8   that's one of the parameters.  You get one of
9   those 115's.

10         **INMATE BELL:**  Yes.  And each and every
11  one, I  -- it was negative.

12         **DEPUTY COMMISSIONER BLONIEN:**  And then in
13  looking at your assessment of dangerousness, the
14  current psych by Dr. Mann notes that you do have
15  several risk factors.  And two are related to
16  substance abuse and your previous history of
17  substance abuse and your intoxication during the
18  commitment offense.  That you also have a history
19  of violent behavior as a juvenile, and you also
20  have a history of other nonviolent crimes as a
21  juvenile.  Your commitments to the Youth
22  Authority, your failure to adhere to conditions
23  of probation of parole is another risk factor in
24  regards to recidivism.  And the final risk factor
25  is that you exhibit a history of school
26  expulsions, having been expelled from high
27  school.  There are more numerous positive factors

1    that indicate a lower possibility of recidivism.
2    And there's a higher concurrence between never
3    being married individuals -- you were married for
4    a short time -- that you have passed the age of
5    35, through no fault of your own.  That just
6    happens.  That you have prosocial behavior
7    involvement, that you are involved in your work
8    in the hobby shop, that your family is also
9    involved in your life and they continue to
10   provide support.  Family support and letters of
11   support are both positive.  That you demonstrate
12   considerable insight into your life crime and the
13   utilization of the time that you have been
14   incarcerated.  You show remorse for the victim,
15   the victim's family.  That you are actively
16   involved in NA and plan to maintain his sobriety
17   in the community.  That you have shown
18   considerable effort in locating resources in the
19   community so that you would be able to maintain
20   that growth.  The assessment of dangerousness
21   within a controlled setting of an institution is
22   seen as below average to other inmates.  And
23   assessment of dangerousness if released into the
24   community is seen as below average in comparison
25   with other inmates.  There's no evidence of
26   psychopathology or mental problems that would
27   preclude routine release planning.  That through

1   your period of incarceration, you have shown the

2   ability to transform your behavior from being

3   impulsive and antisocial to now being a

4   productive, integral part of the community and

5   the workforce. I think with that, I'm going to

6   return it to the chair.

7       **PRESIDING COMMISSIONER MARTINEZ:** All

8   right. Mr. Bell, what are your plans for parole

9   regarding residence?

10      **INMATE BELL:** I plan to parole to my

11  father's house, 227 Just Avenue in San Francisco.

12      **PRESIDING COMMISSIONER MARTINEZ:** Okay.

13      **INMATE BELL:** The house that I literally

14  grew up in.

15      **PRESIDING COMMISSIONER MARTINEZ:** And

16  what about employment?

17      **INMATE BELL:** Right now I have no job

18  opportunities, offers. I have written numerous

19  letters. I have sent over -- maybe a hundred

20  letters out this past couple months. I got a job

21  offer from the Horizon House. They are an

22  organization that literally helps ex-offenders

23  get housing if need be, job opportunities and

24  placement, clothing, other things. The letter, I

25  saw it out here on the table when I first came

26  out here. This is from the Horizon House.

27      **PRESIDING COMMISSIONER MARTINEZ:** This

1    one?

2          **INMATE BELL:**  Yeah.  Plus the Salvation
3    Army.  I have written them, and they also have a
4    drug treatment program, plus housing, job corps,
5    and office of employment.  I don't feel that
6    employment is any problem.  I've always been a
7    worker.  I can always obtain a job.  It's just a
8    matter of not having the connections that anybody
9    owns businesses in my family or any of that.  My
10   father is retired.  My nephews, even though they
11   moved out to Florida, they are in the
12   construction field, the same thing that I plan on
13   doing.  And some of their connections, they told
14   me that I can look them up when I get out, you
15   know, for possible employment.  Through not only
16   the Northern California Service League, the
17   Salvation Army and some other places that I have
18   written, I don't believe -- like Jobs Plus,
19   that's another place that helps ex-offenders find
20   employment.

21         **PRESIDING COMMISSIONER MARTINEZ:**  Okay.
22         **INMATE BELL:**  My last attorney, he had
23   given me an address called the Yushua Foundation
24   out of the Haight.  But when he sent me the
25   address, the address was no longer current.  And
26   then I tried to contact them again, and I had no
27   luck.  Like I said, I've written numerous

1    letters.  These are all the ones I got back
2    return to sender.  They are no longer current.
3    But I have an entire packet of resource addresses
4    for not only employment but education.  And then
5    stuff that the city and county provides, as well
6    as friends outside.  Through some of my good will
7    and giving back to the community, I've been in
8    close contact with friends outside, with not only
9    donations and stuff like that that I have given
10   for charity, but also there's a place here called
11   Job Alert, through the San Francisco Police
12   Department that literally helps -- I think it's
13   an organization called All of Us or None.  It's
14   something recent I've seen in the newspaper, and
15   I clipped it out.  And I wrote the district
16   attorney.  I seen her on TV one morning, and she
17   was talking about a youth program to put youth to
18   work in housing and all of that for inner
19   troubled kids.  I'm waiting on a response for
20   that.  I haven't gotten back a -- a letter back
21   from her or Michael Hennessy that wrote the
22   article.  But they also had job opportunity and
23   job placements that I could go to.  I didn't know
24   if this was an adult place; but I wrote them to
25   ask if they had any places for adults, which I
26   imagine they do.  Because they are in, also,
27   association with some of these other places.

1   Also through CEGA, it's a CETA program. They
2   also have job placements and workings, places.
3   Plus in order to get back into school, I have a
4   junior college not 20 minutes from my house, 10
5   minutes if that, you know, that I plan to maybe
6   enroll in night courses and this and that, and
7   continue my studies in business. I was thinking
8   about business law, but that really pertains a
9   lot of -- that would take me literally away from
10  the building trade. I do know about tort laws
11  and stuff like that, and some of the other
12  things. As far as other resources of jobs,
13  there's a Project Rebound program for
14  ex-offenders that I have written to, and I got
15  their information. And basically, you fill out
16  an application once you are released.

17        **PRESIDING COMMISSIONER MARTINEZ:** Right.

18        **INMATE BELL:** I also wrote Delancey
19  Street at one time, trying to get some
20  information from them. But they no longer do
21  outside work. You have to come in. Most of
22  these places I wrote, they are all -- you have to
23  come straight in, yeah. Even the Northern
24  California Service League, the Salvation Army.
25  They are all --

26        **PRESIDING COMMISSIONER MARTINEZ:** Well,
27  there's places like Crossroads that will accept

1    you and will submit you a letter stating that
2    upon your release, that you are -- you do have a
3    place there.

4              **INMATE BELL**:  Yeah.

5              **PRESIDING COMMISSIONER MARTINEZ**:  So
6    that's one.

7              **INMATE BELL**:  That's what the Yushua
8    Program was.  And apparently they no longer
9    exist, because that was out of the Haight.  And I
10   even had my little brother try to go hunt them
11   down, and he couldn't find any establishments
12   there.

13             **PRESIDING COMMISSIONER MARTINEZ**:  Okay.
14   Let's go on to your letters.  I just want to note
15   this one here.  The Northern California Service
16   League, dated September 7th, 2006.  This is out
17   of San Francisco based.  D. Yee, Y-E-E, is the
18   individual that has written to you.  And it
19   states that it's a community-based organization
20   located in San Francisco with additional office
21   in San Jose.  I'd like to tell you about the
22   parolee employment program.  And that's been in
23   existence for about four years, previously known
24   as the job plus program.  Parolee employment.
25   The program provides job placement assistance to
26   those California state parole -- on California
27   state parole, ana our several agencies throughout

1   the state of California offering job placement
2   assistance.  States, we have a list of current
3   PEP providers to give you, and they did provide
4   those to you here, a listing.  And that states
5   that all paroled agents should know that PEP
6   providers (inaudible) required for you to report
7   to your parole agent shortly after you are
8   released.  Please ask him to refer you to the
9   nearest PEP (inaudible).  We have heard back from
10  no inmates.  The PEP has been sufficiently filled
11  (inaudible) this PEP program is under an umbrella
12  of the Department of Corrections and
13  Rehabilitation.  So if you happen to be returning
14  to San Francisco or Santa Clara County, please
15  come by and meet with one of our staff members.
16  And this is if you've been recently released from
17  state prison, to let them know.  So, that's good.
18  All right.

19          **INMATE BELL:**  Also, on my spare time, my
20  father -- even though he has a small workshop set
21  up in the basement, it's really a small place.
22  It's nothing large.  But there's room underneath
23  the overhang of the kitchen to extend it to a
24  room almost about the size of this, that he has
25  offered to let me remodel it and turn it into
26  like a design workshop to start, you know, this
27  business plan that I have -- you know, for more

1   research and development until I can, you know,

2   literally get, you know, the money to establish

3   my own workshop, a larger place with the

4   equipment that I have and resources from the

5   Small Business Administration that I plan on

6   applying for loans and whatnot.

7         **PRESIDING COMMISSIONER MARTINEZ:**  All

8   right.

9         **INMATE BELL:**  Just get myself started.

10  Plus there's a program called SCORE, from -- that

11  I looked into.  They are ex-CEO's, retired

12  businessmen that are willing to offer you a

13  mentor for a year, to work with you hand-in-hand

14  for anything you possibly need.  I looked into

15  that, and I was trying to get direct contact with

16  somebody out of San Francisco.  But again,

17  because I'm incarcerated, they didn't -- they

18  couldn't give me a mentor or a sponsor at that

19  time.  Excuse me.

20         **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

21         **INMATE BELL:**  But that's something else I

22  plan to pursue.

23         **PRESIDING COMMISSIONER MARTINEZ:**  All

24  right.  This is a letter from the parolee

25  aftercare placement assistance program.  I think

26  you mentioned it.

27         **INMATE BELL:**  Yes.

1           **PRESIDING COMMISSIONER MARTINEZ:**

2     December 29  -- 19th, 2006 letter from Reverend

3     Roland Ruffin, R-U-F-F-I-N, Protestant chaplain

4     at DVI. He also writes you a general support

5     letter for you. He said he commends you for your

6     participation in many of the activities.

7     "Introduced to the importance of making ethical

8     decisions which impact the community in positive

9     ways. In order to achieve this goal, your

10    assistance may be necessary relative to Timothy's

11    need for employment, housing, or personal care

12    upon parole." Well, let me go back. "This

13    letter verifies Timothy's personal commitment to

14    many people at our facility. We have invested in

15    him. He has pledged to engage the tools and

16    resources received from our programs in ways

17    which will provide positive contribution and

18    restitution. In order to achieve this goal, your

19    assistance may be necessary relative to Timothy's

20    need for employment, housing, personal care upon

21    parole. In advance, I would like to express my

22    deepest appreciation for your assistance to help

23    upon request from Timothy Bell." And, all right.

24    And, let's see. Motivation Development Group.

25          **INMATE BELL:** The letter from Reverend

26    Ruffin, I wasn't -- I didn't get a copy, but I

27    think there may be something in my file. He

1   wrote my father's church, Saint Finbar's, up the
2   street from my house.  My father attends
3   regularly up there and does some odd jobs also.
4        **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.
5        **INMATE BELL:**  I don't know if it reached
6   my file or not.  But he was supposed to send a
7   letter out to --
8        **PRESIDING COMMISSIONER MARTINEZ:**  I don't
9   have anything in my packet.
10       **INMATE BELL:**  It was part of this
11  program, this parolee after placement program.
12       **PRESIDING COMMISSIONER MARTINEZ:**  Let me
13  move forward with this, because there's a lot of
14  things here that I need to cover.  There are some
15  letters that you have provided here today that,
16  again, as you were speaking about earlier, that
17  show that you have taken some initiative and
18  tried to reach out to different resources out
19  there in the community.  This is a letter for
20  aftercare assistance that you wrote.  And this is
21  on December 19th of 2006, the Northern California
22  Service League, that we have addressed.  The
23  Salvation Army Harbor Light Center.  And this is
24  a response from the coordinator, intake
25  coordinator Barbara Young from the salvation Army
26  Harbor Light Center.  "We are writing to let you
27  know that we are in receipt of your letter.  Due

1  to limited resources, Harbor Light outreach and
2  intake procedures are unable to accommodate
3  inmates who are incarcerated. In order to apply
4  for the residency at this program, a client must
5  be available for an in-person assessment or
6  interview." And I think that's what we have
7  discussed already.

8  **INMATE BELL:** Yeah.

9  **PRESIDING COMMISSIONER MARTINEZ:** So,
10  nevertheless, a good program. We have Bridging
11  the Gap. That is more or less of a self help.
12  Well, no.

13  **INMATE BELL:** Yeah, that's a 12-step
14  program. It's based out of Vallejo, California.
15  There's no address on that. But there's another
16  resource of the same type on Army Street in San
17  Francisco that I have an address. And I wrote
18  them once before. And again, it's one of those
19  -- they don't give sponsors. You have to come in
20  off the street.

21  **PRESIDING COMMISSIONER MARTINEZ:** Right.
22  Project Rebound, the program for ex-offenders.
23  That's been indicated. Out of San Francisco
24  based. And they provided you with some
25  information, resources. Alcoholism Information
26  and Treatment Centers that you have here, a
27  listing of treatment facilities in San Francisco.

1   Alternative Alcohol Problem, a counseling group,
2   the 12-step program.  Baker Places acceptance,
3   Salvation Army, and the Institution of Advanced
4   Driver Education and Training (inaudible).  And
5   then addresses for resources.  You certainly have
6   done quite a bit in that area, in looking at your
7   research.  This letter is from -- this is, again,
8   a support letter.  And this is from Edward Bell,
9   dated January 31ˢᵗ, 2007.

10          "I'm writing again -- again, I'm
11          writing in support of my brother
12          Timothy.  On behalf of my family
13          and myself, we want you to know
14          that we are available to assist him
15          in his transition into society upon
16          his release.  The skills and
17          maturity he has gained while
18          incarcerated I believe makes him a
19          successful candidate for parole.
20          His remarkable talent as an artist
21          (inaudible) his release.  Given the
22          multitude of options in this field,
23          a strong need for the building
24          trade, I feel it's beneficial to
25          Tim to become a productive member
26          of society.  After several visits
27          with Tim over the years, I have

1          witnessed a tremendous growth,
2          fully functioning, mature adult.
3          Since his undisciplined, youthful
4          behavior, I trust he has grown as a
5          person, ready to give back to
6          society. I believe he will not
7          disappoint his family or anyone he
8          will meet when he is paroled. Tim
9          will have our full support with
10         living accommodations, financial
11         help if needed, and
12         transportation."
13    And where does Edward -- is this your --
14         **INMATE BELL:** That's my youngest brother.
15         **PRESIDING COMMISSIONER MARTINEZ:** Where
16    does he live?
17         **INMATE BELL:** He is living out on Page
18    Street in the Haight. He is the one that works
19    at San Francisco General. I think at the moment
20    he is on leave to get his (inaudible). I think
21    (inaudible) he went back to school for a short
22    period. I think he is working part time at a
23    hospice.
24         **PRESIDING COMMISSIONER MARTINEZ:** Okay.
25    He does provide the address and so forth. No
26    phone number, though. All right.
27         **INMATE BELL:** The letter I received -- I

1  lost contact with him.  But the letter I received
2  with that, he went to a different phone service
3  provider.  And here, because this place deals
4  with MCI, there was a conflict.  So right now
5  there's a block on the telephone trying to get
6  lifted, and he is still having trouble.

7      **PRESIDING COMMISSIONER MARTINEZ:**  All
8  right.  Do you want -- do you have a current
9  letter for Ronald Sutton?  That is your dad,
10  correct?

11     **INMATE BELL:**  No.  He was supposed to
12  send it also to Sacramento.  Because my little
13  brother said he also sent -- in this letter here,
14  he said he sent a copy off to Sacramento.

15     **PRESIDING COMMISSIONER MARTINEZ:**  All
16  right.  So, no current letter.  What I do want to
17  note, that he has been sending one every year.

18     **INMATE BELL:**  Yes, he has.  Yes.

19     **PRESIDING COMMISSIONER MARTINEZ:**  He sent
20  one in --

21     **INMATE BELL:**  As you see, the postmark --
22     **PRESIDING COMMISSIONER MARTINEZ:**  '99.
23  He sent one in '05 August, and then '04; and then
24  we have the most current in August of 2005.  And
25  again, it does -- just for the record, again,
26  that it does indicate that he is providing for
27  you.  "If there's anything I can assist to assist

 1   Timothy in his quest for employment, I will be
 2   there for him, as with any other needs in his
 3   daily life." (inaudible).
 4          (Thereupon, the tape was changed)
 5   "Assist him in his return home.  My home is here
 6   for however long it takes for him to establish a
 7   place of his own."  How old is he?
 8          **INMATE BELL:**  Right now I believe he is
 9   65.  64, 65.
10          **PRESIDING COMMISSIONER MARTINEZ:**  Any
11   health problems?
12          **INMATE BELL:**  No.  He is doing pretty
13   good.  He is retired, but he is doing some
14   part-time work in an apartment complex.  He
15   oversees the, you know, the ongoing maintenance
16   of about 30 units.  And he is going to speak with
17   the owner, because he is getting up to where he
18   can't do that no more.  And upon my release, I
19   might end up getting that as a fallback job,
20   part-time work.
21          **PRESIDING COMMISSIONER MARTINEZ:**  Uh-huh.
22   Okay.  I think these are all the letters here.
23   All right.  Any other letters that I missed?
24          **DEPUTY COMMISSIONER BLONIEN:**  Not any
25   current ones.
26          **PRESIDING COMMISSIONER MARTINEZ:**  No.
27   Those are the only -- aside from your dad's

1   letter, that was not current. (inaudible) they
2   are all current here.

3       **INMATE BELL:** I have -- I was also
4   waiting on some letters from my nephews, like I
5   said, from Florida. They come out periodically.
6   They were just out here last September when I was
7   trying to get all of them up to see me on a
8   visit. And that all fell through, because I
9   guess there was some other incident that took
10  place back there, catastrophe-wise, natural --
11  I'm not sure what it was. It was like a flood
12  thing. But they came out to buy my father's
13  truck. And then we kind of missed each other on
14  the visit that we had set up. But then just --
15  so, two weeks ago, maybe three weeks ago, that's
16  when my father drove up here to try to get in.
17  He come up to pick up the wine cabinet and some
18  other projects that I made the family. And he
19  couldn't get in, because they weren't recently,
20  you know, on the updated visiting thing. Yeah.
21  They have got to reapply every year. So there
22  was a problem, because my nephews had moved to
23  Florida and hadn't re-upped their visiting and
24  this and that, so -- yeah.

25      **PRESIDING COMMISSIONER MARTINEZ:** All
26  right. In regards to PC 3042 notices. As you
27  well know, those are notices that are sent out

1   regarding your hearing and people that have
2   interest in your hearing. Again, specifically
3   the superior court, county of San Francisco,
4   obviously the district attorney's office of San
5   Francisco. The San Francisco Police Department,
6   as well as the Attorney General's office in
7   Sacramento. I do not have any letters in
8   response to your hearing today. And again,
9   noting that also the deputy district attorney
10   from San Francisco is not present here, as well.
11   So with that, we go to questions. I don't have
12   any questions at this time. Commissioner
13   Blonien?

14         **DEPUTY COMMISSIONER BLONIEN:** I just have
15   one question. In reading the trial transcripts
16   and in listening to your version, they just don't
17   jive. Let me finish the question, and then
18   you'll answer it better.

19         **INMATE BELL:** Okay.

20         **DEPUTY COMMISSIONER BLONIEN:** On the
21   autopsy report, the victim was only five-nine and
22   175 pounds. And there's no defensive wounds
23   suffered by him at all. And the doctor testified
24   the fatal wound was the stab wound to the upper
25   abdomen, and that there -- he testified there was
26   no defensive wounds of any sort. And the medical
27   examiner thought the victim was stabbed in his

1  bed, and was able to get up and walk into the
2  dining room, where the knife either fell out of
3  his body or pulled, and then the victim was
4  strangled.

5     **INMATE BELL:** During the trial, I went in
6  basically on the assumption that I was innocent,
7  that they got the wrong man.

8     **DEPUTY COMMISSIONER BLONIEN:** Yeah, I
9  read all that, too.

10     **INMATE BELL:** Yeah. So that was in total
11  denial. If you read further on into the
12  transcripts -- I don't know if there's any in
13  this particular record -- but in the transcripts
14  it basically states he had some contusions about
15  his lip and his forehead. This incident took
16  place in the living room of the individual's
17  house. When I left that house that evening, he
18  was laying in the middle of the floor. I assumed
19  he had gotten up and went down, and went to the
20  bedroom and then laid down on the bed. I don't
21  know what took place. You know, I can only
22  surmise afterwards. But like I said, when the
23  incident took place, I assumed he was bigger or
24  taller. He seemed bigger, you know, okay, at the
25  time. Maybe because of his older -- you know,
26  his elder stature, you know, giving me the
27  impression that he appeared bigger. As far as

1    defensive wounds, I only stabbed him one time.

2    It was more of a -- you know, the fight only

3    lasted -- if it really was a fight, it was more

4    of a wrestling match.  Like I said, I stabbed him

5    one time in the abdomen and left him there,

6    basically in the living room with the knife in

7    him.

8         **DEPUTY COMMISSIONER BLONIEN:**  Four and a

9    half inches deep.

10        **INMATE BELL:**  Yes.  It was the knife we

11   was cutting the pizza with.  It was basically one

12   of those -- just under the butcher knife size.

13        **DEPUTY COMMISSIONER BLONIEN:**  Okay.  That

14   was the only question I had.

15        **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

16   Counsel?

17        **ATTORNEY NORTON:**  No, no questions.

18        **PRESIDING COMMISSIONER MARTINEZ:**  All

19   right.  With that, I'm going to turn it back to

20   you, counsel.  Closing.

21        **ATTORNEY NORTON:**  Thank you.  Before I

22   close, I don't know if this made it over to your

23   side.  It's a business plan that Mr. Bell has put

24   together.  It's very extensive.  I know --

25        **DEPUTY COMMISSIONER BLONIEN:**

26   (inaudible).

27        **ATTORNEY NORTON:**  Is it?  I wasn't sure

1  if that particular document was in there.  I

2  don't think it is.  So I, I wanted to at least --

3  for you to have that for your deliberations.

4  Thank you very much.

5      **INMATE BELL:**  I had one submitted in my

6  main file, in my central file.  I had the

7  counselor, because the letter I submitted --

8      **DEPUTY COMMISSIONER BLONIEN:**  Yeah.  I

9  have seen it before.  I have read it.

10     **ATTORNEY NORTON:**  Okay.  Then you have

11  seen it?  I apologize.  Thank you very much.  I

12  wasn't sure if it was in there.  It's a very

13  impressive document.

14     **INMATE BELL:**  Thank you.

15     **ATTORNEY NORTON:**  Dr. Miller, in her 2005

16  psych eval, makes a statement that I would agree

17  with, that Mr. Bell is not the same man that he

18  was when he entered CDC 24 years ago.  And I

19  think the file is very supportive of that

20  contention.  Mr. Bell has certainly spent his

21  time productively while incarcerated, bettering

22  himself as a citizen within the institution, and

23  certainly preparing himself for his eventual

24  release from incarceration.  I thought that Mr.

25  Bell really demonstrated keen insight today into

26  his actions, the man he was.  As he said, he had

27  a business, and he threw it away to pursue the

1   fast life. And what's -- and this incident, the
2   life crime, does seem to be a rather anomalous
3   event. Tragically, a man died. But Mr. Bell has
4   no other violent proclivities in his history. I
5   believe that the time has come for him to be
6   seriously considered for parole. I know the
7   panel concern -- expressed concern regarding the
8   115 of 2000. And I understand the panel's
9   concern. And it's -- I know, and Mr. Bell knows,
10  and the panel knows, they have to accept the
11  findings of CDC. And of course the standard
12  proof for a 115 is preponderance of the evidence,
13  more likely than not. It's a very low standard
14  of proof in the law. He has been found guilty of
15  it. Now seven years have passed. I think the
16  reason that the clinicians accept his version of
17  it -- I think his version is very plausible. The
18  fact that he tested for a year. As he said, he
19  submitted a urine test that came up negative. If
20  he had just ingested heroin, it would have been
21  positive. Again, but having said that, I
22  understand that that stands, and that the panel
23  is constrained by that finding. But it's now
24  been seven years. And he has continued in his
25  programming, in his AA/NA. And he made a
26  statement today -- he said that he is the only
27  one accountable for his actions. There were

1    plenty of influences, his older brother and
2    stuff, but he refuses to blame those. He takes
3    full responsibility for his own actions. And I
4    think it was very insightful that he didn't
5    attempt to mitigate any of his actions today. He
6    said that he gets high off his creativity in
7    woodworking now. And that, combined with his
8    programming, I think just really supports the
9    position that -- again, drugs and alcohol were
10   definitely a factor in the commitment offense.
11   There's no question about that. And the
12   clinicians rate him as a lower risk in society,
13   and with the condition that he remain sober. And
14   he has certainly gone to great lengths to provide
15   the panel with assurances that he will continue
16   with his sobriety and his programming on the
17   outside. And he has adequate parole plans, and
18   certainly has as many -- as much marketable
19   skills as any inmate I have ever seen. All these
20   things considered, it's my contention that he
21   should be given a parole date today. Thank you.

22        **PRESIDING COMMISSIONER MARTINEZ:** Mr.
23   Bell, this is your opportunity to tell us why you
24   feel you are suitable for parole.

25        **INMATE BELL:** Over the years, like I said
26   earlier, I can't blame anybody for my actions.
27   I'm the one that has been leading my own life. I

1    have gotten in trouble. I made poor choices in
2    not only friends, but poor choices in the actions
3    I have taken. I have had plenty of
4    opportunities, I do agree. And I threw them all
5    away. And it was all for, you know, false gains.
6    I have hurt people along the way; and I have
7    taken the life of Mr. Gill, which didn't have
8    this coming. Over the years, reflecting on my
9    life as a whole and the people I have hurt, I
10   realize that that's the -- you know, that was a
11   young wayward child that no longer exists. I
12   have grown to maturity. I have seen a lot of
13   things over the years, and I have heard a lot of
14   things. And I have seen a lot of pain. Over the
15   years I've tried to atone for that. I've tried
16   to atone for what I've done. I know that this
17   paperwork here isn't nothing compared to what --
18   excuse me -- to what I have done, okay? I can
19   only continue to try to change my life. Every
20   day, through my actions, I try to give back. You
21   know, I teach people down at the shop. I mentor,
22   you know, some of the young people that come
23   through here, not only in the motivational group,
24   but during my own time. I try to show them what
25   I have done wrong over the years, you know. I
26   try to show them that this isn't the life to
27   live. This isn't -- you know, everything I have

1  accomplished in the past I literally threw away
2  over a night of drinking and partying. And it
3  cost, you know, a man his life. I sit before you
4  today with all these accomplishments, and who I
5  am today. And it's somewhat sad to me, because
6  it took the life of Mr. Gill over my selfish
7  acts, you know. I led my sister, you know --
8  even though she was no angel herself, but I led
9  her into, you know, eight years of prison. You
10 know, I literally ruined her life. You know,
11 hopefully through, you know, her rehabilitation
12 and her changes in her life, she has continued on
13 in this life. I know that I myself can do the
14 same. Through my prison experience and some of
15 the trouble I have gotten into in prison, I have
16 tried to change that, you know. You know,
17 there's nothing I can do to, you know, to make up
18 for some of the hurt and some of the pain. Like
19 I said, I'll always be living that. But I
20 brought before you a plan, through not only my
21 business plan but through some of my resources.
22 And any relapse I may, you know, experience, I
23 know that there are people I can go to for help.
24 Not only my father, but people in the community,
25 my father's church -- which I was never a member
26 in the past. I have been in contact with this
27 church. And through this church, you know, I

1   have been trying to change who I was so I don't
2   end up back where I was before.  That's not the
3   life I want to be.  That guy doesn't exist any
4   more.  I found through my talents and through my
5   age and my education, my continual studies, that
6   there's so much in life.  And life is so short.
7   You know, I'm almost 50 years old.  There's still
8   time to be the productive member of society and
9   to give back more than what I have taken.  I
10  never realized that when I stole a car, the
11  people I hurt.  The person had to get up and go
12  to work the next morning, or maybe had a small
13  child that was sick and they couldn't rush him to
14  the hospital.  I never looked at the domino
15  effect and the effects of my actions, what it
16  does to other people.  I have learned today that
17  the person that sits before you today is a caring
18  -- excuse me -- is a caring individual that tries
19  to give back, tries to make atonement.  I have
20  separated myself from the normal prison life, and
21  I have gotten myself involved in positive things.
22  And I can only hope that with what I have
23  documented and what I have brought in and the
24  people I have contacted for resources, that this
25  will, you know, help you guys find me suitable.
26  I believe that through the contacts I have made
27  and some of the people that I have ready to

1   support me -- I have a girlfriend that I have
2   left out of this life.  For 26 years she has
3   stood by.  And, you know, she lives down in San
4   Bernardino.  She has been a close friend, she has
5   been my confidant, and we talk almost weekly on
6   the phone, and through letters and whatnot.  And
7   through that, that's been a big help for not only
8   myself, but it's also made me do a lot of soul
9   searching.  She has been a true friend.  So
10  that's another avenue.  Although the distance
11  that we have always shared is far, you know,
12  there's another resource that I have, you know,
13  to help me during my hard times.  She is in
14  sobriety.  She has been in sobriety now for 27
15  years.  I met her while she was clean.  She came
16  in to the institution on a function at San
17  Quentin, first came in.  And through that we have
18  had contact over the years.  And through other
19  people that she has put me in contact with, and
20  made them look into themselves, is what literally
21  has changed my life.  And I contribute it to the
22  man that also introduced me to the hobby shop and
23  took me off the yard, the prison yard, and got me
24  away from where I was leading.  Because up until
25  that point, you know, until about '85, '86, I was
26  still leading the same life.  You know, I was
27  still involved in the pruno, I was still involved

1  in, you know, the bullshit that goes on in
2  prison.  Over the years, I have slowly stepped
3  away from that.  I am no longer that individual.
4  My racist tattoos -- yes, I regret them, you
5  know.  They force me to wear a shirt 90 percent
6  of the time.  I can't -- I can't change that, you
7  know.  I'm not proud of that part of my
8  lifestyle.  That is just more hate, and, you
9  know, warmongering.  A person I have never really
10  been, that, again, more a part of peer influence
11  that I regret out of my life.  But over the life
12  -- like I said, I take full responsibility for my
13  own actions.  You know, I'm the man that puts my
14  shoes on every day, and I have to walk in them.
15  You know, I have to make -- you know, I have to
16  hold my head up high and prove to others for the
17  rest of my life, you know, the mistakes I have
18  made and the hurt that I have put upon not only
19  my community, but my family, Mr. Gill's family,
20  you know, and the system as a whole.  The
21  monetary expense, everything.  I have never taken
22  any of that into consideration until I started
23  getting into the business life and getting into,
24  you know, rehab and reading and being involved
25  with people that have something positive for me
26  in return.  With that in mind, that's what I have
27  been trying to do in return to give back, you

1    know. I just hope you make the right decision
2    today. I'm really ready to change my life and
3    move on. We can sit here and talk all day long
4    about the wrongs I have committed. That's not
5    going to change. And I understand I have had
6    ample opportunities in the past to change and
7    take advantage of that. I'm not here to make
8    excuses for anything I have done. I'm not here
9    to make excuses for that 2001 beef. That just
10   something that happened. I happened to be in the
11   wrong place at the wrong time. I tried to fight
12   it, I lost. So I accepted the findings. The
13   same thing with everything else. Prior to that,
14   the 115 I got was an incident back in 1985. So,
15   you know, up until 1985, when I literally turned
16   my life all the way around, I hadn't  -- you
17   know, I had been walking in that young man's
18   shoes that led me here today. And since then
19   I've literally gotten rid of that young man.
20   Like in the Shawshank Redemption, you know. He
21   doesn't exist any more. And if he did, yes,
22   there would be a conversation, like the
23   conversations I had with some of the youths that
24   come through here. It's a revolving door. This
25   reception center, I see the same faces come and
26   go. I was that way, you know, in and out of
27   boy's homes and ranches. And those were all

1  stupid things.  It was for real stupid, idiotic

2  things.  Especially when I had my life going well

3  at certain times.  Like I said, I accept that

4  responsibility.  I accept what I have done in the

5  past.  And there's nothing I can do to change

6  that except, you know, to prove from here on out

7  that I can be a productive member of society and

8  give back, you know.  And other than that, it's

9  -- it's in your hands.

10          **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

11  All right.  Mr. Bell, with that we are going to

12  go ahead and recess for deliberations.

13                    **R E C E S S**

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

1  **CALIFORNIA BOARD OF PAROLE HEARINGS**

2   **D E C I S I O N**

3  **PRESIDING COMMISSIONER MARTINEZ:** All

4 right. Everyone that was previously identified

5 has now returned. This is in the matter of

6 Timothy Bell, CDC number C as in Charlie, 34257.

7 Mr. Bell, the panel reviewed all of the

8 information received from the public and relied

9 on the following circumstances in concluding that

10 the prisoner is not suitable for parole and would

11 pose an unreasonable risk of danger to society or

12 threat to public safety if released from prison.

13 And first of all, I'd like to just indicate that

14 we are giving you a one-year denial. I'll state

15 the reasons for that. Certainly the commitment

16 offense was the first reason for the denial.

17 Again, carried out in a very cruel, very callous

18 manner. Again, this involves the strangulation

19 and stabbing death of a Mr. Walter Gill, who was

20 61 years old at the time of his death, noting

21 that the offense was carried out in a manner

22 which demonstrates an exceptional callous

23 disregard for human suffering. And the motive

24 for this is what is still inexplicable, in the

25 sense that we don't know why this happened, other

26 than that it was a situation where he was making

27 **TIMOTHY BELL C-34257 DECISION PAGE 1 2/23/2007**

1  advances to the prisoner's sister and felt it got
2  out of hand.  But nevertheless, something that
3  still is very unexplained.  Conclusions are drawn
4  from the statement of facts where the prisoner,
5  again, on January the 18th of -- I don't know, on
6  or about January 18th, 1981 -- the prisoner, Mr.
7  Bell, along with his sister, Sandra Larkins, had
8  been at a bar the previous evening, contacted
9  with Mr. Walter Gill at that particular bar,
10 proceeded to go to a pizza parlor and then
11 eventually ended up at Mr. Gill's residence.  And
12 at this point in time, again, this resulted in a
13 confrontation between Mr. Gill and Mr. Bell
14 whereupon Mr. Gill was strangled with a telephone
15 cord, wire, and then stabbed in the abdomen with
16 a kitchen knife, or a knife that was used -- had
17 been used previously to cut the pizza that had
18 been brought home that evening.  Again, there was
19 some other actions taken by the prisoner Mr. Bell
20 and his sister, Ms. Larkin, to conceal the crime,
21 noting that they had -- they ransacked the
22 residence, stole items belonging to Mr. Gill, as
23 well as his vehicle that was taken that same
24 evening, as well as then proceeded several days
25 of that vehicle being burnt in a parking lot.
26 Again, indications that the prisoner's uncle and
27 **TIMOTHY BELL   C-34257  DECISION PAGE 2   2/23/2007**

1   sister, Ms. Larkin, were involved in that
2   particular incident, where again the victim's
3   vehicle was burned and left. Again, noting that
4   the situation was a situation where Mr. Gill was
5   stabbed and strangled by the prisoner for --
6   again, as indicated, that there was some issues
7   regarding his sister. The second issue in
8   regards to the prisoner's denial involves his
9   personal history, criminal history. And that
10  involves numerous auto theft arrests and
11  convictions for joyriding, grand theft, several
12  CYA commitments, on to specifically, again, a
13  petition, again, for -- involving a battery,
14  where he was placed as a wardship, and then
15  several beyond control situations where he was
16  also declared as a wardship as a minor and placed
17  on probation, resulting in a commitment to the
18  Hidden Valley Ranch, on to, again, the CYA
19  commitment. And again, involving auto theft,
20  purse snatching. The -- also, again, in regards
21  to -- and these are all in reference to his
22  juvenile record. And the last one, again, where
23  he escaped from the county facility, which was
24  the California Youth Authority. And again -- did
25  you -- and me asked, did you escape from the
26  Hidden Valley? Did you walk away from Hidden
27  **TIMOTHY BELL   C-34257   DECISION PAGE 3   2/23/2007**

1    Valley Ranch?

2            **INMATE BELL:** Yes.

3            **PRESIDING COMMISSIONER MARTINEZ:** All
4    right. So, with that. On into his adult
5    convictions, which again consisted of burglary,
6    several drunk driving arrests and auto theft,
7    receiving stolen property, and grand theft and
8    joyriding, as I indicated. And those were --
9    these are all in adult convictions. And then the
10   last one, which was a hit and run with an injury,
11   grand theft auto, noting that he was committed to
12   CYA. He was paroled in 1981 for that, and he was
13   on parole at the time of the commitment offense,
14   noting that he had been out only three days prior
15   to the commitment offense. So again, with that
16   -- also noting that he does have an unstable
17   social history, noting numerous arrests for -- as
18   a juvenile. And again, getting involved in
19   alcohol and drugs as a teenager moving up, and
20   then also in regards to the -- again, at the age
21   of 16 -- well, again, not finishing school. Did
22   complete his final -- finally completed his
23   education, high school, in CYA during his
24   commitment. Involved in marijuana, LSD, heroin,
25   and methamphetamine during this time frame. In
26   regards to prisoner institutional behavior, I
27   **TIMOTHY BELL   C-34257  DECISION PAGE 4   2/23/2007**

 1    want to note that he does have some misconduct
 2    while incarcerated.  It does include six 115's.
 3    The most recent was in September of 2004,
 4    stimulants and sedatives, possession of
 5    controlled substance.  Again, indications of
 6    heroin.  And in regards to the 128 counseling
 7    chronos, there are a total of four.  The most
 8    recent was back in January 17th of 2006, and that
 9    was for possession of tobacco.  In regards to the
10    psychological report by Dr. Mann, M-A-N-N, dated
11    October the 27th of 2006, it is supportive.  It
12    lists the prisoner with a below average, as far
13    as risk assessment, compared with other inmates.
14    And I'd just like to note for the record that we
15    are going to be requesting a new psychological
16    evaluation to be done for your next hearing to
17    specifically address some of the issues that were
18    brought up here today, and that is regarding
19    first of all your violence potential in the free
20    community as compared to a citizen, not an
21    inmate; the significance of your alcohol/drug as
22    related to your commitment offense.  And again,
23    this is in light of the 2001 115, possession of
24    stimulants, that was -- that you received.  And
25    noting that the 2004 panel had requested
26    specifically to address this issue, but the
27    **TIMOTHY BELL   C-34257  DECISION PAGE 5   2/23/2007**

1    current October 2006 psychological report really
2    does not thoroughly address this matter.  And
3    this is by Dr. Mann.  And also, again,
4    indications that this was not a psychological
5    evaluation that was requested by the board.  This
6    was done through the institution on that.  But
7    again, noting that that should be addressed, and
8    possibly it was not looked at thoroughly at that
9    time that the evaluation was done.  So for that,
10   we will request that.  In regards to your parole
11   plans, Mr. Bell, we do note that you have viable
12   parole plans.  In regards to your residence with
13   your father, support letters that indicate that
14   you do have that offer.  In that area, you have
15   marketable skills I think that you can put to
16   use.  Nothing real concrete in employment, but
17   it's not required.  But always it is helpful that
18   you do get something solid.  You certainly have
19   done your work, your share of work in regards to
20   reaching out to the community and getting
21   substance abuse programs out there and writing
22   letters and so forth.  I mean, there's no issue
23   there.  You certainly have gone way beyond.  And
24   that is one thing that we do like to see.  And as
25   I have indicated to other inmates, and they are
26   in the same situation -- you know, even if you
27   **TIMOTHY BELL    C-34257  DECISION PAGE 6    2/23/2007**

1    don't get an offer, you know, but to come in and
2    to show us that you are making that attempt, sure
3    does go a long way to show that you are trying to
4    get yourself established. We understand it's
5    difficult, especially in here, for someone to get
6    a -- make a commitment to you and say 'hey,
7    you've got a job,' unless it's somebody maybe
8    that is known through the family, or, you know,
9    you luck out in that sense, you know, that they
10   are willing to stick their neck out and say 'hey,
11   yeah, I'll give him a job. It will be here if he
12   needs it, if he wants it.' But not all of them
13   are lucky in that sense. So for you to do that
14   is certainly commendable. And please continue
15   with that. Solidify your parole plans. Update
16   those as you go along, which I think you will.
17   The PC 3042 notices -- again, we noted no
18   opposition, no letters that were sent here today
19   in regards to opposition. Again, noting that the
20   district attorney's office from San Francisco is
21   not present here today. So, in regards to what
22   we -- our findings in regards to this, we do find
23   that the prisoner needs further self help. And
24   this is in order to more or less understand the
25   causative factors of the commitment offense.
26   Until progress is made, the prisoner does
27   **TIMOTHY BELL   C-34257  DECISION PAGE 7   2/23/2007**

1   continue to be unpredictable and a threat to
2   others.   And one of the things that is of a
3   concern is the different versions that have come
4   across.   Initially, again, as indicated, that you
5   had denied it at the beginning during the court
6   proceedings.   You moved on to another version,
7   which is now the current version that we spoke
8   about here today.   But as Commissioner Blonien
9   pointed out to you -- and this is something that
10  I had already looked at also as well, is that in
11  regards to the court proceedings and the forensic
12  pathologist that was interviewed and testified in
13  this as to how this possibly -- I mean, it's
14  obviously different from what you were telling us
15  today.   There is -- their theory on this is that
16  he was stabbed while he was in bed.   Indications
17  that the cord was cut.   You talk about that you
18  were rolling around and it lasted for 30 to 60
19  seconds, and that the cord, the telephone cord
20  was underneath you, and somehow it was --
21  obviously you were accessible to it as well as
22  the knife, which was conveniently right there as
23  you were struggling.   He tried to come at you
24  after you had -- you know, you had -- you know,
25  more or less playing possum and you had to
26  strangle him.   But again, evidence does show that
27  **TIMOTHY BELL    C-34257  DECISION PAGE 8    2/23/2007**

1    there was possibly, again, activity that occurred
2    in the bedroom and then possibly moved on into
3    the living room.  So again, there's some
4    different versions there.  And I think you need
5    to kind of go back, take a look at that a little
6    bit better in regards to those issues there.  So
7    again, until progress is made, the prisoner does
8    continue to be unpredictable, threat to others.
9    We do want to commend you, Mr. Bell, in regards
10   to your extensive involvement -- and again, you
11   were doing in PIA up until that 2000 and -- issue
12   -- but you have been involved in the vocation in
13   the cabinet woodworking, the college courses, the
14   FEMA certification, your participation in NA
15   since '01, your participation in Correctional
16   Learning Network, and your exceptional work
17   chronos in the hobby shop that you have received.
18   And you remain now disciplinary free since 2000.
19   So -- but again, we talked extensively about the
20   115 and about your position.  But bottom line to
21   it, Mr. Bell, is it's a 115, and you were
22   convicted of it.  You were found guilty of it,
23   all right?  And again, that's your version as to
24   what happened.  But you do have somewhat of a
25   record of past drug abuse.  And again, this is
26   something that we have to consider, all right?
27   **TIMOTHY BELL    C-34257  DECISION PAGE 9    2/23/2007**

1   So with that, these positive aspects of your

2   behavior, again, do not outweigh the factors of

3   unsuitability. We are, again, as indicated, a

4   one-year denial. We ask that you remain

5   disciplinary free and that you again avail

6   yourself in self-help programs and therapy

7   programs that become available to you. And we

8   are requesting a new psychological evaluation to

9   be conducted at your next hearing. With that,

10  I'm going to turn it over to Commissioner Blonien

11  for any further comments.

12          **DEPUTY COMMISSIONER BLONIEN:** I really

13  liked your business plan. It is so well thought

14  out. And your products (inaudible) of your

15  products. And you said that you are almost 50.

16  You are still a young man. There's time to live

17  a lot more life, and I think you are truly on the

18  way. And I wish you very good luck.

19          **INMATE BELL:** Thank you.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  **TIMOTHY BELL    C-34257    DECISION PAGE 10  2/23/2007**

114

1          **PRESIDING COMMISSIONER MARTINEZ:**  Wish

2    you luck, Mr. Bell.  All right?  Yeah, we are

3    going to conclude this here.

4                        --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:** JUN 2 3 2007

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **TIMOTHY BELL   C-34257  DECISION PAGE 11  2/23/2007**

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, ROBERT DEVON BELL, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 114, and which recording was duly recorded at DEUEL VOCATIONAL INSTITUTION, TRACY, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF TIMOTHY BELL, CDC NO. C-34257, ON FEBRUARY 23, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated April 8, 2007, at Davis, California.

_____
ROBERT DEVON BELL, TRANSCRIBER
**NORTHERN CALIFORNIA COURT REPORTERS**

# EXHIBIT B

## DEUEL VOCATIONAL INSTITUTION
### Life-Term Inmate Evaluation for the Board of Prison Terms
### Mental Health Evaluation
### (Revised 1998)
### January 2007, Lifer Calendar

#### Addendum to the Full Board of Prison Terms Clinical Evaluation
#### Report of 2005 by P. Miller. Ph.D.. Deuel Vocational Institution

### I.    IDENTIFYING INFORMATION:

| | |
|---|---|
| Name: | Bell, Timothy |
| CDC: | C-34257 |
| Age: | 47-years-old |
| DOB: | 06/10/59 |
| Marital Status: | Divorced |
| Ethnicity: | White |
| Gender: | Male |
| Religion: | Non-denominational |

Inmate Bell is a 47-year-old (DOB 06/10/59) white male, first termer, who was committed to the California Department of Corrections and Rehabilitation (CDCR) for the offense of PC 187, Murder in the 1st Degree. He is serving a sentence of 25-years-to-Life, with a one year enhancement for auto theft/robbery. Inmate Bell entered the CDCR system on 08/11/81 and has served approximately 25 years in prison.

### II.    SOURCE OF INFORMATION:

This report is based upon a review of the inmate's central file, medical and psychiatric record, and a one and a half hour structured assessment interview.

### III.    INFORMED CONSENT/ LIMITS OF CONFIDENTIALITY:

The inmate was informed of the nature and purpose of the interview, his right to refuse to be interviewed, and the lack of confidentiality of statements made by him in the interview. The inmate agreed to voluntarily participate in the interview.

COPY SENT TO INMATE  11-3-06 SM

### IV.    PROGRESS SINCE LAST REPORT:

Inmate Bell received one disciplinary (CDC-115) in the current reporting period for possession of tobacco. This was later reduced to a CDC-128, counseling chrono.

---

| BELL, Timothy | | CDC# C-34257 |
|---|---|---|
| DVI | October 27, 2006 | Page 1 |

During the last reporting period, inmate Bell received laudatory chronos for his work in education and substance abuse treatment.

Inmate Bell received two chronos from P. Noble, Staff Sponsor, which commend his participation in Narcotics Anonymous. The first one, dated 10/20/05, notes "This inmate has been a member of the Narcotics Anonymous Group at DVI since 11/12/01. This inmate has been attending the Narcotic's Anonymous Group during this last quarter. We commend him for his efforts & his desire to learn more about the NA program. We look forward to his continued participation in the program." The second chrono dated, 06/15/06, notes, "This inmate has been a member of the Narcotics Anonymous Group at DVI since 11/12/01. He attends meetings and participates in group discussions. He is gaining knowledge of the NA way to recovery. He is making an effort to change his life by working the program daily. We look forward to his continued participation in the NA program."

Inmate Bell has also participated in an anger management course as reflected in a chrono dated 12/30/05 by T. Moy, Supervisor, Correctional Learning Network, which notes, "The above named inmate, Bell, has participated in 13 Correctional Learning Network program(s) during the Jul-Sept period. This inmate should be commended for his voluntary participation and commitment toward self improvement. Supplemental Certificates were earned for completion of special programming this reporting period; Anger Management 3 hours."

A laudatory chrono from Tom Witt, Institution Artist Facilitator, dated 01/18/06, commends inmate Bell for his participation in the Arts in Corrections program. It notes, "This chrono is to acknowledge and commend inmate Timothy Bell. Mr. Bell has been a participant in the Arts in Corrections program at DVI during 2004-2005. Inmate Bell has continually demonstrated talent, creativity, and skill as an artist during my tenure in the program. Mr. Bell is an insightful, intelligent person with concern for the welfare of others. His integrity in self-disciplined personal growth to be constructive is uniformly substantial."

Inmate Bell has received approximately six certificates of appreciation, completion, and competency regarding his work skills, just in the last reporting period. He continues to make progress on his Business Management Course, moving towards the ultimate goal of starting his own business.

## V. PLANS IF GRANTED RELEASE:

If released, inmate Bell plans to relocate to San Francisco, California, to live with his father. With regard to vocational and financial plans, inmate Bell has applied to several businesses that would utilize his woodworking skills and machine skills. He reports that his father has a room in the basement of the house which is available to be used as a workshop, where he can continue with his entrepreneurial skills in woodworking and move forward on his business plans. Inmate Bell has additionally looked into several clean and sober living environments in San Francisco as a back up housing plan. He has located several Alcoholics/Narcotics Anonymous groups to attend in his local community and remains committed to his sobriety. Inmate Bell is very willing to comply with the conditions of parole. His parole plans, from a psychological perspective, appears to be viable. His prognosis for community living relative to mental health is good.



## VI.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

Underline{General Appearance:}   Inmate looks his apparent age.   Locomotion was self.   Attitude was amiable and cooperative.

Underline{Psychomotor Status:}   Activity level was within normal limits.   His eye contact was excellent. There were no problems noted with abnormal facial, extremity, or trunk movements.

<u>Orientation and Memory:</u>   He was alert and oriented to person, place and time.   His remote, recent past memory, immediate retention, recall, and delayed recall were all good.   Concentration and attention were good.

<u>Speech and Language:</u>   Language and speech was good.   No problems noted with abnormal speech.

Underline{Information and Intelligence:}   His general fund of information was good.   Judgment was critical. Insight appeared true.

<u>Thought Process and Content:</u>   His thought process was logical and coherent.   No problems noted with delusions, hallucinations, thought content or negative symptoms of Schizophrenia.

<u>Affective State:</u>   Affect was within normal limits.   Mood was euthymic.   He denied suicidal and homicidal ideations.

There was no evidence of appetite disturbance, psychomotor retardation, impulsivity, flight of ideas, sleep disturbance, hopelessness, decreased need for sleep, pressured speech, anhedonia, bereavement, grandiosity or racing thoughts.

As per DSM-IV, the following diagnostic impressions appear appropriate for this inmate:

| AXIS I | 303.90 | Alcohol Dependence in institutional remission. |
|--------|--------|------------------------------------------------|
|        | 304.30 | Cannabis Dependence in institutional remission. |
| AXIS II | V71.09 | No current diagnosis or condition. |
| AXIS III |       | Elevated cholesterol, medication controlled. |
| AXIS IV |        | Psychosocial stressors: Incarceration with Life term sentence. |
| AXIS V | GAF = 90 | Global Assessment of Functioning (on a scale of 0-100). Inmate Bell displays good general functioning. He is interested and involved in a variety of activities. He is socially connected. He is behaviorally and emotionally stable.  He is functioning well with everyday problems and concerns. |

Inmate's current level of care is in the General Population.   He is involved in self-help treatment activities.   He is not currently on any medications.   His prognosis for continued mental health is good.

## VII. ASSESSMENT OF DANGEROUSNESS:

Research has been done on determining dangerousness when inmates have been released on parole. There are several factors that have been identified as risk factors and several factors that have been identified as factors that may reduce the risk of recidivism or dangerousness, but it must be stated on the outset that the reliability and validity of these is quite low and there are limits to the opinions expressed as a result of these factors and clinical interviewing. Given the low predictability of clinical evaluation, very little weight should be given to the opinion herein in determining suitability for parole.

Inmate Bell has seven risk factors, all of which are historical, that may indicate future probability of dangerousness or recidivism. The first two are related to substance abuse. Inmate Bell has a previous substance abuse history and was intoxicated during the commitment offense. Additionally, aside from his commitment offense, he has a previous history of violent behavior of battery as a juvenile. He also has a history of other non-violent crimes as a juvenile. He served two commitments in California Youth Authority (CYA), primarily for theft related crimes. It should be noted that he committed his Life crime three days after being released from CYA. Failure to adhere to the conditions of probation or parole is another risk factor in regards to recidivism and possible dangerousness in the community. The final risk factor that inmate Bell exhibits is a history of school expulsion. He was expelled from high school. It has been noted that individuals who have a history of school related problems and expulsion show early conduct problems and at times is a predictor of recidivism or future dangerous behavior.

There are more numerous positive factors that may indicate a lower possibility of recidivism or dangerousness than there are risk factors in this case. In contrast to the above risk factors which are historical, all factors that support a lower risk for recidivism and/or violence are based on the present. There is a higher concurrence between never married individuals and future violence, than inmates who have been married. Inmate Bell was married for a length of a year and a half. Inmate Bell is also 47-years-old. There is some evidence to suggest that violence in men tends to attenuate past the age of 35. Prosocial behavior or involvement is another positive predictor of success in parole. Inmate Bell is very involved in his work in the hobby shop. He is the primary worker in the Hobby Shop and he donates his time to other inmates to teach them woodworking skills as he sees the need arise. Inmate Bell's family is also very involved in his life and they continue to provide support. Family support and letters of support are both positive predictors of success on parole. He also has viable vocational plans and work skills to implement these plans and is very dedicated to the business of woodworking and marketing various projects that he is working on currently.

Inmate Bell demonstrates considerable insight into his Life crime and utilization of the time that he has been incarcerated. He shows remorse for the victim, the victim's family, and all those that were harmed by his crime. He has shown considerable dedication to substance abuse treatment since he has been incarcerated. He is actively involved in NA and has plans to maintain his sobriety in the community. He has shown considerable effort in locating resources in his community so that he would be able to maintain the growth that he has thus far.


Assessment of dangerousness within the controlled setting of an institution is seen as below, average in comparison with other inmates. Assessment of dangerousness if released into the community is seen as below average in comparison with other inmates.

## VIII. CLINICIAN'S OBSERVATIONS/ COMMENTS/ RECOMMENDATIONS:

There is no evidence of psychopathology or mental health problems that would preclude routine release planning in this case. Inmate Bell, throughout his period of incarceration, has shown the ability to transform his behavior at a young age from being impulsive and an antisocial youth, to now becoming a productive and integral part of his community and work force. As mentioned above in the progress section, Inmate Bell did receive a CDC-128 counseling chrono during this reporting period for the possession of tobacco. This is an interesting exception to his prison record, with his last incident of violent behavior occurring in 1982. Considering this history, it is perhaps indicative of a minor blip in a primarily disciplinary free record in the last six years. This behavior, in of itself, is not likely to increase his level of recidivism or dangerous behavior; however, may possibly present difficulties adhering to parole conditions. Over the years he has shown sincere commitment to improving his work skills, anger management skills, and has continued to seek self-help. His decision to maintain his sobriety and continue to seek out substance abuse treatment is critical for his success. Given maintained sobriety and his current level of coping skills, it is unlikely that he will place himself in a similar situation that led to his committing offense.

Noted by:

_____              _____
**HEATHER MANN, Ph.D.**                       **JOHN RANISESKI, Ph.D.**
**Staff Psychologist**                        **Senior Psychologist Supervisor**

HM/tav

Original: C-File
cc:      Medical File

**COPY SENT TO INMATE** _11-3-06 SY_

| BELL, Timothy | | CDC# C-34257 |
|---|---|---|
| DVI | October 27, 2006 | Page 5 |

## DEUEL VOCATIONAL INSTITUTION
### Life-Term Inmate Evaluation for the Board of Prison Terms
### Mental Health Evaluation
### (Revised 1998)
### October 2005 Lifer Calendar

#### Psychosocial Assessment

### I.    IDENTIFYING INFORMATION:

| | |
|---|---|
| Name: | Bell, Timothy |
| CDC#: | C-34257 |
| Age: | 46-years-old |
| DOB: | 06/10/59 |
| Marital Status: | Divorced |
| Ethnicity: | Caucasian |
| Gender: | Male |

COPY SENT TO INMATE  9-9-05 a~

This is the ninth psychological evaluation report for the Board of Prison Terms on inmate Bell, a 46-year-old divorced Caucasian male 1st termer, serving a 26-years-to-Life sentence for Murder in the 1st Degree with use of a Deadly Weapon (1-year enhancement). Inmate Bell entered the CDC system on 08/11/81. Initial processing was conducted at RC CMF. On 09/01/81, he was transferred to San Quentin State Prison. On 08/03/83, he was transferred to Folsom State Prison. Later, on 8/06/85, he was transferred to CTF Soledad and finally on 08/18/93 to Deuel Vocational Institution, where he has remained.

### II.   SOURCES OF INFORMATION:

This report is based on a review of inmate Bell's Central File, Medical/Psychiatric Records, and a two-hour assessment interview.

### III.  INFORMED CONSENT/LIMITS OF CONFIDENTALITY:

During the interview, the inmate was informed of the nature and purpose of the interview, his right to refuse to be interviewed, and the lack of confidentiality of statements made by him in the interview. The inmate agreed to voluntarily participate in the interview.

### IV.  DEVELOPMENTAL HISTORY:

Inmate Bell reports no birth defects and no prenatal/perinatal concerns. He notes that all developmental milestones occurred within normal limits. No speech, language, or motor developmental impairments were reported. Peer interaction and socialization skills were developed in the context of a quiet middle class neighborhood in San Francisco. "I came from a large family and went to a neighborhood school." Inmate Bell reported being involved in various

sports such as baseball, football, and swimming. He enjoyed little league baseball, sponsored by the Police Athletic League. He participated in scouting, beginning as a Cub Scout and advancing to the Boy Scouts. No history of cruelty to animals, enuresis, or arson is noted. He denies being a victim or perpetrator of physical, mental, or sexual abuse while growing up. He identifies only one significant childhood medical problem. In 1968, at the age of nine, inmate Bell's leg was crushed in a bicycle accident in which his 10-year old brother, Michael, was killed. The two boys were riding double coming down a hill and were hit by a bus.

## V.  FAMILY HISTORY:

Inmate Bell is the fourth of five children (Sandra, Raymond, Michael, Timothy, and Edward) born to Orville Bell and Marguerite Conte. His parents were born and raised in San Francisco. They were high school sweethearts who married after graduating from high school. "My father was a foreman for a sheet metal union. My mother was a housewife. They had a good relationship." His father died of a heart attack in 1966, when the inmate was six years old. A year later, his father's best friend, Ronald Sutton, married his mother. The couple had one son, Kenneth, who died of AIDS in 1997. The inmate's stepfather is a retired sheet metal worker living in San Francisco. His mother died in 2001 of emphysema and chronic medical problems.

Inmate Bell reports that he and siblings Sandra, Raymond, and Kenneth had problems with drugs and the law as they were growing up. He notes that Sandra has been "clean" of drugs for approximately 5½ years. She returned home to care for her ailing mother and has continued to live with her stepfather. Raymond remains a "repeat offender" and is currently living in San Francisco attempting to "turn around his life". Edward reportedly is free of a drug or criminal history. He is currently completing his RN degree and works in the psychiatry department at San Francisco General Hospital. Inmate Bell states that he maintains contact with his stepfather and his siblings. He enjoys a good relationship with them.

## VI.  EDUCATION:

Inmate Bell attended school in San Francisco through the 12th grade. He completed his final 30 units while in CYA. He received his high school diploma on 06/12/77 through San Mateo Co. Unified School District. He denied having been in Special Education or having behavioral problems in school. He stated that he was on the track and baseball teams. However, his primary interests were in woodworking and art classes. Following graduation, he began an apprenticeship in carpentry through the Carpenter's Union, working under Richard Mills for approximately 18 months on a periodic basis. When at Preston School of Industries (CYA), he continued his training in carpentry by taking courses in Cabinet Making /Furniture Fabrication (1,800 hrs.) and General Framing/Home Construction (1,000 hrs.).

Since incarceration for the controlling offense, the inmate has completed 1,430 hours of training within the Vocational Machine Shop Program at Deuel Vocational Institution. In 1995, he received a Certificate of Completion in Basic Machine Shop. On 5/9/95, he received the following TABE scores: Reading 12.9 Grade Point Level (GPL), Math 9.0 GPL, Language 7.9 GPL, and Overall Grade Level 9.8 GPL. Since June 2002, he has received 14 Certificates of Completion through the FEMA Emergency Management Institute. In May 2004 he completed the Health Education 100 course through Distance Learning Studies out of Coastline Community

| BELL, Timothy | CDC# C-34257 |
|---|---|
| DVI | September 9, 2005 | Page 2 |

College. Since April 2005, the inmate has received 13 Certificates of Completion on a variety of topics offered through the Correctional Learning Network (CLN). On 07/1/05, T. Moy from CLN commended inmate Bell "for his voluntary participation and commitment toward self improvement".

## VII. PSYCHOSEXUAL DEVELOPMENT/SEXUAL ORIENTATION:

The inmate describes himself as a heterosexual with a normal psychosexual development. He had his first sexual experience at age 12. He noted that through his adolescence, he had several lengthy female relationships. He denies any high-risk sexual behavior or contracting any sexually transmitted diseases.

## VIII. MARITAL HISTORY:

Inmate Bell has been married on one occasion and has no children. He met Jaquelin Wright through mutual friends while incarcerated. Correspondence progressed to visits and eventually to marriage in 1996. The couple had no children. Jackie has two daughters and one son by a previous marriage. Inmate Bell reports that the marriage ended in divorce in 1998 secondary to his concerns about maintaining a marital relationship in the prison setting. He notes that he and Jackie remain friends but have had only occasional contact in recent years.

## IX. MILITARY HISTORY:

Inmate Bell has never served in the military.

## X. EMPLOYMENT HISTORY/INCOME HISTORY:

The inmate notes that his first job was at age 15 in a pizzeria where he was a bus boy and delivered pizza. He was subsequently employed briefly as a bus boy in a restaurant, a valet driver, and a shoe salesman for Kenny Shoes. He then began working as an apprentice carpenter through the Carpenter's Union. From 1977 to 1979, he and a friend owned Appleton and Bell Construction Company; general contracting with special interest in renovating Victorian homes in San Francisco. When arrested for the instant offense, he been released from CYA for three days and was unemployed.

He has had various jobs since being incarcerated. While at Folsom State Prison, he worked in culinary. After transferring to Soledad, from 1985 to 1988 he worked in Plant Operations-Maintenance as a plumber. For several months, he worked in pest control and in the main yard maintaining the weight area. From 1989 to 1993, he worked as a tool room attendant and shop steward in the Handicraft Shop. When he came to DVI in 1993, he began the Vocational Machine Shop Program, which he completed in 1995. He then worked in Plant Operations Machine Shop for approximately 18 months. For 6 months, he was employed by Inmate Day Labor (IDL), in which he participated in the building of the DVI bus terminal. From September 1997 to October 2000, he worked in the Prison Industries Authority (PIA) Metal Shop as a machinist. Since then, inmate Bell has been assigned as Handicraft Shop tool room orderly.

Inmate Bell notes, "I am proud of the work I have done in the Handicraft Shop, woodworking section. The ordering, receiving, etc., I am doing is providing me with skills that I can use when I start my own business. I've tutored many other inmates over the years, and have a couple youngsters working under my supervision now. The Handicraft Program has turned my life around." In recent years, inmate Bell's work ratings have been consistently above average to exceptional. In June 2000, his PIA Supervisor Richie in a laudatory chrono described him as a critical worker. On 04/10/04, R. Spivey, Handicrafts Manager, noted "I have found Inmate Bell to be very honest, reliable, and responsible." On 08/7/05, R. Spivey reported "Inmate Bell has been in the Handicrafts Program since May 1993. He is a very experienced and proficient woodworker. Should Inmate Bell decide on a career in this area, both his skill and energy would serve him well. ...Exceptional worker...I believe he will make good use of his skills when he is released from prison."

Inmate Bell considers his vocational skills to include cabinetry, machinist, and construction work. Through the Handicraft Program, he creates various items out of wood including clocks, jewelry boxes, and hope chests. He has done many projects on consignment and has an extensive work portfolio.

## XI.    SUBSTANCE ABUSE HISTORY:

Inmate acknowledges using drugs and alcohol since his mid-teens. He describes himself as a "recreational user" of marijuana and alcohol in junior and senior high school. He experimented with methamphetamine, heroin, and LSD after that, but used mainly alcohol and marijuana. He estimated that he drank 6-8 beers during parties or over the weekend. He reports receiving two DUI's in 1975 and 1978. Since 1986, inmate Bell has been consistently enrolled in various substance abuse programs including Alcoholics Anonymous (AA), 12 Step Program, and Narcotics Anonymous (NA). From 1995 to 1998, he was involved in the Road to Freedom classes. On 02/23/05, P. Noble, NA staff sponsor, stated "His (inmate Bell) personal growth and positive attitude has proven to be beneficial to himself and the group as a whole... an asset to the group. He has a favorable outlook toward the future."

## XII.    CRIMINAL HISTORY:

Inmate Bell states that while growing up, he hung around his older brother, Raymond who was involved in criminal activity. "I tried to be like him. He taught me how to do crime. It started when I was nine. I went with him to steal bicycles. As I got older, I went on my own doing crime." Inmate Bell's juvenile record includes battery, being beyond control, auto theft and purse snatching. He was committed to CYA on two occasions as a juvenile. As a young adult, he was arrested for burglary, drunk driving, hit and run, and auto theft. He was paroled from CYA on 01/15/81, three days before he committed the instant offense.

Since incarceration for the committing offense, inmate Bell has received seven CDC 115's. Most of these occurred during the first five years of his incarceration. His last CDC 115 was dated 09/25/00 for possession of a controlled substance. Since then, he has programmed well within the prison setting and remained disciplinary-free.

| BELL, Timothy | | CDC# C-34257 |
|---|---|---|
| DVI | September 9, 2005 | Page 4 |

## XIII. PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Bell denies any past history of mental health problems or services. He never received psychological services for a major mood or thought disorder, been hospitalized for psychiatric problems, or received psychotropic medication. There is no record of this inmate ever having been part of the Mental Health Services Delivery System within the California Department of Corrections.

Inmate Bell reports no history of any serious head injuries, seizure activity, or neurological condition. In 1968, he sustained significant orthopedic injuries, but no head injuries when the bicycle on which he was riding was hit by a bus. His older brother died in the accident. He is currently being treated successfully with Lipitor for elevated cholesterol. He states: "I exercise on a regular basis. I am in good health."

Inmate Bell had participated in various self-help programs and psychotherapy groups in prison. He attended Anger Management sessions with Dr. Bateman at CTF. He attended Dr. Shonkwiler's psychotherapy group from 1994 through 1996. He was involved in a Stress and Anger Management program with Dr. Savage. He completed a Stress and Anger Control class by Dr. Christiansen in 1995. He completed all eight Parole Recidivism Prevention classes sponsored by the Protestant Chapel. He has completed four Road to Freedom study programs. He attended the Pro-Social Seminar run by Dr. Salz in 1998. In 2000, he attended the six-week psychoeducational seminar series by Dr. Hawlin. For 18 months he participated in a weekly standing Yoga class. In 2002 he completed Dr. Marlett's 12-week Anger Management Group. In 2004, he completed a seven-week Women's Perspective course offered through the Family Relationship Educational Enrichment program.

## XIV. PLANS IF GRANTED RELEASE:

Inmate Bell plans to parole to San Francisco to live with his stepfather. His immediate plan is to work in the fields of machine shop, cabinetry, or construction. He reports that he has sent out his resume to various companies and is awaiting a response. As a past union member, the Carpenter's Union will be a potential resource. His stepfather and brother, Edward, have offered him assistance with the transition process and in developing a small woodworking business. He plans to begin working out of the existing workshop in his stepfather's basement. He notes that he has accumulated a number of craft tools while involved in the Handicraft Program. He expresses a commitment to continuing his participation in AA/NA programs. He has obtained information regarding community substance abuse resources. He plans to spend his leisure time reconnecting with his family.

### Clinical Assessment

## XV. CURRENT MENTAL STATUS/TREATMENT NEEDS:

The inmate presented for the interview neatly dressed in standard prison garb. He was alert and oriented to person, place, time, and situation. He made good eye contact. He was pleasant, cooperative, and polite throughout. His speech was fluent. He was open and expressive in

discussing his life and the instant offense. Cognitive functioning was within normal limits. He displayed a range of affect appropriate to the issues being discussed. There was no indication of any mood or thought disorder. He denied any auditory or visual hallucinations. He exhibited no psychotic pathology. He expressed no suicidal or homicidal thoughts. He expressed no complaints of a psychological nature. The inmate is not part of the Mental Health Services Delivery System with the California Department of Corrections. He is not on any psychotropic medication.

As per DSM IV diagnostic criteria, the following diagnoses appear appropriate for this inmate:

| AXIS I | 305.90 | Polysubstance Abuse, with alcohol and marijuana as the drugs of choice, in sustained institutional remission. |
|---|---|---|
| AXIS II | V71.09 | No current diagnosis or condition (Antisocial Personality Disorder, by history) |
| AXIS III | | Elevated cholesterol, medication controlled |
| AXIS IV | | Psychosocial stressors: incarceration with Life term sentence, pending Board of Prison Terms Hearing. |
| AXIS V | GAF=90 | Global Assessment of Functioning (0-100 scale). Good general functioning. Interested and involved in a variety of activities. Socially connected. Behaviorally and emotionally stable. Functioning well with everyday problems and concerns. |

## XVI.  REVIEW OF LIFE CRIME:

Details of the committing offense as described by L. Jeffery, CCI dated 01/09/02 are as follows: On 01/18/18, at approximately 6:00 p.m., officers were called to 114 Geneburn Way, San Francisco on the report of a body lying on the steps of the residence. The victim, 61-year-old Walter Gill, was found to have been strangled and stabbed. An autopsy revealed that the victim had been murdered early that morning. Investigation revealed that certain rooms in the house had been ransacked. Bell's fingerprints were found on the pizza box located in the kitchen. Fingerprints belonging to Bell's sister, Sandra Larkins, were found on a piece of glass in the home of the victim. A car belonging to the victim, a green Cadillac, was missing from the garage. The car was later found burned in a parking lot. A witness observed someone set fire to the car at approximately 2:00 a.m..

Inmate Bell's description of the events are as follows: "I went to a neighborhood bar in San Francisco with my sister, Sandra Larkin. She began talking with Walter and later introduced me to him. The three of us went to a restaurant for dinner. We returned to his (Gill's) house with a pizza box. He had been coming onto Sandra throughout the evening. I went to the bathroom. When I came out, he was being sexually aggressive with my sister. As her brother, I thought I needed to protect her. We (inmate and Gill) started arguing and then fighting. I choked him with the telephone cord. I thought he had passed out. But as I got up, he lunged at me. By instinct, I stabbed him with a knife that was lying there. I then panicked. My sister and I ransacked the house to make it look like a burglary. I was afraid how it would look since I had just been released from CYA. We took the car, but I didn't burn it. I regret what I did."

Inmate Bell accepts responsibility for the murder. "He didn't have this coming. My sister was just as responsible with the flirting going on. He was an innocent person. He had a family. His

loss must have been horrible for them. I think back a lot about how I could have acted differently... changed events of the night. I wish I had called the authorities. He might not have died. Going to prison has given me an opportunity to make changes in my life. I now try to make a positive impact on the young inmates. This makes me grow as I help them. The old Timothy Bell doesn't exist anymore."

## XVII. ASSESSMENT OF DANGEROUSNESS:

Research has been done in determining dangerousness when inmates have been released on parole. There are several historical factors that indicate a higher level of dangerousness and probability of recidivism for this inmate. They include criminal behavior at a young age, previous violence, substance abuse problems, and prior supervision failure. Inmate Bell has attempted to address these risk factors through his long-term involvement in AA and NA, as well as his participation in a wide variety of self-help programs offered within CDC to work through issues related to his crime and to make positive change. He has developed an appreciation of the destructive influence of drugs and alcohol. His voiced commitment to remain drug and alcohol-free appears genuine. He has taken numerous classes in Stress and Anger Management, participated in extended programs focused on self-reflection and growth, increasing appreciation of others, and developing skills to prevent recidivism. He has been able to integrate lessons taught into the way he responds to current situations. In recent years, inmate Bell has been programming well, helping others, and remaining disciplinary-free.

Factors associated with a lower risk of recidivism are numerous. His work record is one of consistency and a positive work ethic. Records do not indicate that a major mental health problem played a role in the committing offense. Rather, alcohol use, immaturity, impulsivity, and antisocial behavior appear as major factors in inmate Bell's past episodes of violence. He has worked hard to address these issues with improved maturity, insight, and empathy. His job performance ratings are consistently above average to exceptional. Since incarceration, he has furthered his marketable work skills. He accepts responsibility for his actions that led to the death of the victim. His remorse appears genuine. He has been attentive to the recommendations made by previous Board of Prison Terms. He has expanded job skills, participated in self-help programs available within CDC, received positive chronos and remained disciplinary-free. He has a supportive family system. His parole plans appear feasible.

Assessment of dangerousness within the controlled setting of an institution is seen as significantly below average in comparison with other inmates. Assessment of dangerousness if released to the community is seen as minimal in comparison to other inmates. History of substance abuse appears to be the only currently active risk factor in this inmate.

## XVIII. CLINICIAN'S OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

There is no evidence of psychopathology or mental health problems that would preclude routine release planning in this case. This inmate has shown significant strides in developing alternative ways of dealing with conflict. He has shown initiative in advancing his work skills and personal growth. He has transformed himself from an immature, impulsive and antisocial youth to a mature, confident, and self-controlled adult focused on helping others and leading a productive, non-violent life in the community. I concur with inmate Bell's decision to continue involvement

in a substance abuse program in the community. Continued sobriety is vital for success. Periodic drug and alcohol testing is indicated to verify his ongoing abstinence. He has used his passion for woodworking to bring order to his being, improve his sense of self-worth and provide a positive turning point in his life. He is not the same man that he was when he entered CDC 24 years ago. It is unlikely that he will again place himself in a similar situation that led to his committing offense. The support of his family will be an important resource to him in making a successful transition from incarceration to productive citizen.

Respectfully Submitted:                                    Noted by:

**PATRICIA MILLER, Ph.D.**                                 **JOHN RANISESKI, Ph.D.**
**Staff Psychologist**                                     **Senior Psychologist**
**Deuel Vocational Institution**                           **Deuel Vocational Institution**

COPY SENT TO INMATE 9-9-05 cr

| BELL, Timothy | CDC# C-34257 |
|---|---|
| DVI | September 9, 2005 | Page 8 |

# DEUEL VOCATIONAL INSTITUTION
## Life-Term Inmate Evaluation for the Board of Prison Terms
## Mental Health Evaluation
### (Revised 1998)
### June 2004 Lifer Calendar

### Addendum to the Board of Prison Terms Clinical Evaluation
### Report of March 2002 by Patricia Miller, Ph.D.

## I. IDENTIFYING INFORMATION:

Name:      Bell, Timothy
CDC #:     C-34257

This report is an addendum to the March 27, 2002, Board of Prison Terms Report submitted by DVI Staff Psychologist Patricia Miller, Ph.D. This report is based on a review of the inmate's Central File, Medical/Psychiatric Record, and an interview with the inmate conducted on March 25, 2004. It was established with the inmate that the interview was not confidential and would serve as the basis for a report to the Board of Prison Terms.

## II. BACKGROUND INFORMATION:

Inmate Bell is a 45-year-old Caucasian male who has been incarcerated for 23 years, having been convicted of First Degree Murder. He is serving a sentence of 26-years-to-Life. There have been few changes since the last Board Report. He continues to improve his education and is currently taking a "Health 100" class through Coastline Community College. He has earned over 11 FEMA certificates, and continues with his yoga work. He also remains active in Narcotics Anonymous (NA), having completed the 12-step program. He continues to work in the Tool Room, receiving above average to exceptional work evaluations.

If he is granted parole, he plans on living with his father in San Francisco as he makes the transition from incarceration to freedom. He plans on getting employment as a carpenter or machinist, having gained and honed these skills while in prison. He remains in contact with his surviving family members, and has strong support from his father and his sister.

## III. MENTAL STATUS EXAMINATION:

Inmate Bell arrived at the interview on time, neatly groomed and appropriately dressed in prison blues. He was fully oriented to time, place, person, and situation. His affect and mood were normal, and there was no evidence of delusions or hallucinations. He appeared above average in intelligence, however this was not formally tested. There were no deficits noted in memory, judgment, or concentration, and there was no evidence of suicidal or homicidal ideation or intent. He was cooperative and pleasant throughout the interview.

COPY SENT TO INMATE 4-28-04

| BELL, Timothy | | CDC# C-34257 |
|---|---|---|
| DVI | April 6, 2004 | Page 1 |

## IV.    DIAGNOSTIC IMPRESSION:

As per DSM-IV criteria, the following diagnoses seem appropriate:

| | | |
|---|---|---|
| AXIS I: | 304.8 | Polysubstance Dependence, in Full Institutional Remission |
| AXIS II: | V71.09 | No Diagnosis (Antisocial Personality Disorder, by History) |
| AXIS III: | | None Known |
| AXIS IV: | | Incarceration with Life Term |
| AXIS V: | GAF=85 | Global Assessment of Functioning (0-100 scale). Good general functioning; behaviorally and emotionally stable. . |

## V.    SUMMARY AND RECOMMENDATIONS:

Inmate Bell has seemingly matured a great deal since coming to prison two decades ago. When asked his opinion about how he is different, he indicates he was very self-centered, immature, and materialistic when he was young, and that he has "matured a lot" while in prison. He states he has come to realize that "you're judged by what you do" and indicates he now appreciates what he has lost by coming to prison. He has not received any recent CDC 115s with the last one being in 2000 (for which he continues to deny guilt). He was pleasant and cooperative, has marketable job skills, and has strong family support. He continues to be involved in available programming while in prison, and appears to present a lower than average risk to the community if granted release.

Noted by:

Gregory I. Girtman, Ed.D.
Staff Psychologist

John Raniseski, Ph.D.
Senior Psychologist

## DEUEL VOCATIONAL INSTITUTION
### Life-Term Inmate Evaluation for the Board of Prison Terms
### Mental Health Evaluation
### (Revised 1998)
### June 2002, Lifer Calendar

Psychosocial Assessment

I.   **IDENTIFYING INFORMATION:**

| | |
|---|---|
| Name: | Bell, Timothy |
| CDC: | C-34257 |
| Age: | 42-years, 9-months |
| DOB: | 06/10/59 |
| Marital Status: | Divorced |
| Ethnicity: | Caucasian |
| Gender: | Male |
| Religious Preference: | None |
| Nicknames or Aliases: | None |
| Tattoos: | Multiple on torso and arms. |

This is the seventh psychological evaluation report for the Board of Prison Terms on inmate Bell, a 1st termer, serving a 26-year-to-Life sentence for Murder in the 1st Degree with use of a Deadly Weapon. This report is based on a review of the Central File, Medical/ Psychiatric Record and a ninety-minute psychological assessment interview. Inmate Bell was informed that the interview was not confidential and would serve as the basis for the psychological evaluation report to the Board of Prison Terms.

Inmate Bell entered the CDC system on 08/11/81. Initial processing was conducted at RC CMF. On 09/01/81, he was transferred to San Quentin. On 08/03/83, he was transferred to Folsom. Later, on 08/06/85, to CTF Soledad and finally on 08/19/93 to DVI, where he has remained.

II.  **DEVELOPMENTAL HISTORY:** Inmate Bell reported no prenatal/ perinatal concerns or birth defects. Speech, language and motor development were within normal limits. He noted no enuresis, arson or cruelty to animals. He denied being a victim or perpetrator of physical or sexual abuse. Peer interaction and socialization skills were developed in the context of a quiet middle class neighborhood in San Francisco. "I came from a large family and went to a neighborhood school." Inmate Bell reported playing baseball and football, in addition to being on the swimming team. He participated in scouting, beginning as a Cub Scout and advancing to the Boy Scouts. He enjoyed little league baseball, sponsored by the Police Athletic League. In 1968, at the age of nine, inmate Bell's leg was crushed in a bicycle accident in which his 10-year-old brother, Michael, was killed. The two boys were riding double coming down a hill and were hit by a bus.

III. **EDUCATION:** Inmate Bell graduated from high school in San Francisco in 1977. He stated that he was on the track and baseball teams. However, his primary interests were in

| | |
|---|---|
| **BELL, Timothy** | CDC# C-34257 |

woodworking and art classes. He denied having been in Special Education or having behavioral problems in school.

According to TABE Testing dated 07/09/94, inmate Bell has a Reading Level of 12.9 Grade Point Level (GPL) and an Overall Score of 9.8 GPL. Since incarceration, inmate Bell has completed a machine shop vocational program (1993 to 1995).

IV.     **FAMILY HISTORY:** Inmate Bell is one of five children (Sandra, Raymond, Michael, Timothy and Edward) born to Orville Bell and Marguerite Conte. His parents were born and raised in San Francisco. They were high school sweethearts who married after graduating from high school. "My father was a foreman for a sheet metal union. My mother was a housewife. They had a good relationship." His father died of a heart attack in approximately 1966, when inmate Bell was six years old. A year later, his father's best friend, Ronald Sutton, married his mother. The couple had one son, Kenneth, who died of AIDS in 1997. Inmate's stepfather is a retired sheet metal worker living in San Francisco. His mother died in October 2001 of emphysema and chronic medical problems.

Inmate Bell reported that he and siblings Sandra, Raymond and Kenneth, had problems with drugs and the law as they were growing up. He noted that Sandra has been "clean" of drugs for approximately 2 ½ years. She returned home to care for her ailing mother and has continued to live with her stepfather. Raymond remains a "repeat offender" and reportedly is at Avenal State Prison. Edward reportedly is free of a drug or criminal history. He is currently completing his RN degree and works in the psychiatry department at San Francisco General Hospital. Inmate Bell stated that he maintains contact with his stepfather and his siblings and that he enjoys a good relationship with them.

V.      **PSYCHOSEXUAL DEVELOPMENT/SEXUAL ORIENTATION:** Inmate Bell is heterosexual. He described his puberty and sexual development as normal. He had his first sexual experience at age 12. He noted that through his adolescence he had several lengthy relationships with girlfriends. He denied any high-risk sexual behavior or contracting any sexually transmitted diseases.

VI.     **MARITAL HISTORY:** Inmate Bell has been married on one occasion and has no children. He met Jackie through mutual friends while incarcerated. Correspondence progressed to visits and eventually to marriage in 1996. The couple had no children. Jackie has two daughters and one son by a previous marriage. Inmate Bell reported that the marriage ended in 1998, secondary to his concerns about maintaining a marital relationship in the prison setting. He noted that he and Jackie remain friends and continue to maintain contact.

VII.    **MILITARY HISTORY:** Inmate Bell has never served in the military.

VIII.   **EMPLOYMENT/INCOME HISTORY:** Inmate Bell noted that his first job was at age 15 in a pizzeria where he was a bus boy and delivered pizza. He was subsequently employed briefly as a bus boy in a restaurant, a valet driver and a shoe salesman for Kenny Shoes. He then began working as a carpenter. From 1977 to 1979 he and a friend owned Appleton and Bell

Construction Company, general contracting with special interest in renovating Victorian homes in San Francisco. When arrested for the instant offense, he had recently been released from CYA and was unemployed.

While at Folsom, inmate worked in culinary. After transferring to Soledad, from 1985 to 1987 he worked as a plumber and then worked in pest control for a year to "learn a trade." From 1988 to 1993, he worked as a tool room attendant in the handicraft shop. When he came to DVI in 1993, he began the machine shop vocational program, which he completed in 1995. He then worked in Plant Operations, Machine Shop for 18 months. For 6 months he was employed by IDL (Inmate Day Labor), in which he participated in the building of the DVI bus terminal. From 1997 to October of 2000, he worked in the PIA Metal Shop. Since then, inmate Bell has been assigned as handicraft tool room orderly. In recent years, inmate Bell's work ratings have been above average to exceptional. In June 2000, his PIA Supervisor Richie in a laudatory chrono described inmate Bell as a critical worker.

Inmate Bell considers his vocational skills to include cabinetry, construction and machinist work. Since 1986, he has been involved in DVI's handicraft program in which he creates items out of wood such as clocks, jewelry boxes and hope chests.

IX.   **SUBSTANCE ABUSE HISTORY:** Although inmate Bell acknowledged using drugs and alcohol since his mid-teens, he denied being dependent on any substance. He described himself as a "recreational user" of marijuana and alcohol in junior and senior high school. He experimented with methamphetamine, heroin and LSD after that, but used alcohol the most. He estimated that he drank 6-8 beers during parties or over the weekend. He did acknowledge receiving several DUI's in 1975 and 1978. Inmate Bell participated in Narcotics Anonymous (NA) from 1987 through 1995. He then was involved in the Road to Freedom class for three years. Since 1998, he has attended NA.

X.   **PSYCHIATRIC AND MEDICAL HISTORY:** Inmate Bell reported no significant medical problems. In 1968, he sustained significant orthopedic injuries, but no head injuries when the bicycle in which he was riding was hit by a bus. His older brother died in the incident. No seizure or neurological conditions are noted.

Inmate Bell stated that he never received psychological services as a child or young adolescent. He has never been hospitalized for psychiatric problems or received psychotropic medication. Since incarceration, inmate Bell has not been diagnosed with symptoms indicative of a major mood or thought disorder to warrant formal inclusion in mental health services. He has remained general population status. However, inmate Bell has participated in various self-help programs and psychotherapy groups in prison. He attended Dr. Shonkwiler's psychotherapy group from 1994 through 1996. He completed a stress and anger control class by Dr. Christiansen in 1995. He completed all eight parole recidivism prevention classes. He has completed four Road to Freedom study programs. He attended the Pro-Social Seminar run by Dr. Salz in 1998. In 2000, he attended the six-week psychoeducational seminar series by Dr. Hawlin. For the past year he has participated in a weekly standing Yoga class. He is currently attending Dr. Marlett's 12-week Anger Management Group.

XI.     **PLANS IF GRANTED RELEASE:** Inmate Bell plans to parole to San Francisco to live with his stepfather. His immediate plan is to work as a machinist or cabinetmaker. He reported that he has sent out his resume to various machine and cabinet jobs and is waiting responses. His long-term plan is to own his own cabinetry business. He expressed a desire to continue his participation in Alcoholics Anonymous (AA) / Narcotics Anonymous (NA) programs. He has sent letters to NA and AA programs in the San Francisco area for information regarding 12-Step meetings and services.

Inmate Bell clearly has marketable skills, a good work record in the prison setting and has begun the work search process. He has a supportive family network and a stable living arrangement. He expresses the desire to continue his involvement in NA and AA programs. Prognosis for successful community living is fair to good.

### Clinical Assessment

XII.     **CURRENT MENTAL STATUS/TREATMENT NEEDS:** Inmate Bell presented for the interview neatly dressed in standard prison attire. He made good eye contact, spoke clearly. He had a relaxed and social style. He was pleasant and cooperative.

Inmate was alert and oriented to person, place, time and situation. Psychomotor responses were within normal limits. He displayed a range of affect/ mood appropriate to the issues being discussed. There was no indication of major depression, delusional thought or psychotic process. He denied any suicidal or homicidal ideations. Memory was intact. Concentration was fair. Judgment and insight was fair to good. He tended to minimize the seriousness of his past substance use. However, he has been involved in NA and AA programs for the past 15+ years. He plans to continue in the future. He expressed remorse for his actions and sorrow for the impact that his crime has had on others. He believes that he has put forth effort to address his past behavior and to make positive changes in his attitude, as well as plans for the future.

The following is the current diagnostic picture, per DSM-IV.

| | | |
|---|---|---|
| AXIS I | 304.80 | Polysubstance Dependence, with alcohol as the drug of choice, in institutional remission. |
| AXIS II | 301.7 | History of Antisocial Personality Disorder, much improved. |
| AXIS III | | No current acute medical problems identified in record. |
| AXIS IV | | Psychosocial stressors include incarceration for Life sentence. |
| AXIS V | GAF = 85 | Global Assessment of Functioning (on a scale of 0-100): Good general functioning. Interested and involved in a variety of activities. Socially connected. Behaviorally and emotionally stable. Functioning well with everyday problems and concerns. |

Inmate Bell is in DVI's General Population. He appears to be doing well in his current Mainline placement. There are no mental health needs or concerns.

| | |
|---|---|
| **BELL, Timothy** | **CDC# C-34257** |
| **DVI** | **March 27, 2002**      **Page 4** |

**XIII.  REVIEW OF LIFE CRIME:** The instant offense occurred on 01/18/81 in San Francisco, CA. Timothy Bell reportedly killed Walter B. Gill, age 61. Timothy Bell was tried and found guilty of Murder in the 1st Degree with Use of a Deadly Weapon and received a sentence of 26-years-to-Life.

Central File records of the offense describes the crime in the following manner: On 01/18/81, at approximately 6:00 p.m., officers were called to 114 Geneburn Way, San Francisco, CA, on the report of a body lying on the steps of the residence. The victim, 61-year-old, Walter Gill was found to have been strangled and stabbed. An autopsy revealed the victim had been murdered early that morning. Investigation revealed that certain rooms in the house had been ransacked. Bell's fingerprints were found on a pizza box located in the kitchen. Fingerprints belonging to Bell's sister, Sandra Larkins, were found on a piece of glass in the home of the victim. A car belonging to the victim, a green Cadillac, was missing from the garage. The car was later found burned in a parking lot. A witness observed someone set fire to the car at approximately 2:00 a.m.

Inmate Bell's current version of the instant offense is as follows: Bell recalls that he went to a bar in San Francisco with his sister Sandra Larkins. His sister began talking to the victim and the three of them went to a restaurant for dinner. They returned to the victim's house with a box of pizza. Inmate Bell left the victim and his sister in the kitchen briefly while he went to the bathroom. When he returned, the victim was assaulting his sister. According to Bell a fight erupted and Bell stabbed the victim with a knife that had been lying next to the box of pizza. Bell stated that he ransacked the house to make it look like a burglary because he was afraid of how it would look since he had been released from CYA a day or two before. Bell admits taking the victim's vehicle, but denies burning it. Bell indicated that he regrets his actions and instead of attempting to cover up the crime he wished that he would've contacted authorities. Inmate Bell's sister was a co-defendant in this crime and served 7 ½ years in prison for Voluntary Manslaughter.

**XIV.  ASSESSMENT OF DANGEROUSNESS:** Inmate Bell has a juvenile record, which began at the age of nine. Offenses included, battery, being beyond control, auto theft and purse snatching. He was committed to CYA on two occasions as a juvenile. As a young adult he was arrested for burglary, drunk driving, hit and run and auto theft. He was committed to CYA on 11/16/79 and paroled on 01/15/81. He committed the instant offense three days later. Since being incarcerated for the instant offense, inmate Bell has received seven CDC 115's. Most occurring during the first five years of his incarceration. His last 115 was dated 09/25/00 for possession of a controlled substance. He has continued his involvement in Narcotics Anonymous.

In recent years, inmate Bell has been programming well within the prison setting. Reports of his work are consistently above average, average to exceptional. He has furthered his marketable work skills. He has participated in a variety of self-help and psychotherapy groups to work through issues related to his crime and to make positive change.

Alcohol use, immaturity, impulsivity and antisocial behavior appear as major factors in inmate Bell's past episodes of violence. He has worked hard to address these issues with resulting improved maturity, insight and empathy. He has developed a greater appreciation of the destructive influence of drugs and alcohol. With continued abstinence, violence potential in the community setting is considered average for men in the community population.

**XV.**   **CLINICAL OBSERVATIONS/ COMMENTS/ RECOMMENDATIONS:** Inmate Bell has been in prison for 21-years for 1st Degree Murder. He has shown initiative in advancing his work skills and personal growth. He has a supportive family network. He expresses remorse for the pain he has caused others. He seems sincere in his desire to lead a productive non-violent life in the community. Continued involvement in NA/ AA with periodic drug testing is important if parole is granted. Parole decision should be based on issues other than psychological factors for inmate Bell.

Noted by:

**PATRICIA MILLER, Ph.D.**
**Staff Psychologist**

**EDWARD W. HOPPE, Ph.D.**
**Chief Psychologist**

PM/tav

Original: C-File
cc:     Medical File

| BELL, Timothy | | CDC#_C-34257 |
|---|---|---|
| DVI | March 27, 2002 | Page 6 |

### Life-Term Inmate Evaluation for the Board of Prison Terms
### Mental Health Evaluation
### (Revised 1998)
### Lifer Calendar
### Deuel Vocational Institution

I.  **IDENTIFYING INFORMATION:** Timothy Bell is a 40 year-old (DOB 6/10/59), married Caucasian male who states he does not practice any religion. Mr. Bell wears glasses; has a shaved head and a blond mustache peppered with gray. He entered CDC on 8/11/81 and is serving 25 years to life for first degree murder, burglary, robbery and auto theft. This appears as the sixth report to the Board of Prison Terms and is based upon a review of the central and medical files and a clinical interview on 6/1/99.

II. **DEVELOPMENTAL HISTORY:** Mr. Bell reports a normal birth and developmental milestones. He denies any history of enuresis, arson, or cruelty to animals. He states that he always had friends and was "active socially". He denies being the victim or perpetrator of physical or sexual abuse. He reports he was a Cub Scout and was involved in athletic activities, such as, swimming and Little League Baseball. In 1968 at age 9 Mr. Bell's leg was crushed in a bicycle accident in which his 10 year-old brother was killed. The two brothers were riding double coming down a hill and were hit by a bus.

III. **EDUCATION:** Mr. Bell graduated from high school in 1977. His 7/3/97 TABE scores, in prison indicate a reading level of 12.9 and an overall grade point level of 9.8. He denies having been in special education or having behavioral problems in school. While in prison Mr. Bell began the Machine Shop Vocational Program in 1993 and completed it in 1995.

IV. **FAMILY HISTORY:** Mr. Bell's biological father died in 1966. In 1967 his mother married the deceased father's best friend, and they are still together. Mr. Bell is the 4th child of 6 children, two of whom are deceased. The brother died in the 1968 bicycle accident. Bell's youngest sibling, a half-brother, died of AIDS in 1997. Mr. Bell states except for one brother who is in school, all of his siblings have been in legal trouble. He says that even his half-brother who died of AIDS "was headed in that direction". Of his surviving siblings the younger brother is studying to become a nurse. His older brother is currently incarcerated on a parole violation and has been in and out of prison since 1979. His older sister who was the codefendant in the instant offense lives with one of her children.

In spite of the difficulties he and his siblings have had, Mr. Bell does not consider his family dysfunctional. He states that he and his siblings just "got into trouble when they are away from the house with their peers". He says "they rebelled against" his step-father because "he wasn't stern enough". He explains that he and his siblings always felt

COPY SENT TO INMATE 5/5/99

the step-father "couldn't put his foot down because he wasn't their real father". However, Bell states he admires his step-father and considers "him to be a good man". Mr. Bell reports he is in regular contact with his parents and brother and enjoys good relationships with them.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:** Mr. Bell states he is of heterosexual orientation and had his first sexual experience at age 12. He denies any high risk or sexually aggressive behavior toward women.

VI.   **MARITAL HISTORY:** Mr. Bell was married once from 1996 to 1998 and has no children. He is not in contact with his former wife.

VII.  **MILITARY HISTORY:** Mr. Bell has never served in the military.

VIII. **EMPLOYMENT / INCOME HISTORY:** Mr. Bell states that he initially worked for a construction company and "was involved in home building". He says he "was in a carpenter's union for about a year" before starting a general construction business in which he restored Victorian homes in San Francisco. When arrested for the instant offense he recently had been released from CYA and was unemployed.

Mr. Bell had a job in prison in 1984 as a culinary worker at Folsom until he was transferred to Soledad six months later. From 1985 to 1987 he worked as a plumber and then, "worked in Pest Control for a year to learn the trade". He worked as a tool room attendant in the Handicraft Shop from 1988 to 1993. When he came to DVI in 1993 he began the Machine Shop Vocational Program which he completed in 1995. For the next 18 months he worked in the Plant Operations Machine Shop. After that he was employed for 6 months by IDL (Inmate Day Labor) in which he participated in the building of the DVI Bus Terminal. This particular job involved both construction and masonry. From 1997 to the present he has worked in the PIA Machine Shop as a Tool and Dye Maker in which he makes parts for metal shop fabrication.

Mr. Bell considers his vocational skills to include carpentry, cabinet making, basic construction and machinist work. He continues to pursue the machinist trade in prison. He says he is still involved in DVI's Handicraft Program in which he creates novelty items out of wood such as clocks, jewelry boxes and hope chests.

IX.   **SUBSTANCE ABUSE HISTORY:** Although Mr. Bell states he began using drugs and alcohol in his mid teens and continued until arrested, he denies being dependent on any substance. He describes himself as a "recreational user" of marijuana and alcohol in junior high and high school. He experimented with methamphetamines, heroin, and LSD after that but used alcohol the most. He says he drank more alcohol on the weekends and usually consumed "a couple of 6 packs at a time".

Mr. Bell reports that he enrolled in Narcotics Anonymous over a year and a half ago and attends every week. He participated in Alcoholics Anonymous from 1987 to 1995. He states he left AA because it conflicted with his Road-To-Freedom Class.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:** Mr. Bell has no psychiatric history and has never attempted suicide. At age 9 he was involved in a bicycle accident but did not sustain a head injury. He denies having seizures or any other neurological condition. His homicidal history consists of the instant offense in which he stabbed and killed an elderly man. He was in CYA two separate times for auto theft from 1976 to 1977 and from 1979 to 1981.

Mr. Bell has participated in various self help programs and psychotherapy groups in prison. He completed a stress and anger control class with Dr. Christensen in 1995. He attended Dr. Shonkwiler's psychotherapy group from 1994 to 1996. He completed the 12x12, 12 Traditions and 12 Steps of Alcoholics Anonymous as well as all 8 parole recidivism prevention classes. He has also completed four Road-To-Freedom study programs. He attended the Pro-Social Seminar in 1998. He is currently involved in another Road-To-Freedom study program.

XI.   **PLANS IF GRANTED RELEASE:** When he is paroled Mr. Bell plans to live with his parents in San Francisco until "I can get on my feet". His goal is to get a job and "my own place of residence". He has sent resumes to "machine shops and cabinet shops" in San Francisco. He has contacted the Northern California Service League which is a directory of services for individuals seeking employment. It offers work shops for job seekers as well as information on apprenticeships and trade schools. He also has written to both AA and NA to get information on 12 step meetings and services in San Francisco.

Mr. Bell has viable parole plans which consist of a place to live and realistic vocational goals. He has a supportive family awaiting his return.

## CLINICAL ASSESSMENT

X.    **CURRENT MENTAL STATUS / TREATMENT NEEDS:** Mr. Bell was well groomed, made good eye contact and spoke clearly. He was cooperative, alert and oriented to person, place, time and situation. His attention and concentration are good and memory is intact. He appears of normal intelligence. He exhibited no signs of a thought or mood disorder. It is important to note that Mr. Bell's comments about never being dependent on a substance do not correlate with his years of participation in AA and NA. This may indicate a lack of insight into the seriousness of his substance abuse history.

**DIAGNOSTIC IMPRESSIONS:**

AXIS I    304.80    Polysubstance dependence with alcohol as drug of choice, in institutional remission.

**BELL, TIMOTHY**    C-34257    **DVI**    cl    7/17/99    page 3

| AXIS II | 301.70 | Antisocial personality disorder, much improved. |

AXIS III            No current medical problems noted in record.

AXIS IV            Incarceration is major stressor.

AXIS V            Global Assessment of Functioning (GAF) on a scale of 0-100 = 85 indicating good functioning in most areas.

**CURRENT LEVEL OF CARE:** General population.

**TREATMENT ACTIVITIES:** None.

**MEDICATIONS:** None.

**XIII. REVIEW OF LIFE CRIME:** Mr. Bell states that "I had just gotten out of CYA" immediately before the instant offense. He says he was "hanging around the neighborhood" and going to local bars with his 24 year-old sister. He reports that he and his sister "ended up going out to dinner with an elderly man" whom she had met earlier in the bar. The three of them left together and went to a restaurant where they ate pizza. After dinner they all went to the elderly man's home where they were "sitting around, having a good time. Everything was going well". Mr. Bell says that he went to the bathroom and when he returned their host was "pawing on her, he was making his move on my sis". Bell states that he said it was time to go and told the victim to "back off". He reports that an argument and a fight ensued. While they were fighting Mr. Bell states he grabbed a knife on the table, stabbed the victim, and panicked.

Mr. Bell and his sister "made it look like a burglary" by ransacking the man's house and taking some of his things. They drove away in the victim's car and disposed of his property in various dumpsters, before leaving his "car in the parking lot behind the supermarket". Mr. Bell says "they hoped they'd get away with it" but his sister's boyfriend (who somehow became involved) got paranoid. A few days later someone lit the victim's car on fire which brought police to the neighborhood. The sister's boyfriend then called the police and said he had information on the homicide and told them all he knew because he was afraid he'd be implicated in the crime.

Mr. Bell said "I followed that thing to its end. At any point I could have gotten off that merry-go-round but I didn't. The whole thing just snowballed". He says that he was a brother protecting his sister when she didn't need protecting, "like me being Sir Gallahad". Bell's sister a codefendant, served 7 1/2 years in prison for voluntary manslaughter for the instant offense. He stated "I feel terrible now, I wish I could have turned back the hands of time".

**XIV.    ASSESSMENT OF DANGEROUSNESS:** Mr. Bell has had 6 CDC-115s during his 18 years of incarceration. 6/10/86 Excessive lewd conduct; 8/27/85 Failure to report; 11/23/83 Home brew in cell; 4/22/83 Corresponding between units by using a false return address; 1/9/82 Physical altercation; 1/11/81 Physical altercation. Mr. Bell's level of dangerousness is considered low for the prison population, based on his steady employment, participation in 12 step groups and his disciplinary free status for the last 13 years. He has a supportive family network, a place to live and a marketable trade. He is also making preparations to participate in a 12 step program when released.

**XV.    CLINICIAN OBSERVATIONS / COMMENTS / RECOMMENDATIONS:** While in prison Mr. Bell has matured and developed into a different person from the one who committed the instant offense 18 years ago. He is now a rational and emotionally stable individual who accepts responsibility and expresses genuine remorse for his crime. He has been disciplinary free since 1986.

Mr. Bell should continue his positive program which includes regular participation in a 12 step group. It is important to refer here to Mr. Bell's comments about his never being dependent on a substance. After his years of sobriety he may have distanced himself from the substance abuse of his past. However, he should never lose sight of the seriousness of his substance abuse history. Awareness and understanding of one's past is necessary for personal growth.

**LYNDA SUSSMAN, Ph.D.**
Psychology Associate (CF)

Noted: 
**RICHARD J. OBROCHTA, Ph.D.**
Senior Psychologist, Supervisor (CF)

### PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### JUNE 1996, LIFER CALENDAR
### DEUEL VOCATIONAL INSTITUTION

This appears as the fifth report to the Board of Prison Terms on this 36 years old, (date of birth 06-10-59) Caucasian male, serving a 25 Year to Life for Murder in the First Degree. Subject was also convicted of burglary, robbery, and auto theft. The weapon was a knife. The victim was a 61 year old male. The Subject entered CDC 8-11-81. This Board Report is based upon a review of the Subject's central file, medical record, a previous Board Report completed by Dr. Obrochta on 05-10-94 and two psychological assessment interviews conducted on 04-01-96, (30 minutes), and 04-02-96, (2.5 hours).

**OBSERVATIONS OF SUBJECT:**   Subject is a lean, muscular male who sports a large handlebar mustache and shaved head. He arrived promptly for both assessment interviews and cooperated energetically with the evaluation process. He presents himself as a serious minded, achievement oriented, straight forward individual.

**INMATE'S DEVELOPMENT AND ADJUSTMENT:**   Subject currently works in the Plant Operations Machine Shop pursuing his trade as a machinist after completing the 18 month long vocational training program. He also works as a general maintenance and repair man for the entire institution. Subject likes his work stating it offers him frequent challenges and requires the acquisitions of a variety of skills including plumbing, welding, and general maintenance. He has an excellent working relationship with his supervisor who states "Inmate Bell is outstanding across the board, very industrious, turns out high quantity and high quality work. Any employer who hires him on the streets would have an ace in the hole. He is highly motivated, almost perfectionistic. He came to this job with excellent recommendations and has shown himself to deserve them." His supervisor adds: "I don't give anybody 1's, (excellents), all the way across the evaluation form because I'm not going to do that but Bell deserves it."

In his free time Inmate Bell does woodworking in the hobby shop, making jewelry boxes and clocks. He also is working on remodeling the hobby shop, completing repairs, and performing maintenance. Subject initiated this project on his own with permission to bring it to completion.

Subject has taken advantage of the self-help courses and psychotherapy groups available in the institution. He completed a stress and anger control class with Dr. Christensen in August of 1995. He also has completed three courses through the PRPP Protestant Chapel, Program: Ethics and Values; Healthy Relationships; and Career Development. These are eight week courses geared toward helping the inmate adjust to life on the outside. Subject has been attending Dr. Shonkwiler's psychotherapy group since October of 1994. He also has completed the 12x12, 12 traditions and 12 steps program of AA.

In August of 1995 Subject married a woman he had known for five years. She lives in Chico and visits him every two weeks; family visits 4-6 times a year.

**BELL, TIMOTHY   C-34257   DVI   gml   04-08-96**                              **Page 1**

Subject also is in telephone and correspondence contact with his mother, step-father and younger brother. He speaks very highly of his family; the importance of being close to communicate with them. His mother is in poor health which makes it difficult for her to visit.

Subject hurt his lower back in the 1980's and was unable to stand up straight for almost three months. This frightening experience motivated him to learn Hatha Yoga and practice it daily. Subject served on the Men's Advisory Counsel prior to the work strike. After he was ineffective in stopping the work strike he resigned from the Men's Advisory Council.

**ASSESSMENT RESULTS**: Subject completed the House-Tree-Person projective drawing test. He drew a house with a large oak tree next to it a man sitting underneath the oak tree smoking a cigarette. There are flowers by the house and a swing in the tree. The house has large windows and a prominent door which stands slightly ajar. A curving walkway leads up to the house adding to an inviting and accessible feeling to the drawing. There are birds in the sky and a woman's face drawn almost as a cloud that the man sitting at the base of the tree is looking towards.

Subject describes his drawing as a picture of his home where he grew up. He reminisced about swinging in the large tree. He describes the woman's face as being an image "of Betty Crocker or my mother, I guess. She looks over me." The drawing suggests that the Subject has a healthy ego; is flexible; and is making a satisfactory adjustment. The large, prominent tree with sturdy trunk and roots, overarching limbs and foliage suggest that Subject has an ability or desire to develop psychosocially and satisfy his achievement motives. His mode of environmental interaction is normal, open as he has an accessible personality. The solid trunk suggests the Subject has feelings of power and psychological development. He has good contact with reality and is a trusting and self-disciplined person with a relaxed attitude. Subject has solid ego boundaries. Emotional stability, control, tact in interpersonal relationships are present. There is intellectual maturity and a somewhat reserved interpersonal relationship style.

**DESCRIPTION OF THE CRIME**: Subject described the Murder consistent with what was reported in the previous Board of Prison Terms report. He became tearful when expressing his deep remorse for having participated in the victim's death. He blames himself for his sister's seven year prison sentence for involuntary manslaughter. Subject's description of the crime places all responsibility on himself and the character defects which led to his impulsive, angry and destructive behavior.

**FAMILY BACKGROUND**: Subject is the third of six children. His oldest sibling was his crime partner. She was released from prison approximately eight years ago. The second oldest brother has been in and out of prison for the last 20 years for petty offenses and drug addiction. The next brother was killed in a bicycle accident at the age of 10 years old. Subject's next youngest brother works as a nurses' aide and lighting technician while in school and completing his RN degree. His youngest brother died of AIDS approximately nine months ago. When asked why so much tragedy has happened to his siblings, Subject was at a loss to make sense out of it. He states his family was solid, and close knit. Discipline and punishment were handled in a fair and consistent way. (He described the early loss of his father and the tragedy of his ten year old brother dying but had no other suggestions for what had gone wrong in the

**BELL, TIMOTHY   C-34257   DVI   gml   04-08-96**                     **Page 2**

family). The family rarely talked about anything of substance and never talked about emotionally distressing events. This "no talk" rule possibly contributed to the severe problems that has beset this family, but it is not sufficient to explain it.

Subject presents himself as a mature, achievement oriented and disciplined individual. His vitality, optimism and competent manner distinguish him in the prison population.

**MENTAL STATUS EXAMINATION:** Subject is oriented in terms of person, place, time and situation. He presents as a slender, well built and well groomed man who looks his stated age of 36. He sat with good posture and has good eye contact, is polite, and participated whole heartedly in the assessment process. Speech was clear and normal in rate but, at times, verbose. Mood was moderately depressed and affect varied appropriately with content of the interview. Intellectual functioning was intact with average intelligence, good judgment and insight into the nature of his difficulty. Subject related to this examiner in a polite, respectful and cooperative manner.

**DIAGNOSTIC IMPRESSIONS:** As per DSM IV, the following diagnostic impressions seem appropriate for the Subject:

| | | |
|---|---|---|
| AXIS I: | 305.00 | Alcohol abuse by history, in remission. |
| AXIS II: | 301.70 | Antisocial Personality Disorder, improved. |
| AXIS III: | | History of lower back injury; no complaints. |
| AXIS IV | | Prison sentence of 25 Years to Life. |
| AXIS V | | Minimal symptoms. GAF scale equals 85. |

**CONCLUSIONS:** Subject continues the strides in insight and maturity noted in Dr. Obrochta's report 05-10-94. He is a highly motivated, serious minded and mature individual who conducts himself in a disciplined and goal directed way. He is actively engaged in many aspects of life; increasing and expanding vocational abilities and education; wood working and creative expression; self-help programs; physical fitness routine. His crime appears the result of a combination of factors: alcohol, just being released from CYA, recklessness and immaturity. Subject's current violence potential in the community appears average for the general population.

**RECOMMENDATIONS:** Subject is commended for his progress in his self rehabilitation. He should continue his positive program. Parole plans should include abstinence from alcohol/drug use.

**G. SAVAGE, Ph.D.**
Staff Psychologist

Noted: Obrochta Ph.D
**RICHARD J. OBROCHTA, Ph.D.**
Sr. Psychologist (CF) Supervisor

BELL, TIMOTHY    C-34257    DVI    gml    04-08-96                    Page 3

PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
JUNE, 1994
DEUEL VOCATIONAL INSTITUTION

This appears as the fourth report to the Board of Prison Terms on this Caucasian male, thirty five years old (DOB 6-10-59), serving 25 years to life plus one year enhancement for a total of 26 years to life; convicted of Murder in the 1st Degree with the use of a deadly weapon (a knife); also convicted of burglary, robbery, and auto theft. The subject's crime partner was his sister. The victim was a sixty-one year old male who had been strangled and stabbed. The subject entered CDC 8-11-81. This board report is based upon a review of the subject's central file, medical records plus a a 2 hour psychological assessment interview.

MENTAL STATUS EXAMINATION: The subject is oriented in terms of person, place, time and situation. He exhibits no psychotic symptomatology. There is a history of alcohol abuse\marked dependency. The subject's problems with the law began when he was nine years old. An older brother has a criminal record. The subject's sister, as mentioned, was co-responsible in the instant offense and also has a past criminal history.

The subject and his sister met the victim at a bar in San Francisco. The three of them socialized and apparently did some bar-hopping. They returned to the victims' home; had pizza. The subject left the victim and his sister in the kitchen for a while. When subject came back, the victim was assaulting the subject's sister. As the subject describes, ...one thing led to another...before it was all over, the instant offense had occurred. The subject's intitial intentions of helping protect his sister developed into an out-of-hand situation for which the subject is not only contrite but quite angry with himself for being part of something like this.

The subject grew up in San Francisco with the short hiatus of one year in Sunnyvale CA. The subject describes his parents as hard working. His father died in 1966 of a heart attack at age 29 years. Subject was about 7 years of age at the time. One year later the mother married the father's best friend. It was about this time that the subject began acting out for reasons unknown. Compounding the conflicts and complexities was the fact that the subject's brother was killed in a bicycle-bus accident at 10 years of age. The subject also was on the bike when the accident happened. The subject was trapped; suffered a crushed and some what paralyzed right leg; was hospitalized for several months. When asked, the subject can not provide an answer to what was the reaction from the family to the fact that subject was involved in this fatality. After some thinking, the subject admitted the question was food for thought but could recall the only repercussion or reaction to the accident was the fact that the parents did not buy bicycles for the children for about 2 years.

The subject describes his mother and stepfather in very positive terms. Both, however, did have a drinking problem for a number of years, accompanied by agruments and unrest. The subject indicates his parents stopped drinking about 8 years ago. The stepfather, 58, is a retired sheet metal worker. The mother, about the same age, has been ill with respiratory problems for the past five years. As indicated, the older brother Raymond, 37, is described as being in and out of prison, currently for various parole violations. The subject's sister and co-responsible in the instant offense, is described as employed and taking care of her family. There are two younger brothers: one is attending college and the other is in construction work. The subject projects a very positive impression of maturation. As he says in part, "... I've grown old ... know what I want to be and what I don't want to be ... I don't want to come back (the prison), this is not where I want to be ... if I don't reach out, I'll be the same old bum with high aspirations ... so I decided to get active ... learn a trade ... read how'- to magazines and books ... learn how to sell, market and start my own business ..." The subject's

COPY SENT TO INMATE 6-10-94

health-oriented it appeared aside from the somewhat typical body-building activities, the subject also has discovered personal merit in the experiences of meditation and hatha yoga. He applies the latter within the context of western tradition, exercise, and so on.

INMATE'S ADJUSTMENT AND DEVELOPMENT: The subject has been active in Alcoholics Anonymous since 1987. At DVI he joined the 12 step program about 3 months ago. He also signed up for the Lifers Group, Psychotherapy. While at CTF, he completed 10 sessions of psychotherapy, 1991-92. There are a number of luditory chronos regarding the subject's past activities, recreational functions (organizing softball teams) and his wood working skills. The hobby shop represented his only source of income for the five years he was at CTF. He has invested much time, effort and expense in wood working tools\materials. There is no question, from the lauditory chronos, the subject is well thought of by all staff and particularly custodial staff at CTF.

The subject was transferred to DVI, August 1993. He has been active in the Vocational Machine shop job curriculum and plans to pursue this through the apprenticeship and journeyman levels. Currently he works with metal and is building a pipe-cutting machine. He operates a lathe and various milling machines. He also signed up for a mathematics refresher course which will involve Trigonometry and Geometry. The subject is in contact with his mother and stepfather. In March 1993 the subject had a family visit with his younger brother. The subject has been disciplinary free since 1986.

DIAGNOSTIC IMPRESSIONS:    As per DSM-III-R the following diagnosis seems appropriate for the subject. AXIS I. 305.00 Alcohol Abuse (by history). AXIS II. 301.70 Antisocial Personalty (improving). AXIS III. medical problems include complaints about lower back pain. AXIS IV. mild severity of psychosocial stressors. AXIS V. minimal symptoms and adjustment (GAF Scale =85).

CONCLUSIONS: The subject has made great strides in insight, responsibility for self and respect for others; along with a continuous movement of progressive unfolding maturity. He has exchanged his acceptance of a status quo institutional existence for the dynamism of life.

Psychopathology is indirectly related to the instant offense which could be described as conditional, circumstantial and unfortunately opportune.    The instant offense was precipitated by alcohol which impaired the judgement of the subject and encouraged acting-out with impulsivity and anger. Current violence potential in the community is about average for the general population.

RECOMMENDATIONS: The subject should continue to do his positive program as long as he is incarcerated. Once released, provisions should include abstinence from and monitoring of usage of alcohol\drugs.

*Drunla Van Clev, Ph.D*

RICHARD OBROCHTA, Ph. D.
Staff Psychologist

BELL, T.    C-34257    DVI    so   5-10-94

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
MARCH 1991 ISL CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
FEBRUARY 8, 1991

This is the third psychological evaluation for the Board of Prison Terms on
inmate Bell. He was seen for a 30 minute interview, with a review of his
Central file and medical record, for the purpose of this evaluation.

Three years ago, his psychiatric evaluation for the Board of Prison Terms,
by Dr. Clyde Martin, indicated an antisocial behavior for the diagnosis.
He has not received any recent disciplinary actions. He is currently
working in the tool room of the hobby shop and was attending Alcoholics
Anonymous. His difficulties with criminal behavior began at the age of
nine. There is no psychiatric history.

Today, he was curious about the reasons for being labeled "antisocial."
The DSM-III-R criteria for antisocial personality disorder were reviewed
with him, and he acknowledged a sufficient number of criteria to qualify
for that diagnosis.

MENTAL STATUS EXAMINATION: Inmate Bell is a well developed, well nourished
male who appears to be his stated age. He was adequately dressed and
groomed for the interview. He was relaxed and cooperative. His speech was
normal. His affect was normal. There was no indication of hallucinations,
paranoid thinking or suicidal ideation. He was oriented with no memory
problems. His intellectual functioning is estimated to be in the average
range with some limited ability to reason abstractly. He has limited
insight into the reasons for his maintaining a life of crime. He claims
that he knows right from wrong and was not thrill-seeking, nor was he a
follower. His self-understanding is limited to identifying his feelings of
frustration and "wanting to get ahead." His attention and concentration
were good. His judgment for hypothetical problems is good, in contrast to
the pattern of his behavior throughout his lifetime. He apparently has the
ability to reason correctly, but does not often use this ability to
anticipate the consequences of his actions as it pertains to criminal
behavior.

BELL        C-34257        CTF-CENTRAL        02/08/91        gj

BELL
C-34257
Page 2

PSYCHIATRIC DIAGNOSIS:

AXIS I:     V71.09 - No diagnosis.
AXIS II:    301.70 - Antisocial personality disorder.
AXIS III:   No current medical disorder, per medical record.
AXIS IV:    Two - mild (incarceration).
AXIS V:     GAF is currently 90, and GAF for the previous year has been 90.

PSYCHIATRIC CONCLUSIONS: The diagnosed psychopathology was indirectly
related to the offense. It clearly predisposed him to the offense, but did
not determine it. During observation in the institution, he has
psychiatrically shown no significant change. In a less controlled setting,
such as a return to the community, this inmate is likely to continue
functioning as he has in the past in the community. His violence potential
outside of a controlled setting in the past is considered to have been
average, and is presently estimated to be the same. Any conditions of
parole should include close supervision and monitoring for substance abuse.
If he is not paroled or released, he should continue in his present
rehabilitation program.

*RonaldKitt Ph.D.*

RONALD KITT, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
MARCH 1988 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 5, 1988

This is the second psychiatric evaluation for the Board of Prison Terms on this inmate. My contact with the inmate is a 30-minute interview and a review of his Central file. He denies any previous psychiatric history. He has a long history of antisocial behavior and incarcerations previously at the California Youth Authority and was, in fact, out only three days when the current offense took place.

MENTAL STATUS EXAMINATION: The patient is a well developed, well nourished, muscular individual who appears his stated age. He was neatly dressed and well groomed. He was relaxed and cooperative. His speech was of normal intensity, rate and inflection and he was spontaneous. His affect was normal. His thought content was appropriate to affect. His flow of thought was normal. He denies depressive or suicidal ideation. He has normal associations of thought. He is oriented as to time, place and person. His intellectual functioning was not estimated. He has some insight but impaired judgment. He has numerous 115s while being incarcerated.

PSYCHIATRIC DIAGNOSIS:

AXIS I:     V71.01 — Adult antisocial behavior.
AXIS II:    V71.09 — No diagnosis.
AXIS III:   None.
AXIS IV:    One — none.
AXIS V:     GAF of 90, and a GAF of 90 over the past year.

PSYCHIATRIC CONCLUSIONS: The diagnosed pathology is only indirectly related to the crime. It predisposed the offense, but did not determine it. During observation in the institution, the inmate has psychiatrically shown no significant change. In a less controlled setting, such as a return to the community, it is felt that the individual would revert to his previous antisocial behavior.

SUGGESTED ACTIONS: I would suggest that he be continued in his present rehabilitation program, as benefit is likely. It is felt that his potential for violence is probably about the same as the average inmate. If he were to be paroled, he certainly should have very close supervision and drug and alcohol testing, since he has had previous problems with these. I have no further recommendations to the Classification Committee.

CLYDE V. MARTIN, M.D.
Consulting Psychiatrist
Correctional Training Facility, Soledad

3-7-85

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
DOCUMENTATION HEARING
MARCH 1985 CALENDAR
FOLSOM

BELL C-34257

Timothy Bell is a 25-year-old first termer to the California De-
partment of Corrections, having been committed from San Francisco
County in 1981 for Murder First. The probation report describes
a record with law enforcement authorities beginning at age 9 with
subsequent placement in juvenile institutions and California Youth
Authority. Noted is the fact that he had been out on CYA parole
for about three days before the commitment offense occurred. CYA
records indicate a history of substance abuse. NRC-CMF staff
summary of 8/27/81 describes Mr. Bell as apparently institution-
alized and knowledgeable to institutional living. There has been
no indicated history of psychiatric illness and there are no prior
psychiatric or psychological examination reports available this
date. He currently maintains an adequate adjustment at this fac-
ility.

Seen on 2/19/85 for the purpose of this report, Mr. Bell was co-
operative to examination procedure and appeared to be in good con-
tact with his environment. His memory functions seemed unimpaired.
He maintained relevant and coherent speech during interview and
gave the impression of dull normal intellection. His mental sta-
tus was considered clear and this examination was without evidence
of psychiatric disorder.

Regarding the commitment offense, Mr. Bell has denied responsib-
ility for the crime. He blames his conviction on manipulation of
evidence and misrepresentation by the police. He denied a sub-
stance abuse problem. He denied any kind of history of psychia-
tric problems. He expressed dissatisfaction in his Folsom place-
ment, feeling that he is unable to productively program at this
facility.

There is no apparent evidence by history or examination, of sig-
nificant psychiatric disorder and Mr. Bell would seem adequately
described from a psychiatric point of view, as having a sociopath-
ic behavior disorder. There are no particular recommendations to
be made of any psychiatric nature at this time. He appears quite
capable of participating in a productive institutional program.

Robert K. Bolin
Staff Psychologist

Noted:
E. H. Harris, M.D.
Chief Psychiatrist

2/265/85          FOLSOM          RKB:cw

## DISCIPLINARY REPORT

| DATE | VIOLATION/RULE # | INSTITUTION | SPECIFIC ACT |
|------|------------------|-------------|--------------|
| 1/11/81 | 3005b | SQ | BEING INVOLVED IN A PHYSICAL ALTERCATI GUILTY. 10 days D.D. 10 days credit for time served. |
| /9/82 | 3005(B) | SQ | PHYSICAL ALTERCATION. GUILTY. 10 day disciplinary detention. |
| /22/83 | 3139(B) 3147(3) | SQ | CORRESPONDING BETWEEN UNITS BY USING FALSE RETURN ADDRESS. GUILTY. 5 days D.D. Suspended for 90 days clean time |
| 1/23/83 | 3006/3016 | FOL | HOMEBREW IN CELL. GULTY. 5 days disc plinary detention suspended for 90 day clean conduct. 95 days IBC. Refer IC Assessed $9.00. |

BELL, Timothy    C-34257

# EXHIBIT C

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
**JANUARY 2007 CALENDAR**

I.    COMMITMENT FACTORS:

   A.    LIFE CRIME: All relevant documents from the previous hearings have been considered and that information appears valid and this writer has no further information to add.

      1.  Summary of Crime: Remains the same as stated in the previous hearing.

      2.  Prisoner's Version: Remains the same as stated in the previous hearing.

      3.  Aggravating / Mitigating circumstances: Remains the same as stated in the previous hearing.

         a.    Aggravating Circumstances:
            (1)    The victim was vulnerable due to his age.
            (2)    Use of weapon: knife.

         b.    Mitigating Circumstances:
            (1)    None.

   B.    MULTIPLE CRIME(S): None.

II.    PRECONVICTION FACTORS: Remains the same as stated in the previous hearing.

III.    POSTCONVICTION FACTORS: Documents from the previous hearing remain valid. Since his last hearing he continues to be housed at Deuel Vocational Institution with Medium A custody. He continues to be assigned to hobby.

   A.    Special Programming / Accommodations: No special Accommodations / Disability.

   B.    Custody History: Bell arrived at Deuel Vocational Institution on 8/19/93 where he is presently housed. Since his last hearing he continues to remain at Medium A custody. He continues to be assigned to Hobby as the Tool Room Attendant.

   C.    Therapy & Self-Help Activities: He has previously participated in the Yoga for Health program and the Alcoholics Anonymous program. He is currently active in Narcotics Anonymous and has been since 11/12/2001.

   D.    Disciplinary History: He has remained disciplinary free since 9/25/2000.

   E.    Other: He is currently enrolled in a Small Business Course offered by Coastline Community College.

   FUTURE PLANS: Remains the same as stated in the previous hearing.

NAME: **BELL**        CDC #: C-34257        DVI        CALENDAR: **JANUARY 2007**  HEARING

A.    Residence:  : Upon release, Bell plans to reside in San Francisco with his father at the following address: Ronald Sutton at 227Joost Ave San Francisco, CA 94131, There is no telephone number at this time.

B.    Employment:  Bell indicated that he is a skilled cabinetmaker and may pursue a career in cabinet making or as a machinist.

V.    USINS STATUS: Bell is a United States citizen.

VI.    SUMMARY:

A.    Prior to release, the prisoner could benefit from the following: 1) Remain disciplinary free, 2) Participate in Self-help / Therapy programs.

B.    This report is based on an interview with the prisoner on 10/16/2006 lasting approximately 1 hour(s) and a complete review of the central file lasting 3 hour(s).

C.    The prisoner was afforded an opportunity to examine his central file on 10/16/2006 (See CDC chrono dated 10/16/2006.  Inmate elected to examine his file at a later date.

D.    For the purpose of effective communication per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan,  no accommodation was required.


M. R. NEVIS
Correctional Counselor I

J. ZUNIGA
Correctional Counselor II

L. WOOD
Facility Captain

JANE T. ROWE
Classification & Parole Representative

NAME: **BELL**        CDC #: C-34257          DVI          CALENDAR: **JANUARY 2007** HEARING

# EXHIBIT D

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 8/23/2005 TO 8/22/2006 | | | **PLACEMENT:** Deuel Vocational Institution. |
| | | | **CUSTODY:** Medium A. |
| | | | **VOCATIONAL TRAINING:**  None available during this review period. |
| | | | **ACADEMICS:**  Certificate dated 2/6/2006 from the Emergency Management Institute for completing A Citizen's Guide to Disaster Assistance. |
| | | | **WORK RECORD:** Assigned to hobby for this entire review period. CDC 101 dated 11/30/2005 reflects exceptional work performance. |
| | | | **GROUP ACTIVITIES:** Continues to attend Narcotics Anonymous. |
| | | | **PSYCHIATRIC TREATMENT:** None during this review period. |
| | | | **PRISON BEHAVIOR:**  Has remained disciplinary free for this review period. |
| | | | **OTHER:** Certificate of Accomplishment dated 9/2005 for completion of the Human Body 1-8 Correctional Learning Network program. 128 B Laudatory chrono's dated 10/20/2005 and 6/15/2006 for his continued participation in the Narcotics Anonymous program since 11/12/2001. 128 B dated 12/30/2005 reflects participation in 12 Correctional Learning Network programs. Certificate dated 9/2005 for participation in 4 Correctional Learning Network programs during the month of September. Letter from the Salvation Army encouraging him to apply for assistance upon parole. |

'RE _____

DATE  *10 - 25 - 06*

☐#: **C-34257**          DVI          CALENDAR: **JANUARY 2007**   HEARING:

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 8/23/2006 TO PRESENT 10/22/2006 | | | **PLACEMENT**: Deuel Vocational Institution. |

**PLACEMENT**: Deuel Vocational Institution.

**CUSTODY**: Medium A.

**VOCATIONAL TRAINING**: None available during this review period.

**ACADEMICS**: Letters of agreement dated 8/28/2006 from Coastline Community College for starting and completing courses in Small Business Management 222 and Painting Creatures I Art 134 AD.

**WORK RECORD**: Assigned to hobby for this entire review period. There are no CDC 101's on file for this review period.

**GROUP ACTIVITIES**:   Continues to participate in the Narcotics Anonymous program.

**PSYCHIATRIC TREATMENT**: None during this review period.

**PRISON BEHAVIOR**: Has remained disciplinary free for this review period.

**OTHER**: Certificate of completion dated 9/6/2006 for completion of Own Your own Business.
Certificate of Participation dated 9/6/2006 for 6 programs offered by the Correctional Learning Network.
Letter dated 9/7/2006 from the Northern California Service League offering assistance on finding employment upon parole.
Certificate of completion dated 10/5/2006 for completion of Success in the Workplace.
Certificate of completion dated 10/5/2006 for completion of Victims Awareness.
Letter from Narcotics Anonymous World Services accepting him to attend N/A meetings upon Parole and also will assist in finding a sponsor.

**ORDER:**

☐ BPT date advanced by _____ months.      ☐   BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐   PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

NAME: BELL          CDC #: C-34257          DVI          CALENDAR: JANUARY 2007     HEARING:

OARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | _M. NEVIS, CCI_ |
| | | | _J.E. ZUNIGA, CCII_ |
| | | | _L. WOOD, F.C._ |
| | | | _J. T. ROWE, C&PR_ |
| | | | COPY SENT TO INMATE _10-31-06 SH_ |

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

NAME: **BELL**          CDC #: **C-34257**          DVI          CALENDAR: **JANUARY 2007**      HEARING:

**EXHIBIT D**

**EXHIBIT E**

ENDORSED
F I L E D
*San Francisco County Superior Court*

NOV 1 6 2007

GORDON PARK-LI, Clerk
BY: _____ CARLOS BARRAZA
Deputy Clerk

1

2

3

4

5

6

7

8       **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9       **FOR THE CITY AND COUNTY OF SAN FRANCISCO**

      Department No. 22

10

11 | **IN THE MATTER OF THE APPLICATION** )   **WRIT NUMBER 5672**

12 |           **OF** )

13 |      **Timothy BELL** )

14 |        **Petitioner,** )

                )   **ORDER**

15 | **FOR A WRIT OF HABEAS CORPUS** )

16

17     Timothy Bell ["Petitioner"] has filed a petition for writ

18 of habeas corpus complaining of due process violations at his

19 fifth subsequent parole suitability hearing before the Board of

20 Parole Hearings ["Board"] in February 2007.

21

22     Petitioner was convicted of first-degree murder with the

23 use of a knife in San Francisco Superior Court in August 1981

24 and sentenced to state prison for 26 years to life.

25 //

1

1     In denying Petitioner parole in February 2007, the Board
2  noted his commitment offense was carried out in a manner
3  demonstrating an exceptionally callous disregard for human
4  suffering (15 Cal. Admin. Code § 2402, subd. (c)(1)(D) (West
5  2007)[1]).  Petitioner alleges this unsuitability factor is void
6  for vagueness.  The Board also concluded Petitioner would pose
7  an unreasonable risk to public safety if he were released (*Id.*,
8  subd. (a)).  Petitioner contends this finding offends due
9  process because there was no evidence to support it.

10

11     When determining suitability for parole, the Board is
12  required to consider all relevant and reliable information
13  available.  (*Id.*, subd. (b).)  Because circumstances that may
14  not firmly establish parole unsuitability standing alone may
15  contribute to a pattern that results in a finding of
16  unsuitability, the Board is accorded broad discretion to attach
17  particular importance to any circumstance or combination of
18  circumstances tending to indicate unsuitability for parole.
19  (*Id.*, subd. (c).)

20

21     Due process of law therefore requires only that "some
22  evidence" supports the Board's decision.  (*In re Powell* (1988)
23  45 Cal.3d 894, 902, 904.)

24

25
     [1]    All further references to statutes and rules are to this edition.

2

1        Section 2402 of title 15 of the California Administrative
2   Code ["section 2402"] enumerates the factors relevant to the
3   Board's parole decision.

4

5        As relevant, subdivision (c) of section 2402 provides the
6   following circumstances each tend to indicate unsuitability for
7   release on parole: (1) the prisoner committed the offense in an
8   especially heinous, atrocious, or cruel manner; (2) the prisoner
9   possesses a previous record of violence; (3) the prisoner has an
10  unstable social history; (4) the prisoner previously has
11  sexually assaulted another individual in a sadistic manner; (5)
12  the prisoner has a lengthy history of severe mental problems
13  related to the offense; and (6) the prisoner has engaged in
14  serious misconduct while in prison.

15

16       The subdivision explains that an offense might be committed
17  in an especially heinous, atrocious, or cruel manner when: (A)
18  multiple victims were attacked in the same or separate
19  incidents, (B) the offense was carried out in a dispassionate
20  and calculated manner, i.e. an execution-style murder; (C) the
21  victim was abused, defiled, or mutilated; (D) the inmate
22  demonstrated an exceptionally callous disregard for human
23  suffering; and (E) the motive is inexplicable or very trivial in
24  relation to the offense.   (§ 2402, subd. (c)(1).)
25  //

3

1       Petitioner's first claim alleges the unsuitability factor
2   enumerated in subparagraph (D) is unconstitutionally vague.
3   This factor provides that a commitment offense may be especially
4   heinous, atrocious, or cruel when it is carried out in a manner
5   demonstrating an exceptionally callous disregard for human
6   suffering.   (§ 2402, subd. (c)(1)(D).)  Petitioner contends this
7   factor invites arbitrary and discriminatory enforcement because
8   it fails to explain when the manner of commission shows such an
9   exceptionally callous disregard for human suffering that the
10  offense becomes especially heinous, atrocious, or cruel.

11

12      Contrary to what Petitioner contends, the law does provide
13  guidance on this issue.  In *In re Smith* (2003) 114 Cal.App.4th
14  343, 366-67, the Sixth District Court of Appeal explained that
15  "*all* second degree murders by definition involve some
16  callousness-i.e., lack of emotion or sympathy, emotional
17  insensitivity, indifference to the feelings and suffering of
18  others."  Yet "parole is the rule, rather than the exception,
19  and a conviction for second-degree murder does not automatically
20  render [an inmate] unsuitable."  (*Smith*, *supra*, 114 Cal.App.4th
21  at 366.)  Therefore, to demonstrate an exceptionally callous
22  disregard for human suffering under section 2402, the crime in
23  question must have been committed in a more aggravated or
24  violent manner than that ordinarily shown in the commission of a
25  second-degree murder.  (*Id.* at 366-67; *In re Scott* (2004) 119

4

1    Cal.App.4th 871, 891, rehg. den., review den.)  This may be
2    demonstrated by evidence the inmate acted with cold, calculated
3    dispassion; or that he tormented, terrorized or injured his
4    victim before deciding to shoot the victim; or that he
5    gratuitously increased or unnecessarily prolonged the victim's
6    pain and suffering.  (Smith, supra, 114 Cal.App.4th at 366.)
7

8         Accordingly, the Smith Court found no evidence of
9    exceptional cruelty or callousness where the inmate had grabbed
10   a gun in a jealous rage and immediately shot his wife three
11   times in the head.  (114 Cal.App.4th at 351, 367.)  As the court
12   explained, these actions did not display cold, calculated
13   dispassion; or that the inmate tormented, terrorized or injured
14   his victim before deciding to shoot her; or that he gratuitously
15   increased or unnecessarily prolonged her pain and suffering.
16   (Smith, supra, 114 Cal.App.4th at 351.)

17

18        By the same token, the Fourth District Court of Appeal did
19   find some evidence to support finding exceptional cruelty and
20   callousness where the defendant and her companions  bound the
21   victim, stabbed her multiple times with a knife and bayonet and
22   informed that her husband was suffering a similar fate while she
23   lay dying.  ((2004) 116 Cal.App.4th 339, 351, as mod. on denial
24   of rehg., review den.)
25   //

5

1       Board Regulations provide additional examples of aggravated
2   conduct demonstrating an exceptionally callous disregard for
3   human suffering.  (15 Cal. Admin. Code § 2282(b) [sentence
4   matrix for base terms of first-degree murder].)  One such
5   example is torture, as where the victim is subjected to
6   prolonged infliction of physical pain before being killed.
7   Another is severe trauma, as where death does not result
8   immediately but from cumulative beatings, clubbing, stabbing,
9   stranqulation, suffocation, burning or the infliction of
10  multiple wounds.  (*Id.*)

11

12      Considering the authority above, Petitioner's void-for-
13  vagueness claim lacks merit.

14

15      Because the exhibits attached to the petition show some
16  evidence to support the Board's conclusion that Petitioner would
17  pose an unreasonable risk to public safety if released from
18  prison, Petitioner's claim that the record does not support the
19  Board's finding fails also. The law accords the Board broad
20  discretion in parole decisions and requires a panel to find a
21  prisoner unsuitable for parole if in the panel's judgment the
22  prisoner will pose an unreasonable risk of danger to society if
23  released from prison, regardless of the length of time the
24  prisoner has served.  (§ 2402, subds. (c) & (a).)
25  //

6

1

2          The exhibits attached to the petition indicate that
3   Petitioner committed the murder as a 20-year old, several days
4   after he had been released from a California Youth Authority
5   facility.  He has an extensive prior criminal history.  He had
6   spent the evening in question in the company of his older sister
7   and the 61-year old male victim, who were flirting with each
8   other.  The victim had taken Petitioner and his sister out to
9   dinner and had invited them to his home.  Petitioner strangled
10  and stabbed the victim because he felt the victim's advances
11  were getting out of hand.  Petitioner and his sister stole the
12  victim's car and items from his home, which they ransacked to
13  conceal their crime and make it look like a burglary.  The car
14  was later burned.  While in prison, Petitioner committed six
15  serious disciplinary violations, most recently for possession of
16  controlled substances in September 2004 and possession of
17  tobacco in January 2006.

18

19         The hearing panel noted that Petitioner has marketable
20  skills,  had obtained letters of support and had secured his
21  enrollment in substance abuse programs.  His latest psychiatric
22  evaluation report indicated he would pose a below-average risk
23  of danger to the community if released on parole.  Even so, the
24  panel was concerned that the report failed to address the
25  significance of Petitioner's use of narcotics and alcohol, an

7

1  issue on which the previous panel had specifically requested
2  clarification.

3

4      In light of these circumstances, it cannot reasonably be
5  said that the panel acted arbitrarily or capriciously in
6  concluding that Petitioner was not yet suitable for parole and
7  would pose an unreasonable risk of danger to society or public
8  safety if released from prison.

9

10     For the foregoing reasons, the petition for writ of habeas
11 corpus is DENIED.

12

13     Because the Court appoints counsel on habeas corpus only
14 after issuing an order to show cause (Cal. Rules of Ct. R.
15 4.551, subd. (c)(2)), Petitioner's request for appointment of
16 counsel is DENIED.

17

18

19

20

21

22

23 Dated: 11/16/07

24                              Judge of the Superior Court

25

8

ENDORSED
F I L E D
San Francisco County Superior Court

IN THE SUPERIOR COURT OF CALIFORNIA

OCT 1 1 2008

COUNTY OF SAN FRANCISCO

GORDON PARK-LI, Clerk
BY: _____ CARLOS BARRAZA
Deputy Clerk

CASE NO. _____ 5672

| | |
|---|---|
| Tim Bell, In Pro Per<br><br>v.<br><br>Steve Moore, Warden | MOTION FOR COURT TO TAKE JUDICIAL NOTICE OF NEWLY DISCOVERED EVIDENCE |

On October 2, 2007 Petitioner became aware of evidence presented to the Superior Court of California County of Santa Clara In re <u>ARTHUR CRISCIONE</u>, On Habeas Corpus Order No.: 71614. This order was filed on August 30, 2007 and contains comprehensive evidence that supports Petitioner's vagueness challenge.

Petitioner filed Habeas Corpus in this court on September 14, 2007.

Petitioner requests this court incorporate all relevant evidence from <u>Criscione</u> into Petitioner's petition.

I declare under the penalty of perjury that the foregoing is true and correct.

*Timotly Bell*

Timotny J. Bell 10-4-2007

**EXHIBIT F**

COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

```
FILED
Court of Appeal First Appellate District

DEC 06 2007

Diana Herbert, Clerk
By_____Deputy Clerk
```

In re TIMOTHY BELL,

on Habeas Corpus.

A119952

(San Francisco County
Super. Ct. Writ No. 5672)

THE COURT:*

The petition for a writ of habeas corpus is denied.

Dated: **DEC 0 6 2007**

McGUINESS, P.J. P.J.

---

* McGuiness, P.J., Siggins, J., & Horner, J. (Judge of the Alameda Sup. Ct., assigned by
the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), participating.

**EXHIBIT G**

Court of Appeal, First Appellate District, Div. 3 - No. A119952
**S159080**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re TIMOTHY BELL on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

FEB 1 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
Chief Justice